

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NS:KDE/KCB                                           *271 Cadman Plaza East*
F.#2015R00270                                        *Brooklyn, New York 11201*

                                                    December 5, 2019

<u>By Hand and ECF</u>

Honorable Ramon E. Reyes, Jr.
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

             Re:     United States v. Renato Barca, Jr., <u>et al.</u>
                     <u>Criminal Docket No. 19-575</u>
                     United States v. Mark Kocaj
                     <u>Criminal Docket No. 19-577</u>[1]
                     United States v. Adrial Lopez
                     <u>Magistrate Docket No. 19-1126</u>

Dear Judge Reyes:

             The government respectfully submits this letter in support of its motion for
permanent orders of detention as to the defendants Andrew Campos, Vincent Fiore, Mark
Kocaj, Richard Martino and Adrial Lopez.  As set forth below, the defendants pose a danger
to the community, a risk of obstruction of justice and cannot be trusted to abide by the terms
of release.  Therefore, they should be detained pending trial.[2]

---

        [1]      The indictments returned in <u>Barca, et al.</u> and <u>Kocaj</u> were both randomly
assigned to the Honorable Frederic Block.  The government has filed a motion to have these
cases reassigned to the Honorable Brian M. Cogan as related to other cases filed as part of
this investigation that have been previously assigned to Judge Cogan.

        [2]      The government reserves the right to argue that the defendants also pose a
flight risk or that other defendants in the above-referenced matters should be detained or
released on substantial bond packages.

I.      Legal Standard

    A.      Bail Reform Act

        Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or poses a risk of flight or obstruction of justice.  18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community").  A finding of dangerousness must be supported by clear and convincing evidence.  United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).  A finding of risk of flight or obstruction of justice must be supported by a preponderance of the evidence.  United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405; United States v. Madoff, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009).

        The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).  In addition, a court may order detention if there is a "serious risk that the [defendant] will ... obstruct or attempt to obstruct justice, or . . . intimidate . . . a prospective witness," among other things.  18 U.S.C. § 3142(f)(2)(B).

    B.      Organized Crime Defendants

        Courts in this circuit have routinely faced the issue of pretrial detention of organized crime defendants charged with racketeering-related offenses.  See, e.g., United States v. Giallanzo, et al., 17-CR-155 (DLI) (E.D.N.Y. 2007) (case in which Bonanno family acting captain Ronald Giallanzo, soldiers Michael Palmaccio, Michael Padavona and Nicholas Festa and associates Christopher Boothby, Evan Greenberg, Michael Hintze and Robert Tanico all detained as dangers to the community); United States v. Cirillo, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese family acting bosses Dominick Cirillo and Lawrence Dentico, as well as Genovese family captain Anthony Antico, detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005); United States v. Gotti, 219 F. Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino family acting boss Peter Gotti detained as danger to the community), aff'd, United States v. Ciccone, 312 F.3d 535, 543 (2d Cir. 2002); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino family captain Carmine Agnello detained as danger to the community); United States v. Defede, 7 F. Supp. 2d 390, 395-96 (S.D.N.Y. 1998) (Luchese family acting boss Joseph Defede detained as danger to the community); United States v. Salerno , 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (Genovese acting boss and captain detained as danger to the community), order vacated, 794 F.2d 64 (2d Cir.), order reinstated, 829 F.2d 345 (2d Cir. 1987).

Together, these cases stand, at the very least, for the following propositions: (1) organized crime defendants often constitute dangers to the community due to the high likelihood that they will continue to commit crimes if released on bail, and (2) elaborate bail packages involving home detention and electronic monitoring are insufficient safeguards to protect the community against dangerous organized crime defendants.

> 1.    Organized Crime Defendants Are Likely
>        to Commit Crimes if Released on Bail

Organized crime defendants pose a particular threat to the community due to the continuing nature of the charged enterprise and its violent criminal activities. At bottom, because organized crime defendants are career criminals who have pledged their loyalty to an illegal enterprise, they pose a distinct threat to commit additional crimes if released on bail. See Salerno, 631 F. Supp. at 1375 (finding that illegal businesses of organized crime require constant attention and protection, and recognizing strong incentive on part of its leadership to continue business as usual).

In addition, defendants pose a danger to the community not only when they commit acts of violence, but when it is likely that they will commit even non-violent crimes that are detrimental to the community. See Senate Report at 3195 ("language referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence."). In Colombo, the court held that "[i]n light of Congress' direction that '[w]here there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate.'" United States v. Colombo, 777 F.2d 96, 99 (2d Cir. 1985) (quoting Senate Report at 3189). In Salerno, the court upheld the detention of two leaders of the Genovese organized crime family, noting:

> The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions. The illegal businesses, in place for many years, require constant attention and protection, or they will fail. Under these circumstances, this court recognizes a strong incentive on the part of its leadership to continue business as usual. When business as usual involves threats, beatings, and murder, the present danger such people pose in the community is self evident.

631 F. Supp. at 1375.

2.     Elaborate Bail Packages Are Insufficient to Protect the Community
Against Violent Organized Crime Defendants

Finally, the Second Circuit repeatedly has rejected "elaborate" bail packages for dangerous defendants, including members of organized crime families shown to be involved in violent criminal activities.  See United States v. Dono, Nos. 07-5333-cr(L), 07-5334-cr(CON), 275 Fed. Appx. 35, 2008 WL 1813237, at *2-3 (2d Cir. Apr. 23, 2008) (rejecting conditions that included, among others, home detention and electronic monitoring, and requirement that defendant's father – a retired police officer – take "personal responsibility" for defendant); Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail secured by real property); United States v. Orena, 986 F.2d 628, 630-33 (2d Cir. 1993) (rejecting $3 million bail secured with real property, in-home detention, restricted visitation and telephone calls, and electronic monitoring); Colombo, 777 F.2d at 97, 100 (rejecting, among other conditions of release, $500,000 bail secured by real property); see also United States v. Boustani, 932 F.3d 79 (2d Cir. 2019) (holding that Bail Reform Act does not permit two-tiered bail systems where wealthy defendants are effectively released to self-funded private jails).

The Second Circuit has viewed home detention and electronic monitoring as insufficient to protect the community against dangerous individuals.  In United States v. Millan, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately
> replicate a detention facility without the confidence of security
> such a facility instills.  If the government does not provide staff
> to monitor compliance extensively, protection of the community
> would be left largely to the word of [the defendants] that [they]
> will obey the conditions.

4 F.3d 1039, 1049 (2d Cir. 1993) (internal citations and quotation marks omitted).  See also Orena, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal citation and quotation marks omitted).

Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring.  See, e.g., Dono, 2008 WL 1813237, at *2-3 (noting that the idea that "'specified conditions of bail protect the public more than detention is flawed'") (quoting Orena, 986 F.2d at 632); United States v. Cantarella, No. 02-CR-307 (NGG), 2002 WL 31946862, at *3-4 (E.D.N.Y. Nov. 26, 2002) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); Agnello, 101 F. Supp. 2d at 116 (Gershon, J.) ("the protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility"); United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the

4

Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

II.     The Charged Crimes

    A.     The *Barca* and *Kocaj* Indictments

       On December 4, 2019, a grand jury returned a sealed 26-count indictment against the defendants in Barca, et al.  As charged in the Barca indictment, the defendants have engaged in racketeering conspiracy as members or associates of the Gambino family, with a pattern of racketeering activity involving, among other offenses, loansharking, wire fraud, including honest services wire fraud, money laundering and multiple acts of obstruction of justice.  Kocaj is also charged in an additional indictment with extortionate extension of credit conspiracy and extortionate collection of credit for using threats of violence to collect over $30,000 on behalf of an Albanian organized crime figure. Specifically, Campos, Fiore, Kocaj and Martino are charged with the following offenses:

- Campos:
  - Count One: Racketeering conspiracy based on the following predicate racketeering acts ("RAs"):
    - o RA Five: Wire fraud relating to payroll tax violations
    - o RA Seven: Money laundering and money laundering conspiracy relating to cashing checks for work never performed ("Additional Checks")
    - o RA Eight: Wire fraud relating to tax evasion
    - o RA Nine: Extortionate collection of credit conspiracy and extortionate collection of credit relating to John Doe
    - o RA Ten: Money laundering and money laundering conspiracy relating to the construction of Campos's residence
    - o RA Eleven: Wire fraud, including honest services wire fraud, relating to Construction Company #1
    - o RA Twelve: Wire fraud for overbilling Construction Company #4 and Construction Company #5
    - o RA Sixteen: Obstruction of justice conspiracy and obstruction of justice relating to instructing an individual to falsely take responsibility for cashing Additional Checks
  - Count Three: Wire fraud conspiracy relating to payroll tax violations
  - Count Six: Wire fraud conspiracy relating to tax evasion
  - Count Seven: Money laundering conspiracy relating to cashing Additional Checks
  - Count Eight: Money laundering relating to cashing Additional Checks
  - Count Nine: Money laundering relating to cashing Additional Checks

- Count Ten: False statements conspiracy relating to a scheme to make false statements to the Department of Labor, Occupational Safety and Health Administration ("OSHA Fraud");
- Count Eleven: Extortionate collection of credit conspiracy relating to John Doe;
- Count Twelve: Extortionate collection of credit relating to John Doe;
- Count Thirteen: Money laundering conspiracy relating to the construction of Campos's home
- Count Fourteen: Money laundering relating to the construction of Campos's home
- Count Fifteen: Money laundering relating to the construction of Campos's home
- Count Sixteen: Wire fraud conspiracy, including honest services wire fraud, relating to Construction Company #1
- Count Seventeen: Wire fraud conspiracy for overbilling Construction Company #4 and Construction Company #5
- Count Twenty-Five: Obstruction of justice conspiracy relating to instructing an individual to falsely take responsibility for cashing Additional Checks
- Count Twenty-Six: Obstruction of justice relating to instructing an individual to falsely take responsibility for cashing Additional Checks

- Fiore:
  - Count One: Racketeering conspiracy based on the following RAs:
    - RA Five: Wire fraud relating to payroll tax violations
    - RA Seven: Money laundering and money laundering conspiracy relating to cashing Additional Checks
    - RA Eight: Wire fraud relating to tax evasion
    - RA Nine: Extortionate collection of credit conspiracy and extortionate collection of credit relating to John Doe
    - RA Eleven: Wire fraud, including honest services wire fraud, relating to Construction Company #1
    - RA Twelve: Wire fraud for overbilling Construction Company #4 and Construction Company #5
    - RA Thirteen: Wire fraud, including honest services wire fraud, relating to Construction Company #2
    - RA Fourteen: Wire fraud, including honest services wire fraud, relating to Construction Company #3
    - RA Fifteen: Obstruction of justice conspiracy and obstruction of justice relating to directing the destruction of payroll documents
    - RA Sixteen: Obstruction of justice conspiracy and obstruction of justice relating to instructing an individual to falsely take responsibility for cashing Additional Checks

  - Count Three: Wire fraud conspiracy relating to payroll tax violations

- <u>Count Seven</u>: Money laundering conspiracy relating to cashing Additional Checks
- <u>Count Eight</u>: Money laundering relating to cashing Additional Checks
- <u>Count Nine</u>: Money laundering relating to cashing Additional Checks
- <u>Count Ten</u>: False statements conspiracy relating to the OSHA Fraud;
- <u>Count Eleven</u>: Extortionate collection of credit conspiracy relating to John Doe;
- <u>Count Twelve</u>: Extortionate collection of credit relating to John Doe;
- <u>Count Sixteen</u>: Wire fraud conspiracy, including honest services wire fraud, relating to Construction Company #1
- <u>Count Seventeen</u>: Wire fraud conspiracy for overbilling Construction Company #4 and Construction Company #5
- <u>Count Eighteen</u>: Wire fraud conspiracy, including honest services wire fraud, relating to Construction Company #2
- <u>Count Nineteen</u>: Wire fraud conspiracy, including honest services wire fraud, relating to Construction Company #3
- <u>Count Twenty</u>: Wire fraud conspiracy relating to fraudulently having work performed at Fiore's residences
- <u>Count Twenty-Two</u>: Obstruction of justice conspiracy relating to directing the destruction of payroll documents
- <u>Count Twenty-Three</u>: Obstruction of justice relating to directing the destruction of payroll documents
- <u>Count Twenty-Four</u>: Obstruction of justice relating to, among other things, directing the production of a false invoice relating to work performed on Fiore's residence
- <u>Count Twenty-Five</u>: Obstruction of justice conspiracy relating to instructing an individual to falsely take responsibility for cashing Additional Checks
- <u>Count Twenty-Six</u>: Obstruction of justice conspiracy relating to instructing an individual to falsely take responsibility for cashing Additional Checks

- <u>Kocaj</u>:
  - <u>Count One</u>: Racketeering conspiracy based on the following RAs:
    - <u>RA Five</u>: Wire fraud relating to payroll tax violations
    - <u>RA Eleven</u>: Wire fraud, including honest services wire fraud, relating to Construction Company #1
    - <u>RA Twelve</u>: Wire fraud for overbilling Construction Company #4 and Construction Company #5
  - <u>Count Three</u>: Wire fraud conspiracy relating to payroll tax violations
  - <u>Count Ten</u>: False statements conspiracy relating to the OSHA Fraud;
  - <u>Count Sixteen</u>: Wire fraud conspiracy, including honest services wire fraud, relating to Construction Company #1
  - <u>Count Seventeen</u>: Wire fraud conspiracy for overbilling Construction Company #4 and Construction Company #5

- Kocaj is also charged in a separate indictment with extortionate collection of credit conspiracy and extortionate collection of credit relating to the collection of a gambling debt from John Doe[3] on behalf of an Albanian organized crime figure.

- <u>Martino</u>:
  - <u>Count One</u>: Racketeering conspiracy based on the following RAs:
    - o <u>RAs One through Four</u>: Bank fraud relating to having co-defendant Frank Tarul ("F. Tarul") falsely state that he was the principal of certain corporations when in fact Martino was the principal of the companies
    - o <u>RA Six</u>: Obstruction of justice conspiracy and obstruction of justice relating to concealing Martino's wealth to obstruct the enforcement of the Martino Forfeiture Money Judgment.
  - <u>Count Three</u>: Bank fraud conspiracy relating to scheme to conceal Martino's role in certain corporations
  - <u>Count Four</u>: Obstruction of justice conspiracy relating to obstructing the enforcement of the Martino Forfeiture Money Judgment
  - <u>Count Five</u>: Obstruction of justice relating to obstructing the enforcement of the Martino Forfeiture Money Judgment

B.    <u>The Lopez Complaint</u>

Today, Adrial Lopez was arrested pursuant to a complaint alleging Lopez's extortionate collection of credit.  As detailed in the complaint, Lopez, a former professional boxer, is a loanshark who is fraudulently obtaining workers' compensation benefits.

The investigation has revealed Lopez's threats and acts of violence.  For instance, in the past, Lopez has knocked a victim unconscious and slammed his head against a doorjamb.  More recently, Lopez has repeatedly boasted of wide-ranging acts of violence, including brandishing a firearm, assault (leaving a victim's "fucking brain bleeding"), lying in wait at a victim's home (prepared to "knock him out as soon as he walk in") and intimidating witnesses (leaving "everybody[] afraid" because a member of the Purple Gang, who had "like 60 bodies," had scared people into not cooperating with the police).  Lopez has also stated that he would "clip," <u>i.e.</u>, murder, an individual if he cooperated against him.  In addition to these acts of violence, Lopez has perpetrated a long-running workers' compensation insurance scheme and attempted to procure fake identification documents.

---

[3] The individual identified in the <u>Kocaj</u> indictment as "John Doe" is not the same person as the individual identified in the <u>Barca</u> indictment as "John Doe."

Moreover, law enforcement agents this morning also executed search warrants at Lopez's home and his vehicle and recovered, among other things, multiple, large knives (including one that appears to have blood on it), a ski mask with the eyes cut out, brass knuckles and over $25,000 in cash.

The evidence in support of this extensive criminal activity is overwhelming, some of which is set forth below.[4]  The proffer includes a brief description of the following: (1) the government's investigation of the Gambino organized crime family of La Cosa Nostra (the "Gambino family") and the defendants; (2) the defendants' association with and membership in the Gambino family; (3) the defendants' involvement in the charged criminal activity alleged in the Barca and Kocaj indictments, with particular attention to certain crimes of violence and efforts to obstruct justice; (4) other instances in which the defendants discussed using violence; and (5) the defendants' efforts to evade court-authorized supervision.

III.     The Proffered Facts

A.     Overview of the Investigation

The indictments returned in this case are the result of a multi-year investigation by this Office, the Federal Bureau of Investigation, the Internal Revenue Service – Criminal Investigation and the New York City Police Department into the ongoing criminal activities of the Gambino family, a violent criminal enterprise that engages in crimes including murder, extortion, bribery and obstruction of justice.  The present charges are the product of the government's use of a diverse array of investigative tools, including (1) court-authorized wiretaps on telephones used by, among others, defendants Vincent Fiore and Richard Martino;[5] (2) court-authorized interception of oral communications occurring at the office of CWC Contracting Corp. and its affiliate, Eastern Interiors LLC (collectively, "CWC"); (3) search warrants executed at certain of the defendants' residences and CWC's office; (4) witness interviews; and (5) consensual recordings.

---

[4]     The government proffers the following facts regarding certain of the charged crimes.  The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.  The government is entitled to proceed by proffer in a detention hearing.  United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004); United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986).

[5]     The government hereby provides notice to the defendants pursuant to 18 U.S.C. § 2518(9) of its intent to rely on wiretap and oral interceptions at the detention hearing in this case.  In order to preserve the integrity and confidentiality of the government's investigation, notice to the defendants of the interceptions prior to their arrest was not feasible.

This investigation makes clear that the Gambino family is thriving, earning millions of dollars through various forms of fraud, bribery, money laundering and extortion, particularly in the construction industry, and distributes these illicit proceeds to other members and associates of La Cosa Nostra. This investigation has also revealed how, when it became aware of law enforcement activity, the Gambino family took extensive steps to obstruct the investigation by, among other things, directing a witness to lie, creating false documents and retaliating against those who cooperate with the government.

B.    Defendants' Membership in or Association with La Cosa Nostra

According to multiple witnesses and as alleged in the Barca, et al. indictment, the defendant Andrew Campos is a captain in the Gambino family and Vincent Fiore, Richard Martino, James Ciaccia and George Campos[6] are all inducted members, or soldiers, of the Gambino family who report to Campos. In becoming inducted members, these defendants swore allegiance for life to the crime family above all else, even their own families. Kocaj is an associate of the Gambino family who reports to Campos and has ties to various Albanian organized crime figures.

As described in more detail below, Campos and Martino were charged in 2004 with, among other crimes, racketeering for various crimes they committed as part of their membership in the Gambino family, including committing a massive scheme to defraud users of adult entertainment websites and telephone services of over $80 million. See 03-CR-304 (CBA) (E.D.N.Y.). Ultimately, on February 14, 2005, Campos pleaded guilty to one count of wire fraud conspiracy, in violation of 18 U.S.C. § 371, for which he was sentenced principally to 21 months' imprisonment and ordered to pay $300,000 in forfeiture.

That same day, Martino pleaded guilty to conspiracy to commit mail and wire fraud relating to the schemes, in violation of 18 U.S.C. § 371. Martino also pleaded guilty to conspiracy to commit Hobbs Act extortion, in violation of 18 U.S.C. § 371. As the Court found after a Fatico hearing, Martino threatened to kill a business rival and had another individual viciously assaulted – beaten, pistol-whipped and cut with a knife. Martino was sentenced principally to a total of 108 months' imprisonment and ordered to forfeit $9,100,000 (the "Martino Forfeiture Money Judgment").

Fiore also has a prior federal conviction stemming from his membership in the Gambino family. In August 2003, Fiore and another individual entered a social club in Fairfield County, Connecticut and demanded that the owner pay a $30,000 debt incurred by the prior owner. When the owner resisted, Fiore and his co-conspirator assaulted the owner and his elderly father, forcing the father to be taken to a local hospital.

---

[6]    George Campos is Andrew Campos's father. Andrew Campos is referred to below as "Campos" and George Campos is referred to below as "G. Campos."

10

In September 2004, Fiore was arrested and charged with attempted Hobbs Act extortion in an indictment that also charged five other defendants with racketeering and racketeering conspiracy for their commission of crimes as part of their association with the Gambino family.[7]  See 04-CR-28 (JBA) (D. Conn.).  Following a contested bail hearing, Fiore was detained pending trial as a danger to the community.  See id., ECF Dkt. No. 39.  On April 4, 2005, Fiore pleaded guilty to attempted Hobbs Act extortion, for which he was sentenced principally to 27 months' imprisonment and three years' supervised release.  See id., ECF Dkt. No. 242.

The current investigation has revealed that after their release from prison, Campos, Martino and Fiore have continued to commit crimes as part of their membership in the Gambino family.  In particular, Campos has risen to become a powerful captain in the criminal enterprise.  For instance, the investigation has revealed that Campos, with Fiore's assistance, helped the Gambino family investigate the circumstances surrounding the murder of Francesco "Frank" Cali, who, at the time of his death on March 13, 2019, was the underboss of the Gambino family.

As captured on court-authorized wiretaps of Fiore's telephone, on the morning after Cali's murder, Fiore received a call from co-defendant James Ciaccia, another soldier in the Gambino family who also reports to Campos.  During the conversation, Fiore referred to the "news" and said he read a "short article."   Fiore also stated that it was "a good thing," i.e., that Cali's death (which was widely publicized) was good for Fiore and Ciaccia because the two of them report to Campos, whose power within the Gambino family was likely to rise in the wake of the murder.

In the aftermath of Cali's murder, Campos met with multiple high-level Gambino family members, which shows Campos's powerful position within the organization.  For instance, on March 14, 2019, at approximately 5:49 p.m., law enforcement agents conducting physical surveillance observed Campos leaving his home and driving into Manhattan, where he parked near a pizzeria and got out of his car.  At approximately 6:33 p.m., Campos was picked up in a vehicle registered to an LCN associate and driven to another location in Manhattan, where he met outside with Louis Filippelli, another Gambino family captain.  Thereafter, Campos and Filippelli got into the LCN associate's car and drove to near a church in Brooklyn, where they were observed meeting outside with, among others, Giuseppe Gambino, another inducted member of the Gambino family.

Several days later, Campos and Fiore traveled to Staten Island to meet with multiple other high-level Gambino family members to discuss the circumstances surrounding Cali's death.  Arrangements for this clandestine meeting were captured over lawfully

---

[7] Although Fiore was not charged with racketeering offenses, the government was prepared to prove at trial that Fiore was an inducted member of the Gambino family who committed the attempted extortion for a Gambino family associate.  See, e.g., 04-CR-28 (JBA) (D. Conn.), ECF Dkt. No. 198.

intercepted conversations between Fiore, Campos and Ernest Grillo, a captain in the Gambino family, on March 17, 2019.

The next morning, March 18, 2019, Fiore spoke with his ex-wife.  During the conversation, Fiore referred to the Cali murder and his attendance at the meeting the night before.  Among other things, Fiore stated that he saw the "tape," i.e., the surveillance video from Cali's home that captured the murder.  Fiore also discussed a possible motive for the murder relating to a woman who had been at Cali's home that day.  During the call, Fiore referred to Cali affectionately as "Frankie" and somebody who "was loved."  Fiore also said that the "two" of them (i.e., Fiore and Campos) had driven to Staten Island and met "a half dozen" people.  Later that day, Fiore also spoke with Kocaj, who asked Fiore how Fiore "made out with him [i.e., Campos] last night."  Fiore said that he (Fiore) was a "victim of his" last night and did not get home until approximately 12:30 or 12:45 a.m.

Campos and Fiore have also expressed their allegiance to one another by virtue of their membership in the Gambino family.  For instance, in May 2019, Fiore purchased a home in Briarcliff Manor through a fraudulently procured mortgage loan.  Campos gave Fiore the necessary money for the down payment (and Kocaj served as a co-signor).  In a lawfully intercepted conversation on May 9, 2019 at CWC's office, Fiore stated, "I asked you . . . could it be done?", to which Campos replied, "Yeah, what, am I gonna say no to you?  I'm not gonna say no.  I won't do that.  I'm never gonna say no to you."  Fiore confirmed, "You're my blood."[8]

The results of a search warrant executed on Campos's home on June 26, 2019 further reveal just how importantly he views his membership in the Gambino family.  Specifically, in a closet off of Campos's bedroom, agents discovered multiple pictures of Campos and Martino visiting in prison Frank LoCascio, who was the underboss of the Gambino family under boss John Gotti and is currently serving a life sentence for, among other offenses, murder.  (See Ex. A).

C.    Campos's and Fiore's Extortion of John Doe

Campos and Fiore extorted an individual described in the Barca indictment as John Doe, who provided workers for CWC at various construction projects.  Specifically, in 2018, Campos paid off multiple loans that Doe owed to others, including the defendant

---

[8] In addition to his membership in the Gambino family, Fiore has also revealed his close association with other LCN organized crime families.  For instance, during a lawfully recorded conversation on April 16, 2019, in which Fiore and Kocaj, among others, discussed members of the Genovese crime family of LCN, Fiore identified "Ernie," i.e., Ernest Muscarella, as the current underboss of that criminal organization.

Adrial Lopez, and then used extortionate means to collect the money from Doe by unlawfully retaining money otherwise due to Doe for his services.

At one point, Lopez complained to Doe that he had not received certain money from Campos or one of his associates. Doe relayed this conversation to Campos, who stated, in sum and substance, that if Lopez hurt Doe after he knew that Campos was paying off the loan, that Campos would leave Lopez "on the sidewalk" and that if Lopez made Doe a "sacrificial lamb" then Lopez would "die that day."

Fiore also threatened to assault John Doe on multiple occasions. For example, as captured on a conversation occurring over Fiore's cell phone on March 13, 2019, Fiore yelled at Doe because the payroll expenses for CWC employees who Doe supervised were too high, which meant that Fiore and Campos would not be able to withhold as much money from Doe's earnings to help satisfy the loans. During the conversation, Doe laughed, causing Fiore to state:

> No, you laugh. When you get punched in the face and your teeth get knocked out, 'cause you're being a dick, you're not going to laugh no more, okay? . . . You think it's a fucking joke. Don't make light of it. Because at the end of the day, this is coming out of your fucking ass. . . You're lucky you're not in front of me because I'd knock your fucking teeth out. . . . Because I know what you are and I know who you fucking are. . . . Listen, I don't give a fuck. At the end of the day, when you're upside down [i.e., not able to cover payroll and loan payments], you deal with him [i.e., Campos]. You deal with him. . . . How you fuckin' lasted fifty something years, I don't know.

A spreadsheet recovered from a hard drive used by Fiore during the execution of a search warrant at CWC's office on June 26, 2019 confirms his and Campos's collection of over $100,000 from Doe by deducting money that would otherwise be owed to him through his work for CWC. Furthermore, on September 18, 2018 – after the execution of the warrant – during a lawfully recorded conversation, Doe began to ask Fiore about the money Doe owed to Campos and Fiore, stating, "When you see Andrew, last we spoke, I still had a balance." At this point, Fiore interrupted Doe and, pretending not to know to what Doe was referring, stated, "Balance of what? What do you owe? I don't know nothing about that. . . Andrew's out of this equation. There's no need for you to mention his name. . . . He's doing what he's doing, so you don't need to bring up his name."

### D.   Kocaj's Extortion of Another "John Doe" Victim

In addition to the crimes charged in the Barca indictment, Kocaj is also charged in the Kocaj indictment with extortionate collection of credit and conspiracy to commit that offense for his recovery of over $30,000 of a gambling debt on behalf of an

Albanian organized crime figure ("Individual-1") from an individual described in the <u>Kocaj</u> indictment as John Doe[9] (the "Victim").

Before Kocaj helped extort the Victim, in November 2018, the Victim had sought Kocaj's help in collecting a gambling debt that was owed to the Victim. Specifically, on or about November 27, 2018, in a lawfully recorded conversation, the Victim explained that an individual (the "Debtor") owed the Victim approximately $50,000. Kocaj asked questions about the Debtor, boasting, "I'll send somebody to grab him by the fucking neck" and "find out where this guy is, I'll send somebody, it's not a problem." Kocaj noted he would send "a couple of my Albanian guys." Kocaj made clear that if the Debtor did not pay, he would "catch a fucking beating" because the people Kocaj would send "know how to send a message." Kocaj directed the Victim to report back with more information about the Debtor, but the Victim never did.

Rather, in May 2019, Kocaj learned that the Victim himself owed over $40,000 to Individual-1 as part of the Victim's gambling operation. Specifically, on May 1, 2019, during a lawfully recorded conversation, Kocaj reported to another individual that the Victim owed Individual-1 money and had to pay, otherwise "[h]e's going to get his head split open. . . . These are not the guys to fuck around with. . . . These Albanians, you know what they'll do." Kocaj later made clear that the Victim is "going to get hurt. I know these guys. . . . They'll do it. And they'll catch him. Whether it's now or later." Thereafter, Kocaj repeatedly stated that the Victim had to pay the debt or else he would be assaulted. For instance, on May 4, 2019, during a lawfully recorded conversation, Fiore stated, "I don't care, if the kid [<u>i.e.</u>, the Victim] don't want to pay, just tell me, I don't give a fuck. I'll tell them do what they want. I don't give a shit. . . . If he says fuck these guys, . . . will tell my friends to do what they have to do." Ultimately, Kocaj collected over $30,000 from the Victim (via another individual) on behalf of Individual-1.

E.     <u>Martino's Scheme to Conceal His Substantial Financial Assets</u>

As mentioned above, in 2005, Martino was sentenced to a total of 108 months' imprisonment and required to pay $9.1 million in forfeiture for his commission of multiple offenses, and, as established at a <u>Fatico</u> hearing, having an individual pistol-whipped and beaten. On July 15, 2014, Martino was released from the custody of the U.S. Bureau of Prisons and began serving his three-year term of supervised release. Thereafter, the government sought to enforce the remaining amount of the Martino Forfeiture Money Judgment. To avoid satisfying the Forfeiture Money Judgment, among other things, Martino and co-defendant F. Tarul concealed Martino's substantial wealth and income.

As set forth in more detail below, Martino repeatedly falsely certified to the United States Probation Department (the "Probation Department") that he worked at F.

---

[9] As mentioned above, the individual identified in the <u>Kocaj</u> indictment as "John Doe" is not the same person as the individual identified in the <u>Barca</u> indictment as "John Doe."

Tarul's flooring company.  For example, in July 2017, Martino falsely certified that, among other things: (i) he did not operate any businesses, (ii) he had not received any money from any source (other than F. Tarul's flooring company) within three years, (iii) he did not have any checking or savings accounts and had not done business at any financial institutions, (iv) he did not own assets in anyone else's name; (v) no entity held assets on his behalf; and (vi) he did not conduct any transfers of personal property of over $1,000 in the last five years.  In this same document, Martino offered to pay $100 per month toward his outstanding financial obligations, including the Martino Forfeiture Money Judgment.

          In fact, Martino did not work for F. Tarul's company but rather controlled numerous corporations that conducted millions of dollars' worth of financial transactions, including construction work, investments in pizzerias and other business ventures.  Because of Martino's prior federal conviction and known association with the Gambino family, among other things, Martino and F. Tarul, together with others, concealed Martino's interest in, among other companies, Global Business Ventures Advisors, LLC ("Global").  For instance, F. Tarul opened multiple bank accounts at Bank of America, N.A., JPMorgan Chase, N.A. and Orange Bank and Trust Company variously in the name of the Martino Companies and identified himself as the principal when in fact Martino controlled the companies.  Indeed, as captured on a judicially authorized wiretap, on or about February 14, 2017, F. Tarul spoke with a co-conspirator about compiling a set of financial records to nominally assume the lease for a pizzeria Martino was constructing.  During the conversation, F. Tarul asked, "Am I part of Global?," to which the co-conspirator confirmed, "You are Global."  F. Tarul replied, "Oh I am Global?  Yeah, that's right.  I am, I'm worldwide."  F. Tarul then called Martino, who told F. Tarul that for his submission, F. Tarul should put "Global Ventures value, half a million dollars."

F.    Honest Services Wire Fraud Schemes

          As alleged in the Barca indictment, as part of their operation of CWC, Campos, Fiore, Kocaj and others engaged in a series of wire fraud schemes by, among other things, paying and agreeing to pay bribes and kickbacks to multiple employees of numerous construction companies, including real estate developers.  In exchange, these employees took numerous actions to benefit CWC, including awarding contracts, securing payments to CWC and assisting in the approval of change orders, which are work that is added or deleted from the original scope of work of a contract.  These illicit payments were made in cash and through in-kind benefits in the form of, among other things, free labor and construction materials, which were fraudulently accounted for in CWC's financial documents as relating to legitimate CWC construction projects.

          For example, between approximately June 2018 and June 2019, Campos, Fiore, Kocaj and others paid hundreds of thousands of dollars in bribes and kickbacks to multiple employees of a real estate development company identified in the indictment as

"Construction Company #1"[10] in exchange for their support of CWC.  For instance, CWC paid illicit bribes and kickbacks to co-defendant John Simonlacaj in the form of, among other things, free labor and materials used to perform extensive renovations at Simonlacaj's residence in Scarsdale, New York (the "Simonlacaj Residence").  The costs incurred by CWC were paid for by a change order that fraudulently indicated the expenses were related to a Construction Company #1/CWC project.  As Kocaj, who is related to Simonlacaj, stated on during a lawfully recorded conversation or about February 25, 2019, the work was paid for by a "change order" but it "should have been pro bono. . . . Write it off . . . They [i.e., Construction Company #1] do 50 million a year in business. . . . You don't think it's worth it do to some of the paperwork?"  In addition, in an attempt to secure work for CWC, Fiore stated during an intercepted conversation on January 31, 2019, "I'll bring Mark [i.e., Kocaj] with me, his name is Chippy, he's uh, the cousin, so you know but keep it to yourself, the cousin of [Construction Company #1], this director, John [i.e., Simonlacaj].  There's a beautiful in there.  There's things we can do with Chippy there, he whispers what he needs to whisper and we get things done."

          Additionally, as captured by court-authorized wiretaps on Fiore's cell phone, on or about March 15, 2019, Fiore told Campos that CWC owed a construction worker (the "Worker") money for work the Worker had performed at the Simonlacaj Residence and at a home owned by another Construction Company #1 employee (the "CC#1 Employee #1").  Fiore stated, "I owe [the Worker] some money.  I forgot to pay him.  One is John Si's house, we owe him some money there.  [The CC#1 Employee #1], on Delanoy [Avenue in the Bronx, the home owned by the CC#1 Employee #1], I owe him some money there. . . . I explained . . . I'm waiting on the ticket work. . . . I can't pay you what I don't have.  Until I get the purchase order and know I'm going to get paid."  Later that day, Fiore directed a co-conspirator to fraudulently account for the payments in CWC's financial records, stating, "I just got off the phone with Andrew a couple minutes ago. . . . Delanoy . . . [the CC#1 Employee #1's] house.  [The Worker's] got 12 man days there . . . You gotta put it against the Belnord [construction project].  Chippy knows about it. . . . [the street of the Simonlacaj Residence].  He's owed eight days over there. . . . Put that against 76 11[th Avenue project].  Chippy knows about that as well.  That's, um, John Si's house."

          As another example, on April 12, 2019, Fiore spoke with another employee of Construction Company #1 (the "CC#1 Employee #2").  Toward the end of the conversation, they discussed the bribes paid by Fiore and the fraudulent change orders the CC#1 Employee #2 agreed to help approve.  Specifically, the CC#1 Employee #2 stated, "I gotta write the other thing for you too," i.e., a fraudulent change order.  Fiore replied, "Yes, yes.  Are you on speaker or am I off speaker?"  CC#1 Employee #2 said, "Hold on a sec, no one's here anyway."  Fiore then stated, "Let me know what, what I gave you so far."  CC#1 Employee #2 replied, "38," i.e., $38,000.  Fiore said, "How much?  38, right?", to which CC#1 Employee #2 confirmed, "38, yea."  Fiore then said, "Okay.  And I owe you, there's another

---

[10] Construction Company #1 develops multiple construction projects on which CWC has worked, including The XI, located at 76 11th Avenue in New York, New York.

42 that's gotta come, correct?  It was 80?"  CC#1 Employee #2 stated, "It was 80, it was 85 and then the 50 is after when you get the other one."  Fiore said, "Right, but right now," and the CC#1 Employee #2 stated, "Right now, it's 85 minus the 38. . . . for now. . . . And then I'll do the . . . give me Monday, Monday, I'll work out the verbiage for the other shit [i.e., another fraudulent change order], pay you guys for the general conditions, I'll do something with that."  Fiore said, "You got it my man."

Fiore, together with others, committed similar schemes with employees of other real estate development companies, including those described in the Barca indictment as Construction Company #2 and Construction Company #3.  For example, Fiore and co-defendant Benito DiZenzo provided free labor and materials at a location in White Plains, New York, which became a jujitsu gym, that was performed at the request of an employee of Construction Company #2 (the "CC#2 Employee"), a project manager for  the construction project at Larkin Plaza in Yonkers who was associated with the gym.

Over time, Fiore became upset that the value of the bribe to the CC#2 Employee had grown to more than he and DiZenzo had anticipated.  Therefore, on February 27, 2019, during a conversation intercepted occurring over Fiore's cell phone, Fiore told DiZenzo to "put on a separate spreadsheet, not on the computer.  I need you to write down every fuckin piece of material that we sent over there and I need to know the man hours that are over there.  Not on Procore [i.e., software used in the construction industry], but on the side.  Alright?"  DiZenzo stated that he "put on Procore that they were working at Larkin," to which Fiore replied, "That's fine but make a side note on where they actually were and give me that.  Alright? . . . . The only thing [CC#2 Employee] could do is when it comes to our change orders, they come across his desk and he signs off on them. They come through him."  As Fiore later stated to DiZenzo on May 15, 2019, during an oral conversation intercepted at CWC's office, "We helped this kid [i.e., CC#2 Employee].  The kid is not even making an attempt. . . . [W]e did the right thing.  Listen, between labor and materials it's gotta be over $40,000."

G.      "Additional Checks" Money Laundering

To reap the benefit of their various crimes, and to fund other illegal activity, Campos and Fiore made extensive use of check cashing businesses and shell companies to illicitly funnel millions of dollars in cash out of CWC.  Specifically, beginning in approximately October 2014, Campos and Fiore, together with others, caused CWC to issue millions of dollars in checks to associates for work that was never performed (the "Additional Checks").  These associates went to check cashing businesses, cashed the Additional Checks and returned the money to the defendants for them to use.  To conceal the illicit nature of these payments, the defendants and their co-conspirators completed documentation falsely stating that these Additional Checks were for work performed in connection with CWC construction projects.  In actuality, this was a method by which the defendants, among other things, secured the benefit of their illicit activity by withdrawing illegal proceeds in cash.

H.    OSHA False Statements Scheme

Campos, Fiore and Kocaj, as well as co-defendants Barca, G. Campos, Ciaccia, DiZenzo and Michael Tarul ("M. Tarul"), are all charged with a scheme to fraudulently procure cards from the United States Department of Labor indicating their completion of required OSHA Outreach Training Program ("OTP") courses.

Between approximately January 2018 and May 2019, these defendants, together with others, engaged in a scheme to fraudulently acquire OSHA OTP cards by agreeing with an OTP instructor (the "Instructor") to falsely report to the DOL that they had completed certain OTP courses – many of which purportedly occurred at CWC's office building – when in fact they never completed those courses.

For instance, on or about May 6, 2019, the Instructor falsely certified to the DOL that he administered a 10-hour OSHA OTP training course at CWC's office building attended by, among others, Campos, G. Campos, Kocaj and M. Tarul.  Similarly, on May 21, 2019, the Instructor falsely certified to the DOL that he administered a 30-hour OSHA OTP training course at CWC's office building attended by Ciaccia and DiZenzo.  Barca aided the scheme by, among other things, collecting paperwork with identifying information for his co-conspirators and sending it to the Instructor.

The defendants also used criminal means to obtain site supervisor training ("SST") cards, which, as required by the NYC Law, certified that certain CWC supervisors had taken the required 30-hour OSHA OTP course and an additional 32 hours in training.  As one example, on or about May 7, 2019, many of the defendants met at CWC's office to complete an exam required by the company that would issue the SST cards (the "SST Company").  In advance of the meeting, an employee of the SST Company (the "SST Employee") had given the defendants the answers to the required exam, and the co-conspirators completed the required paperwork together.  In exchange for the answers to the exam and the certification that the co-conspirators had taken all of the required training courses, Campos authorized the payment of a bribe to the SST Employee of approximately $15,000 in cash, which was generated by the cashing of one of the Additional Checks.

During the meeting on May 7, 2019, which was lawfully recorded, while many of the co-conspirators fraudulently completed the required paperwork together, Campos said, among other things, "See, I woulda got this one [i.e., a question on a test] wrong . . . Maybe he is giving you one wrong one in these things . . . We can't get all the same ones wrong. . . . I think he gave us wrong answers. . . We are going to wind up failing this and he's [i.e., the SST Employee] going to fucking say fail or pass, he's keeping the money."

I.    Campos's and Fiore's Obstruction of Justice

Over time, certain defendants became aware of aspects of the government's investigation.  Campos and Fiore took extensive steps to obstruct this investigation by

variously instructing witnesses to lie, destroying incriminating materials, creating fraudulent documents and retaliating against witnesses who testified truthfully in the grand jury.

For instance, between approximately May 2019 and June 2019, Fiore instructed multiple individuals to destroy evidence, including by directing a co-conspirator to shred payroll documents which contained evidence of the scheme to pay workers in cash without making required payroll tax withholdings, which the co-conspirator did.

As another example, in November 2019, Campos and Fiore directed an individual to falsely take responsibility for conduct relating to the Additional Checks scheme described above. Specifically, during lawfully recorded conversations in November 2019, Fiore told the individual that Campos would pay for the individual's legal expenses and possible financial penalties for, among other things, cashing the Additional Checks and returning the money to Fiore. Fiore instructed the individual to falsely claim he had spent the money (rather then return it to Fiore for his and Campos's benefit) due to, among other things, a purported drug addiction, instructing the individual to say, "[I] paid the guys in cash and whatever profit I made, I spent. . . . I got high, tell him every fucking thing. I got high, I love the women. . . . I got bad habits, you know."

In addition, between approximately October 2019 and November 2019, Fiore instructed an individual to create a false invoice to justify work that CWC workers had performed at Fiore's residence (but which was paid for by CWC). To make it appear as if Fiore had paid for the work, Fiore wrote a check from his consulting company to the individual's company but instructed the individual to cash the check and return the money to Fiore.

On October 31, 2019, during a lawfully recorded conversation, Fiore met with the individual, who stated that he had written a date in June 2019 for the false invoice because Fiore had purchased his home in May 2019. Fiore had written a date in October 2019 on his check from his consulting company to the individual's company. To account for the different dates, Fiore created a false story he and the individual could recite if ever questioned, stating, "You gave me this proposal back in June, and I paid you, now I'm done. . . . I wrote the check and that's it, that's all. Fuck these guys."

Finally, in November 2019, Campos and Fiore directed that an individual who they believed had testified before the grand jury (the "Witness") be fired for providing truthful information to the government. Specifically, on November 22, 2019, during a lawfully recorded conversation, Fiore told an individual that as "a personal favor to Andrew," the individual had to remove the Witness from CWC projects because the government "[h]ad him down to the grand jury." Fiore stated that Campos told Fiore that the Witness "didn't have to talk" and "could've pled the Fifth." Fiore even complained that had he instructed the Witness to invoke his Fifth Amendment right, as Campos wished, "That's obstruction of justice."

J.      Other Offenses

        The defendants also committed other offenses alleged in the Barca indictment. For instance, Campos, Fiore and Kocaj all participated in a long-running scheme to defraud the Internal Revenue Service by paying CWC employees millions of dollars in cash without making the required payroll tax withholdings and payments.  These defendants also overbilled CWC clients by, among other things, causing them to pay for fraudulent and/or inflated change orders.  In addition, Campos, together with others, committed tax evasion and related money laundering by having CWC pay extensive personal expenses, including the construction of his home.

K.      Intercepted Communications and Other Evidence of Acts of Violence

        During the course of the investigation, Fiore and Kocaj were also intercepted describing acts of violence they have committed in addition to the charged offenses.  For instance, on March 29, 2019, during a lawfully intercepted conversation occurring over his cell phone, Fiore bragged about how he wished to send his daughter to assault individuals at school who had hit Fiore's son.  Fiore explained that he wanted to "send the fucking Latin Kings up there, and if that didn't work, I was going to send the Bloods up there because [his ex-wife's] little nephew is a Blood" but ultimately did not do so.  Fiore explained that his ex-wife's father was a Latin King, her nephews are Bloods and her cousin was a member of the "Ching-a-Lings," another gang.  As another example, on April 16, 2019, during a lawfully intercepted conversation, Kocaj recounted how he had had a fight in a diner and "stabbed the kid, I don't know, 1,000 times with a fork."

L.      Defendants' Evasion of Court-Ordered Supervision

        As set forth above, in 2004, Campos and Martino, together with others, were charged with, among other offenses, racketing conspiracy for various crimes they committed as part of their association with the Gambino family.  Following his release from the custody of the Bureau of Prisons in July 2014, Martino began a three-year term of supervised release. One of the standards conditions of his supervised release was that he could not associate with felons, including, of course, his former co-defendant Campos.  Nonetheless, the investigation has revealed that Campos and Martino repeatedly violated that condition by using sophisticated methods to evade the court-ordered supervision and meet on multiple occasions.  Similarly, Martino himself repeatedly lied to the Probation Department about, among other things, his employment and finances.  Fiore was also captured on a recording stating that he too associated with Campos following Fiore's release to a half-way house, which was also a violation of the conditions of his release.  Some of these efforts – which counsel heavily in favor of detention – are described below.

        1.      Martino and Campos Meetings

        As one example, law enforcement officers learned from judicially authorized wiretapping of F. Tarul's cell phone that Campos and Martino were scheduled to meet on

February 2, 2017.  That day, law enforcement officers conducting physical surveillance observed Martino and Campos meet at Country Kitchen Diner in Pelham, New York.  At the end of their meeting, Campos and Martino hugged each other but, despite dining together, left minutes apart.

Martino and Campos also used more elaborate methods to avoid being seen meeting together, including using F. Tarul as an intermediary and to transport Martino to illicit meetings.  For instance, as captured on judicially authorized wiretapping of F. Tarul's cell phone, on June 7, 2017, at approximately 12:09 p.m., F. Tarul asked what Martino was doing.  Martino replied that he was heading to the Bronx and asked if he wanted to meet, which F. Tarul said he would.  Martino also stated that "the other guy," i.e., Campos, would be with F. Tarul later.  At approximately 12:24 p.m., Martino and F. Tarul spoke again and they agreed to meet by Fordham Prepartory School.  At approximately 12:55 p.m., law enforcement officers observed Martino's empty car near Fordham Prepartory School in the Bronx.  At approximately 1:05 p.m., officers observed F. Tarul's and Campos's empty cars near Antonio's Trattoria in the Bronx.  At 1:10 p.m., officers observed Martino inside the restaurant.  At 1:20 p.m., F. Tarul stepped outside, appearing to look for someone.  At 1:40 p.m., officers observed Martino, F. Tarul, Campos and another individual sitting at a table inside the restaurant together.  At 2:48 p.m., Campos left, and at 3:09 p.m., Martino and F. Tarul walked out of the restaurant together, got into F. Tarul's car and left.

As another example, as captured on judicially authorized wiretapping, on July 9, 2017, at approximately 8:53 a.m., Martino spoke with F. Tarul and asked him to call "CWC," i.e., Campos (the principal of CWC), and let "CWC" know that Martino had a message from "Tow Truck" about a meeting the next day.  Martino told F. Tarul that Campos would know where to go.  F. Tarul said he would "call him" right now.  Minutes later, F. Tarul attempted to call Campos but the call went to voicemail.  At approximately 10:00 a.m., F. Tarul again spoke with Martino and stated that he (F. Tarul) had confirmed with Campos that Campos would be at the meeting.  The next morning, July 10, 2017, law enforcement officers conducting physical surveillance observed Campos meet in the Pelham Bay diner with Louis "Louie Jet" Gampero, an inducted member of the Luchese crime family associated with Jets Towing company.  Outside of the diner, officers also observed, among others, Pasquale "Patty" Falcetti, a captain in the Genovese family, having a meeting.  Shortly thereafter, Campos met with Falcetti in the diner.  After their conversation, Campos left.

### 2.     Martino's Repeated Lies to the Probation Department

As alleged in the Barca indictment, Martino repeatedly lied to the Probation Department while on supervised release, which, among other things, obstructed the enforcement of the Martino Forfeiture Money Judgment.  For instance, Martino repeatedly claimed that his sole source of income was working for co-defendant F. Tarul's flooring company when in fact Martino operated multiple businesses that transacted millions of dollars' worth of financial transactions as part of a variety of ventures.

For instance, as captured on a judicially authorized wiretap, on May 24, 2017, F. Tarul told Martino that Martino's "PO officer" (i.e., the Probation Officer assigned to supervise Martino) had contacted F. Tarul and wanted to meet with him and Martino.  F. Tarul told Martino that he told the Probation Officer that he and Martino were "out in the field."  Martino told F. Tarul to falsely tell the Probation Officer that he and F. Tarul were "picking up some supplies" and could meet the Probation Officer at a "job site."  Martino and F. Tarul then concocted the story they would tell the Probation Officer about where they had been.  Martino suggested that F. Tarul tell the Probation Officer that he had been working at a job in Portchester, i.e., one of Martino's business ventures he had not disclosed.  F. Tarul replied, "What am I going to tell her? . . . You don't want her to come there," and Martino agreed, "I don't want her to come there."  Martino and F. Tarul then discussed whether the Probation Officer had attempted to contact Martino earlier.  F. Tarul said he did not think so but that he was going to tell her, "You know what, actually, he wasn't feeling well . . . if you had a meeting or whatever and I wasn't going to get you so then I just, . . . I said, 'I'm not at the office, we're not at the office, we're out in the field most of the day.'"  Martino said he would drive to meet with F. Tarul, who stated that if the Probation Officer called him again he would tell her (falsely) that "We're heading to, we're going to be heading to [a project at] 1490 Boston Road."

As Martino's and F. Tarul's conversation ended, the Probation Officer directed F. Tarul to meet a location in the Bronx.  F. Tarul asked for "a half hour" and the Probation Officer told him to come "as soon as you can."  F. Tarul said he would and would "bring Rich with me too."  F. Tarul immediately called Martino back and told him about the conversation with the Probation Officer.  Martino said he would "meet [F. Tarul] somewhere else that way I'll park the car and we'll go together" in a vehicle associated with F. Tarul to make it appear as if Martino was in fact working for F. Tarul's company.  F. Tarul said he would "run home" and put on his boots "so I look like I was dirty," i.e., as if he were actually working with Martino.

Similarly, on July 10, 2017, the Probation Officer directed Martino to meet with her.  As captured on a judicially authorized wiretap, Martino called F. Tarul, told him that the Probation Officer wanted to meet and asked for the address for F. Tarul's company in case she wanted to meet there.  Martino also wondered where else he could meet the Probation Officer, asking, "Where is that job again?"  After F. Tarul gave the address to two projects, Martino said he was going to tell the Probation Officer that "my office is closed now."  F. Tarul then suggested that Martino tell the Probation Officer that "we moved to Mount Vernon because I shut down."  Martino agreed that he would "tell her" that.

Later that morning, Martino again spoke with F. Tarul and discussed the paperwork he would need to show the Probation Officer that day.  The two then discussed where to meet so that Martino could get the required paperwork.  Martino said he did not want to drive in his vehicle because he was concerned that he might get "pinched," i.e., arrested by law enforcement, and "I got my Jeep here with everything in it."  F. Tarul then volunteered to travel to meet Martino but Martino declined.  Ultimately, Martino met with

the Probation Officer and reported back to F. Tarul that it went well but that he (Martino) needed six months of pay stubs, and the two agreed to meet later.

### 3.    Fiore and Campos's Violation of Fiore's Conditions

Fiore was also captured admitting how he and Campos violated Fiore's conditions of release at a halfway house following his release from prison. Specifically, on April 16, 2019, during a lawfully recorded conversation, Fiore recounted how he had borrowed $10,000 two weeks before he was arrested on his prior federal case for attempted extortion. Fiore stated that, while incarcerated, he "sent a message" to his creditor that he would "straighten it out" and be sure that the creditor "got his money."  After a dispute arose with the loan, Fiore stated that "I wasn't in the halfway house 15 fucking minutes, Andrew [i.e., Campos] comes and picks me up" and drove him to a social club, where he had a discussion about the loan.

## IV.    The Defendants Pose a Danger to the Community and a Serious Risk of Obstruction of Justice

Campos, Fiore, Kocaj, Martino and Lopez all pose a substantial danger to the community and cannot be trusted to abide by the terms of release. As discussed more specifically below, each of the relevant considerations under the Bail Reform Act strongly favors detention here.

### A.    Nature and Circumstances of the Crimes Charged

In addition to a wide range of financial crimes, Campos, Fiore and Kocaj, together with Lopez, are all charged with one or more crimes of violence under the relevant provisions of the Bail Reform Act. See United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002) (citing 18 U.S.C. § 3156(a)(4)(A), (B)) (Bail Reform Act defines a "crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another," or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense"); Chimurenga, 760 F.2d at 404 (conspiracy to commit a crime of violence is a crime of violence for purposes of the Bail Reform Act). Here, the defendants extorted money from their victims through explicit and implicit threats of force and violence, threats which were made more credible by the defendants' membership in and association with La Cosa Nostra.

Moreover, Campos, Fiore and Martino are all charged with efforts to obstruct justice, which especially counsels in favor of detention. See, e.g. 18 U.S.C. § 3142(f)(2)(B) (permitting a court to order pre-trial detention where there is "a serious risk that the [defendant] will . . . obstruct or attempt to obstruct justice, or . . . intimidate . . . a prospective witness," among other things). Indeed, unlike dangerousness, detention based on obstruction of justice does not require clear and convincing evidence, only proof by a preponderance of the evidence. See United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988) (stating that in

conducting a detention hearing, the government must prove "by a preponderance of the evidence that the defendant either has been charged with one of the crimes enumerated in Section 3142(f)(1) or that the defendant presents a risk of flight or obstruction of justice"); see also United States v. LaFontaine, 210 F.3d 125, 134 (2d Cir. 2000) (affirming detention based on witness tampering in a white collar case with no allegations of violence or threats aimed at witnesses); United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (reversing district court's rejection of dangerousness because no specific witness had been identified as the object of potential influence or intimidation, because no "such . . . identification is required," where there was evidence that the defendant "threatened to harm any witnesses that might testify against them").  Here, the grand jury's determination that Campos, Fiore and Martino all obstructed justice likely satisfies the preponderance standard alone.  In any event, the proof of such efforts detailed above is extensive.  Furthermore, in addition to obstructing the government's investigation, as detailed above, these defendants have also taken extensive measures to evade court-ordered supervision, including using intermediaries to avoid non-association provisions of supervised release.  Simply put, these defendants cannot be trusted to abide by any conditions of release.

> B.      Evidence of the Defendants' Guilt

As discussed above, the evidence of the defendant's guilt is exceedingly strong.  The government intends to prove the defendant's guilt at trial through, among other things, the testimony of multiple cooperating witnesses, wiretap intercepts, oral communication intercepts, consensual recordings, and physical and documentary evidence.

> C.      History and Characteristics of the Defendants

> 1.      Andrew Campos

Campos's history and characteristics clearly favor detention.  His dangerousness is demonstrated by the charged and uncharged conduct in this case, including his years' long extortion of John Doe and his efforts to obstruct justice by (a) offering to pay for an individual's legal expenses and financial penalties if he falsely claimed he spent the money cashed as part of the Additional Checks scheme and (b) directing that a CWC worker be fired for testifying before the grand jury.  In fact, as a powerful captain of the Gambino family and dedicated member of that criminal organization, he has a network of criminal associates that he can direct to commit crimes on his behalf.

Nor is this Campos's first federal offense based on his association with the Gambino family.  As detailed above, on December 9, 2005, Campos was sentenced principally to 21 months' imprisonment and required to pay $300,000 in forfeiture for his participation (with, among others, Richard Martino) in massive schemes to defraud users of adult entertainment services.  Campos was released from the custody of the Bureau of Prisons in January 2008.  Clearly, his time in prison has not deterred him from committing future offenses.  Rather, it is his commitment to the Gambino family that drives his decision-making, which clearly counsels in favor of detention.

2.      Vincent Fiore

Fiore's history and characteristics also weigh heavily in favor detention.  As described above, Fiore has committed a wide variety of offenses, including using explicit threats of violence to extort John Doe.  He has also gone to great lengths to obstruct the instant investigation, including passing messages for Campos (including to fire a worker who testified in the grand jury) and also directing the creation of fake documents and crafting false stories to be used to counter the government's investigation and prosecution.

Like Campos and Martino, Fiore has already served substantial time in federal prison for crimes he committed as part of his membership in the Gambino family.  As detailed above, on July 11, 2005, Fiore was sentenced principally to 27 months' imprisonment for attempted extortion in which he and others violently assaulted the owner of a social club as well as his elderly father.  While that case was pending, Fiore was detained as a danger to the community.  And as described above, immediately after Fiore was released to a halfway house in September 2006, Fiore violated the terms of his release by associating with, among others, Campos.  In addition to that violent offense, in May 1990, Fiore pleaded guilty to Criminal Possession of a Loaded Firearm in the Third Degree in New York County Supreme Court, for which he was sentenced to five years' probation.

3.      Richard Martino

In addition to obstructing justice and taking steps to evade court-authorized supervision – including by committing crimes while on supervised release – Martino has an extensive criminal history, which favors detention. As mentioned above, in 2005, Martino was sentenced to 108 months' imprisonment for his massive fraud scheme with Campos and also for extorting a business associate, including by having him viciously beaten and pistol-whipped.  In addition, (i) in September 1985, Martino was convicted after trial of Criminal Possession of a Weapon in the Third Degree, for which he was sentenced to two to four years' imprisonment; and (ii) in February 1980, Martino pleaded guilty to Attempted Robbery in the Second Degree, for which he was sentenced to five years' probation. Martino's documented criminal history as well as his long-time membership in and allegiance to the Gambino family, including committing acts of violence on its behalf, all counsel strongly in favor of detention.

4.      Mark Kocaj

Kocaj's history and characteristics also warrant detention.  While Kocaj does not have any prior convictions, he is charged with numerous serious offenses, including racketeering, extortion and bribery.  These offenses, by their very nature, involve violence or threats of violence, which, as demonstrated by the intercepted calls and meetings described above, Kocaj was willing to employ.  Indeed, in addition to being close with Gambino family captain Campos and other inducted member of La Cosa Nostra, Kocaj has close ties to violent Albanian organized crime figures who, in Kocaj's words, "are not the guys to fuck

around with" because a victim would get his head "split open. . . . These Albanians, you know what they'll do."

### 5.   Adrial Lopez

Lopez's history and characteristics also require that he be detained.  As set forth above, Lopez, a former professional boxer who still competes, has used acts and threats of violence to operate a loansharking business for over a decade, all the while fraudulently obtaining workers' compensation benefits.  Indeed, in one conversation, Lopez opined that Campos would have an individual killed to prevent him from cooperating with the government, adding, "That's what I would do."  He also recounted other acts of violence he took against those who slighted him, including committing a violent assault, brandishing a firearm and lying in wait.  These recent threats are reinforced by his criminal history, which include: (i)  in February 1985, following his arrest for Criminal Possession of a Narcotic Drug and Criminal Possession of a Weapon in the Third Degree (Bomb/Silencer/Machine Gun), Lopez was convicted of Criminal Possession of a Weapon in the Fourth Degree, for which he was sentenced to a fine; and (ii) in June 1998, following his arrest for Burglary in the Second Degree, Lopez was convicted of Criminal Mischief in the Fourth Degree (a Class A misdemeanor), for which he was sentenced to three years' probation.  Moreover, as set forth above, agents recovered over $25,000 in cash, multiple large knives (including one that appears to have blood on it), a ski mask and brass knuckles from his home and/or vehicle, which further reinforces the need for detention.

### D.   Seriousness of Danger Posed by the Defendants' Release

In light of their membership in or association with La Cosa Nostra, including the Gambino family, a violent criminal enterprise, and their involvement in crimes of violence, the seriousness of the danger posed by the defendants' release should not be underestimated.  As noted above, courts in this circuit have recognized that where, as here, organized crime defendants are charged with employing violent conduct, the risk of continued violent conduct is substantial and justifies detention.  See Salerno, 631 F. Supp. at 1364.  Indeed, the risk posed by the defendants' release is heightened because they all have displayed access to substantial but unaccounted for wealth.  This demonstrates that they have the power and ability to flee and commit acts of violence without detection.  See United States v. Torres, 435 F. Supp. 2d 179, 182-83 (W.D.N.Y. 2006) (noting that magistrate judge relied on the defendant's "unexplained wealth" in denying the defendant's bail application).

V.      Conclusion

        For the foregoing reasons, the government respectfully requests that the Court enter permanent orders of detention with respect to the defendants Andrew Campos, Vincent Fiore, Mark Kocaj, Richard Martino and Adrial Lopez.

                                Respectfully submitted,

                                RICHARD P. DONOGHUE
                                United States Attorney

                        By:     ___/s/_____
                                Keith D. Edelman
                                Kayla C. Bensing
                                Assistant U.S. Attorneys
                                (718) 254-6328/6279

<u>Exhibit A:</u>

Photographs of Items Seized from Campos's Home in June 2019

