

125 Park Avenue, 7th Floor
New York, NY 10017
Telephone (212) 655-3500
Facsimile (212) 655-3535

Henry E. Mazurek
*Partner*
Direct (212) 655-3594
Fax (646) 682-9222
hem@msf-law.com

December 11, 2019

**VIA ECF**

Hon. Frederic Block
United States District Court Judge
United States Courthouse
225 Cadman Plaza East
Courtroom 10C South
Brooklyn, NY 11201

  Re: *United States v. Andrew Campos*, 19-cr-575

Dear Judge Block:

  We represent Defendant Andrew Campos in the above-captioned case. Pursuant to 18 U.S.C. § 3145(b), we respectfully write to appeal the December 5, 2019 Order of Magistrate Judge Ramon E. Reyes, Jr. entering a permanent order of detention as to Mr. Campos. Because Mr. Campos' proposed bail package is sufficient to reasonably assure the safety of the community and the integrity of these proceedings, the Magistrate Court's decision was contrary to the Bail Reform Act's dictates, and should be reversed.[1]

---

[1] It is our understanding that the government moves for detention based only on dangerousness and risk of obstruction of justice. (*See* Gov. Detention Letter [Dkt. 17], referred to herein as "Detention Ltr.".) Because the government does not present any argument that Mr. Campos poses a flight risk (for good reason), this memorandum does not focus on this potential ground for detention under the Bail Reform Act. Still, we note that Mr. Campos' personal background poses no risk of flight. He is a lifelong New Yorker, and has lived his entire life (age 50) in the Bronx or Westchester County. Mr. Campos has been married for nearly 30 years, and has four daughters, ages 17-22. He has been gainfully employed in the construction industry for most of his adult life, and has managed his family-owned construction company, CWC Contracting Corp., over the last five years. For reasons stated herein, he poses neither a flight risk nor danger to any person or the community. We note that his passport was surrendered upon his arrest, and he has no international ties. *See, e.g., United States v. Gallo*, No. 99 CR. 1199 LMM, 2000 WL 269894, at *2 (S.D.N.Y. Mar. 10, 2000) (finding that the government had not met its burden of demonstrating that the defendant was a flight risk, noting the defendant "has strong roots in the community" and "does not have a passport").

I.  **The Government Has Failed to Meet Its Burden Under the Bail Reform Act to Require Pretrial Detention of Mr. Campos**

We respectfully submit that the following proposed combination of conditions of pretrial release are sufficient to reasonably ensure the safety of the community and the integrity of these proceedings:

(1) A $4,500,000 personal recognizance bond, co-signed by eight financially responsible individuals, and secured by four homes belonging to Mr. Campos' closest family members and two lifelong friends;

(2) Home detention in his family home in Scarsdale, New York, where his wife and four daughters live, with electronic monitoring;

(3) Travel restricted to the Southern and Eastern Districts of New York, when authorized under conditions of home detention;

(4) Continued surrender of Mr. Campos' passport, and an agreement not to secure new travel documents;

(5) Associational bars as deemed appropriate by the Court; and

(6) Supervision by Pretrial Services, as directed.

While the charges against Mr. Campos are admittedly serious, they are insufficient to warrant his pretrial detention. Under the Bail Reform Act, this case is one where the presumption of bail applies. The government cannot meet its burden of establishing that there are no "condition, or combination of conditions" that will "reasonably assure" the Court that Mr. Campos will not "endanger the safety of any other person or the community," and will not present a "serious risk" that he will "obstruct or attempt to obstruct justice." 18 U.S.C. §§ 3142(c), (f)(2)(B).

The Indictment essentially presents an economic crimes case, largely flowing from Mr. Campos' position as executive and manager of CWC Contracting Corp., which is an interior, drywall and framing construction contractor. The government claims a series of criminal violations fairly common-place in the New York construction industry: namely, payroll tax fraud for paying laborers in cash; hiding income from construction projects; offering "kickbacks" to project managers on jobs in the form of free labor and supplies for personal home improvements that benefit the project managers in return for favorable treatment on CWC's contracts; use of business assets and workers to benefit Mr. Campos personally; and lying to OSHA regulators about training courses taken by laborers who are assigned to job sites. These alleged crimes do not inherently involve the threat or risk of violence or support obstruction of justice claims. Notably, they also do not relate back to the charged RICO enterprise of the Gambino Crime Family. The government proffers no evidence of how any alleged position in organized crime helped to procure, promote, or maintain these alleged offenses. Rather, the Indictment reads as a series of disconnected allegations, starting off with seven pages of retread boilerplate language used in the last 25 years

of organized crime cases, and then pivoting to these series of economic crimes in the construction industry without any relation back to organized crime.

Despite this disconnect, the government's detention letter against Mr. Campos rests largely on an alleged association with organized crime to claim he presents a current danger or serious risk to obstruct justice prior to trial, asserting that "[o]rganized crime defendants pose a particular threat to the community due to the continuing nature of the charged enterprise and its violent criminal activities." (Detention Ltr. at 3.) However, the government's evidentiary proffer that Mr. Campos individually poses a threat of violence is sparse and involves only the uncorroborated testimony of a single individual, one of the government's cooperating witnesses. There is no allegation by the government that Mr. Campos ever personally engaged in or directed violent acts.[2]

The specific charges facing Mr. Campos related to alleged violence is a singular set of extortionate collection of credit counts (one conspiracy count and one substantive count) involving one of the government's cooperating witnesses. This person owned his own subcontracting carpentry business for years and had multiple contracting partners, including CWC Construction Corp. Despite purported claims of being extorted, this person repeatedly solicited new business and new contracts with CWC, and continued voluntarily to visit the CWC offices almost daily up until the time of Mr. Campos' arrest. This lone uncorroborated allegation does not involve any specific threat directed by Mr. Campos, instead, according to the government's detention letter, it occurred through CWC's "unlawfully retaining money otherwise due to Doe for his services." (Detention Ltr. at 13.) Thus, the charged "extortion" apparently involved an electronic accounting record that debited alleged victim "Doe's" account with CWC based on earlier credits extended to his company by CWC as pre-payments for expected construction work. Significantly, this is usually how construction businesses account for advances on work projects. This is hardly the kind of serious allegation of threatened violence that could not be ameliorated under strict pre-trial conditions of release.

---

[2] Although Magistrate Judge Reyes denied Mr. Campos bail on Thursday, December 5, the following day, Magistrate Judge Sanket J. Bulsara granted Mr. Campos' codefendant Mark Kocaj bail subject to the following conditions: (1) $600,000 personal recognizance bond secured by two properties and four financially responsible co-signers, (2) home detention, and (3) GPS monitoring. (*See* Min. Entry for Dec. 6, 2019 Proceedings as to Mark Kocaj [Dkt. 75].) The government's detention memorandum contains conclusory allegations of Kocaj's ties to organized crime: "Kocaj is an associate of the Gambino family who reports to Campos and has ties to various Albanian organized crime figures." (Detention Ltr. at 10.) Otherwise, the allegations against Kocaj are, if anything, more concrete than those against Mr. Campos. Specifically, the Detention Memorandum describes Kocaj's direct participation in extortion, in contrast to the attenuated allegations against Mr. Campos. (*Compare* Detention Ltr. at 13-14, *with id*. at 12-13.) The government also alleges Mr. Kocaj's involvement with additional acts of violence, charged in a separate Indictment, notably absent as to Mr. Campos. (*See id*. at 20.) The government has represented to Mr. Kokaj's counsel that it does not intend to appeal the Magistrate's bail decision.

Finally, the thin allegations of obstruction, which involve alleged conduct occurring just last month in November 2019 (and none before, despite substantial surveillance and electronic eavesdropping of Mr. Campos and his alleged co-participants in crime), do not support an inference that Mr. Campos presents a "serious risk" to obstruct these proceedings going forward. The obstructive conduct proffered in the government's detention letter involves uncharged claims of retaliation against a laborer who had already testified before the grand jury. (*See* Detention Ltr. at 19.) This alleged act was directed by a charged co-conspirator, and there is only indirect evidence that Mr. Campos was involved. Even more tangentially, the charged obstruction counts in the Indictment allege only that a co-defendant told the cooperating witness (the same as mentioned above) to lie if asked about alleged additional payments to CWC. These alleged "additional payments" to CWC, however, are based only on the uncorroborated statements of the cooperating witness. Further, there is no evidence that Mr. Campos was involved in the conversations between the cooperating witness and the co-defendant. If the government had evidence that Mr. Campos was a participant in, or had knowledge of these discussions, presumably the government would have included it by proffer as part of its motion for Mr. Campos' detention.

Given the weakness of the government's proffer and the substantial bail package Mr. Campos proposes here, which both restricts his liberty and ensures significant moral suasion over him, Mr. Campos' continued detention is anathema to the Bail Reform Act's directives and its presumption of pre-trial release.

The law is clear, "it is only a limited group of offenders who should be denied bail pending trial." *United States v. Madoff*, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009) (quotation marks and citations omitted); *United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2d Cir. 1986) (pretrial detention is a drastic measure, narrowly reserved for "extreme case[s]"); *United States v. Scarpa*, 815 F. Supp. 88, 91 (E.D.N.Y. 1993) (pretrial detention "has been and should remain the exceptional practice") (emphasis supplied). Mr. Campos is not one of them. This Court should order his pretrial release on the proposed substantial bail conditions presented here.

## II.     Legal Standard

The Bail Reform Act requires pretrial release on a personal recognizance bond "unless the [Court] determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). In this case, the government also moves for detention on grounds that Mr. Campos poses "a serious risk that [he] will obstruct or attempt to obstruct justice." *Id.* at § 3142(f)(2)(B).

In making its bail determination, the Court should consider the following factors: "(1) the nature and circumstances of the offense charged . . .; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id.* at § 3142(g).

Even if the Court finds that release on the defendant's personal recognizance creates a danger to the community, or a risk of obstruction of justice or flight, the law still favors pretrial

release "subject to the least restrictive further condition, or combination of conditions, that [the Court] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B); *accord United States v. Zherka,* 592 F. App'x 35, 36 (2d Cir. 2015) (quoting *United States v. Sabhnani,* 493 F.3d 63, 75 (2d Cir. 2007)). When deciding an issue of pretrial release, "the court should bear in mind that it is only a limited group of offenders who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987).

Under 18 U.S.C. § 3145(b), this Court's review of the Magistrate Judge's detention order is *de novo*. *United States v. Molina*, No. 11 CR. 528 JFK, 2012 WL 3564013, at *3 (S.D.N.Y. Aug. 16, 2012) ("A district court having original jurisdiction over a charged offense must review a magistrate judge's detention order *de novo* and do so promptly."). Thus, in deciding Mr. Campos' bail application, this Court should "exercise its independent judgment, and not defer to the magistrate." *United States v. Paulino*, 335 F. Supp. 3d 600, 609 (S.D.N.Y. 2018) (citing *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985)).

### III. A Presumption of Release Applies in Mr. Campos' Case

In arguing that Mr. Campos should be detained, the government fundamentally relies on the general proposition that "[o]rganized crime defendants pose a particular threat to the community due to the continuing nature of the charged enterprise and its violent criminal activities." (Detention Ltr. at 3.) The government's argument largely boils down to the claim that it's proffer of a defendant's alleged membership in, or management title with a criminal enterprise, alone is sufficient to grant pretrial detention. The Second Circuit already has rejected the government's argument, presuming a defendant's dangerousness based solely on alleged ties to organized crime. *United States v. Persico*, 376 F. App'x 155, 156 (2d Cir. 2010) (reversing the district court's detention decision under a "clear error" standard of review, where the lower court applied a presumption of the defendant's dangerousness based on his alleged connections to the Colombo crime family, and allegations that "he had the ability to order others to use violence," and, in dicta, finding that it would be "close call" on clearly erroneous review to find the government met its burden for detention when it presented no specific evidence that the charged defendant committed acts of violence or directed them). In this case, like *Persico*, Mr. Campos is not charged with any offenses that create a rebuttable presumption of detention. Instead, there is a statutory presumption that there are conditions of release available to ameliorate any risks Mr. Campos may pose. *See* 18 U.S.C. § 3142(e)(2), (3).

Defendants have repeatedly been granted pretrial release under circumstances analogous to Mr. Campos' here. The recent case of *United States v. Esposito* is instructive. 309 F. Supp. 3d 24 (S.D.N.Y.), *aff'd*, 749 F. App'x 20 (2d Cir. 2018), and *reconsideration denied*, 354 F. Supp. 3d 354 (S.D.N.Y. 2019). Esposito, who allegedly held a "'position of significant influence' in the Genovese Family," was charged "with a racketeering conspiracy allegedly perpetrated to protect the Genovese Family's power, to intimidate its victims, and to enrich its members. In furtherance of the conspiracy, Defendants allegedly committed acts of extortion, solicited unlawful kickback payments, committed fraud, and used threats of physical violence and economic harm." *Id.* at 26. Significantly, "two firearms, a pair of 'brass knuckles,' and 'a large amount of cash' were found

in Esposito's home at the time of his arrest." *Id.* In moving for Esposito's detention, the government made arguments similar to those it makes here: that "Esposito poses a significant danger to the community and a risk of flight because he is a high-ranking member of the Genovese Family who is charged with orchestrating threats of violence with a wide network of criminal associates and controlling significant cash assets for the Genovese Family." *Id.* at 27.

Still, the *Esposito* court found that there were conditions allowing Esposito's release, explaining that it was "not persuaded that Esposito poses such a grave danger to the community that he must be detained pending trial." *Id*. at 31. In granting Esposito pre-trial release, the court found that "[a]lthough there are serious allegations of threats of violence in this case, there do not appear to be any allegations that Esposito actually carried out any acts of violence." *Id.* The allegations against Mr. Campos are substantially less severe. There are no allegations that Mr. Campos ordered or executed any acts of violence or attempted violence. The only allegations relevant to Mr. Campos' purported dangerousness are that he paid off the debts of an associate "John Doe," and that as repayment for the loan he retained money "otherwise due" to Doe. (Detention Ltr. at 12-13, 23.) The government also apparently attributes to Mr. Campos allegedly threatening statements that a co-defendant made to "John Doe," without any evidence he directed them, agreed with them, or even knew about them. (*Id.* at 13.) Furthermore, the government does not contend that anyone attempted any violence following those statements.[3]

In another similar case, *United States v. Cammarano*, 18-cr-15 (AKH), Bail Hearing Tr. [Dkt. 65] (S.D.N.Y. Jan. 18, 2018), the court likewise released the defendant under the Bail Reform Act, although the government maintained that he "presents a danger to the community," and "is the acting boss of the Bonnano organized crime family." *Id*. at 53:18-20. Like Mr. Campos, Cammarano was alleged to have longstanding ties to organized crime, and had a prior organized crime conviction for racketeering. In the government's words, Cammarano previously "pled [guilty] to loan-sharking in a count that alleged that he was at all times an associate, soldier and acting captain in the Bonnano organized crime family." *Id*. at 53:25-54:5. Still, the court ultimately granted Mr. Cammarano pretrial release with a $4 million secured bond, and home detention. *See United States v. Cammarano*, 18-cr-15 (AKH), Appearance Bond [Dkt. 75] (S.D.N.Y. Feb. 7, 2018).

The court also released the defendants in *United States v. Eppolito*, No. 05-CR-192, 2005 WL 1607192 (E.D.N.Y. July 11, 2005), who were charged "with multiple murders while they were policemen acting in aid of Mafia members' criminal activities in the 1980s and early 1990s," as well as more recent acts of "illegal drug dealing." *Id.* at *1. Although recognizing that those charges, which carried a "maximum sentence [of] life imprisonment," "could hardly be more serious," the *Eppolito* court granted the defendants "bail with strict conditions of control to protect the public." *Id.* Indeed, a litany of cases grant bail to defendants alleged to have significant stature in organized crime families. *See United States v. Michael J. Persico*, 10-cr-147 [Dkt. 108] (E.D.N.Y. May 13, 2010) (granting pretrial release to son of life-imprisoned mob boss, an

---

[3] Oddly, the only statements attributed to Mr. Campos in the government's motion are expressly protective of Doe, the alleged extortion victim. (Detention Ltr. at 13.)

allegedly powerful Colombo associate charged with racketeering murder); *United States v. Modica*, 09-cr-1243 (S.D.N.Y. Apr. 21, 2010) (granting pretrial release to alleged powerful Gambino soldier facing racketeering charges including double murder, jury tampering, assault and extortion); *United States v. Agate*, 08-cr-076 (E.D.N.Y. 2008) (granting pretrial release to alleged high ranking gangsters charged with violence); *United States v. Cutaia*, 08-cr-097 (E.D.N.Y. 2008) (same); *United States v. Spero*, 99-cr-520 [Dkt. 107] (E.D.N.Y. June 24, 1999) (granting pretrial release to alleged acting Bonanno boss facing four murder charges); *United States v. John A. Gotti*, 98-cr-042 [Dkt. 249] (S.D.N.Y. Sept. 16, 1998) (granting pretrial release to son of life-imprisoned mob boss, allegedly a Gambino acting boss); *United States v. Orena*, 93-cr-1366 [Dkt. 26] (E.D.N.Y. Dec. 29, 1993) (granting pretrial release to son of Colombo acting boss).[4]

The government's cases to the contrary, (Detention Ltr. at 2), include allegations of violence notably absent here. *See United States v. Giallanzo*, 17-cr-155, Indictment [Dkt. 1] (E.D.N.Y. Mar. 23, 2017) (charging, as predicate acts of RICO violations, conspiracy to murder, attempted murder, conspiracy to commit arson, attempted arson, kidnapping conspiracy, and drug distribution); *United States v. Cirillo*, 05-cr-212, Indictment [Dkt. 1] (E.D.N.Y Mar. 17, 2005) (alleging, as a predicate act for RICO purposes, at least one instance of conspiracy to murder); *United States v. Peter Gotti*, Br. of the United States as Defendant-Appellee, 2002 WL 32389771, at *5 (2d Cir. Sept. 20, 2002) (describing conspiracy to murder warden of United States Medical Center at Springfield, Missouri as well as the warden's family);[5] *United States v. Agnello*, 101 F. Supp. 2d 108, 111 (E.D.N.Y. 2000) (detailing multiple acts of arson and attempted arson directly committed or instructed by the defendant); *United States v. Defede*, 7 F. Supp. 2d 390, 395 (S.D.N.Y. 1998) (allegations that the defendant supervised "acts of violence" on behalf of the Lucchese organized crime family); *United States v. Salerno*, 631 F. Supp. 1364, 1366-68 (S.D.N.Y.), *vacated*, 794 F.2d 64 (2d Cir. 1986), *rev'd*, 481 U.S. 739 (1987), and *aff'd*, 829 F.2d 345 (2d Cir. 1987) (detailing allegations of violence, including multiple murders and conspiracies to murder).

The instant case carries a presumption favoring Mr. Campos' release. Neither the government's allegations of organized crime connections, nor the caselaw it cites in support of detention overcome that presumption.

---

[4] *See also United States v. Gambino*, 809 F. Supp. 1048, 1050 (S.D.N.Y. 1992), *aff'd*, 17 F.3d 572 (2d Cir. 1994) (discussing the significant bail packages securing the pretrial release of Joseph Gambino and John Gambino, who were captains and lieutenants in the Gambino crime family).

[5] The government cites to *United States v. Gotti*, 219 F. Supp. 2d 296 (E.D.N.Y.), *aff'd sub nom. United States v. Ciccone*, 312 F.3d 535 (2d Cir. 2002), which does not contain a detailed description of the violent acts in which Peter Gotti allegedly participated, but this Court is well aware of them, having presided over a several weeks-long trial in that case. The charges, *inter alia,* involved detailed acts of directed violence to control the Brooklyn waterfront and an attempted $3 million extortion of a famous martial-arts actor.

IV.     **The Government's Thin Allegations of Extortion Are Insufficient to Meet Its Heavy Burden of Demonstrating Mr. Campos' Dangerousness by Clear and Convincing Evidence**

> [T]o obtain an order of pretrial detention on the basis of dangerousness, the Government must demonstrate by clear and convincing evidence that a defendant poses a risk of danger to others, and that no conditions "will reasonably assure . . . the safety of the community." Clear and convincing evidence "means something more than 'preponderance of the evidence,' and something less than 'beyond a reasonable doubt.'" Put another way, a detention order must draw upon evidence that provides "a high degree of certainty" as to danger.

*Paulino*, 335 F. Supp. at 609 (quoting *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985); *accord United States v. Gallo*, No. 99 CR. 1199 LMM, 2000 WL 269894, at *1 (S.D.N.Y. Mar. 10, 2000) ("To find danger to the community under this standard of proof requires that the evidence support such a conclusion with a high degree of certainty." (quotation marks and citations omitted)). "This quite meaningful showing will only apply to a limited number of individuals." *Paulino*, 335 F. Supp. at 603.

The government argues that Mr. Campos is a "member or associate[] of the Gambino family," and as a "career criminal[] who ha[s] pledged [his] loyalty to an illegal enterprise, [he] pose[s] a distinct threat to commit additional crimes if released on bail." (Detention Ltr. at 3, 5.) But the government cannot carry its burden of demonstrating dangerousness based on mere allegations that Mr. Campos has connections to organized crime. *See supra* § III; *accord United States v. Collazo*, No. 90 CRIM. 0824 (LMM), 1991 WL 89637, at *3 (S.D.N.Y. May 21, 1991) (although there was a presumption of defendant's dangerousness, government had not met its burden by "stat[ing] that Collazo is the head of the organization that sold drugs at 1625–1631 Fulton Avenue," in the "absence of any evidence or proffer by the government that Collazo—as distinguished from 'Collazo's organization'—has, in the past, used violence against others.").

The government's other allegations against Mr. Campos are similarly insufficient—the evidence of Mr. Campos' dangerousness is, at best, thin. As an initial matter, because he is presumed innocent, contentions stemming solely from the nature of the crimes alleged in the Indictment are the "the least important of the various factors" to be considered under the statute, and should not be "afford[ed] . . . undue weight." *Paulino*, 335 F. Supp. at 613 ("To avoid punishment for a crime for which a defendant has not yet been shown to have committed, many courts have suggested that the weight of the evidence is the least important of the various factors. Thus, the Court is cautious [not] to afford this factor undue weight.") (quotation marks and citations omitted).

Furthermore, the charges themselves undermine the government's contention that Mr. Campos presents a danger. As stated earlier, the Indictment essentially depicts crimes of tax fraud and money laundering, economic crimes that would not, without more, permit the government to seek detention. *See* 18 U.S.C. § 3142(f). Defendants charged with far more extensive financial crimes are routinely released on bail. *See, e.g., United States v. Webb*, No. 15-cr-252 (PKC) [Dkt.

35] (E.D.N.Y. July 18, 2015) (defendant was released on bond with the condition of strict house arrest in international FIFA bribery case); *United States v. Seng*, No. 15-cr-706 (VSB) [Dkt. 35] (S.D.N.Y. Oct. 16, 2015) (defendant, arrested for large-scale bribery of a United Nations official while boarding his private jet to leave the country, released on house arrest); *Madoff*, 586 F. Supp. 2d at 249 (defendant, who was facing a life sentence for one of the largest fraud cases in the nation's history was released on restrictive conditions of house arrest); *United States v. Dreier*, 596 F. Supp. 2d 831-32 (S.D.N.Y. 2009) (defendant charged with $400 million fraud, who the court characterized as "not only a master of deceit and a doyen of dishonesty but the kind of person who, under stress, may resort to desperate measures," was released on bail); *United States v. Brooks*, No. 06-cr-550 (JS) [Dkt. 75] (E.D.N.Y. Jan 3, 2008) (defendant, whose fraud exceeded $140 million, released on bail).

Far from demonstrating Mr. Campos' involvement in "violent criminal activities," (Detention Ltr. at 3, 4), the government presents only a single incident allegedly involving Mr. Campos that contains even a whiff of dangerousness. (*See id.* 5-6.) And those allegations are insufficient to meet the government's burden; as to Mr. Campos, they make little sense. Specifically, the government claims that Mr. Campos "extorted an individual described in the . . . indictment as John Doe," as he "paid off multiple loans that Doe owed to others . . . and used *extortionate means* to collect the money from Doe by unlawfully retaining money otherwise due to Doe for his services." (*Id.* at 12-13) (emphasis added). This allegation is woefully devoid of detail. The government fails to proffer any facts identifying the alleged nature or source of the threats or "extortionate means" purportedly involved. Apparently recognizing the insufficiency of these allegations, the government supplements them with three sets of quotations. The first, attributed to Mr. Campos, is plainly insufficient as it does not include any threats to Doe. (*See id.* at 13.) The second and third were not made by Mr. Campos, nor has the government proffered any evidence that they were made at his behest. (*Id.*) Such meager representations cannot support a finding, by clear and convincing evidence, of Mr. Campos' dangerousness.

Finally, the government points to Mr. Campos' prior conviction, which was based on fraud, as evidence of his dangerousness. (*Id*. at 24.) Defendants with more significant criminal histories, including those with convictions for racketeering or violence, are frequently released on bail. *See, e.g., Paulino*, 335 F. Supp. 3d at 613–14 (discussing the defendant's several prior convictions, including one that was "entirely consistent with his behavior in the instant offense," prior to ordering his pre-trial release); *Cammarano*, 18-cr-15 (AKH), Bail Hearing Tr. at 53:25-54:5 (the defendant, who had a prior racketeering conviction for "loan-sharking," which included allegations "that he was at all times an associate, soldier and acting captain in the Bonnano organized crime family," released on bail); *Collazo*, 1991 WL 89637, at *3 (in a presumption case, defendant who "ha[d] twice been convicted for illegal possession of a firearm," was released on bail).

Significantly, in his prior federal case, Mr. Campos was released on bail and allowed to surrender voluntarily to the custody of the Bureau of Prisons following his guilty plea and sentencing. He perfectly complied with his conditions of pretrial release, which did not include any liberty restrictions, such as home detention and electronic monitoring, which are being offered here.

Because the government has failed to establish Mr. Campos' dangerousness by clear and convincing evidence, he should be granted pretrial release.

## V. There is Little Risk that Mr. Campos will Attempt to Obstruct Justice Upon Release

The government misconstrues the applicable standard in arguing that the obstruction of justice charges against Mr. Campos "especially counsel[] in favor of detention." (Detention Ltr. at 24.) While the government must only prove that Mr. Campos poses a risk of obstruction by a preponderance, *see United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988), the government is incorrect that "the grand jury's determination that Campos . . . obstructed justice likely satisfies the preponderance standard alone." (Detention Ltr. at 23.) The operative "question is not simply whether [his] actions can be considered obstruction, but whether there is a *serious* risk of obstruction in the future." *Madoff*, 586 F. Supp. 2d at 250 (emphasis in original). In other words, the government must demonstrate by a preponderance of the evidence that Mr. Campos will obstruct justice *in the future*, and that no combination of conditions can reasonably ameliorate that risk. It has not done so here.

The government's claim that Mr. Campos poses an obstruction risk rests almost entirely on two allegations of past obstruction—the past, however, does not necessarily presage future conduct. *See id.* ("the Court should consider past behavior in assessing the likelihood of prohibited behavior in the future, but the Government needs to show that there is a serious risk that these potential harms exist going forward."). And in any event, the weight of the evidence against Mr. Campos on that score is also razor thin.

The two allegations of obstruction in which Mr. Campos is mentioned in the detention letter are that: (1) "in November 2019, Campos and Fiore directed an individual to falsely take responsibility for conduct relating to the Additional Checks scheme," (Counts 25 and 26); and (2) the uncharged conduct that "in November 2019, Campos and Fiore directed that an individual who they believed had testified before the grand jury . . . be fired for providing truthful information to the government." (Detention Ltr. at 19.) Other than these general statements, the government is silent as to Mr. Campos' connection to either incident: Mr. Campos is not alleged to have taken the specified actions, nor does the government even proffer that he directed or was otherwise involved in these actions. The paucity of detail supporting the inference that Mr. Campos is responsible for these acts critically undermines the claim that he "took extensive steps to obstruct this investigation." (*Id.* at 18.) Mr. Campos should not be detained on this specious basis. *See, e.g., United States v. Schlegel*, No. 06-CR-550, 2008 WL 11338900, at *1 (E.D.N.Y. June 13, 2008) (defendant indicted for both conspiracy to obstruct justice, and obstruction of justice, among other offenses, and who "presented a strong risk of harming the integrity of the trial and the judicial process," released under substantial bail package, which was the "least restrictive means necessary to ensure . . . the safety of the community, and to prevent an obstruction of justice ").

Perhaps once again recognizing the weakness of its position, the government attempts to bolster its case for Mr. Campos' detention with allegations that he participated in violations of his co-defendant Martino's supervised release. (*See* Detention Ltr. at 20-21.) But these again uncharged assertions do not withstand scrutiny as to Mr. Campos. First, it is undisputed that during

the pendency of his prior case, Mr. Campos consistently complied with the terms of both his pretrial supervision and post-incarceration supervised release. Second, the alleged supervised release violations occurred in 2017—approximately six years after Mr. Campos completed his term of supervision in 2011. (*Id.* at 21.) The government's effort to tarnish Mr. Campos for aiding in another person's supervised release violations, years after his term expired without incident, should be accorded little weight.[6] Mr. Campos has never violated his court-imposed conditions of release or supervision.

In its final attempt to assert that Mr. Campos presents a risk of future obstruction, the government summarily alleges that he is "a powerful captain of the Gambino family and dedicated member of that criminal organization, he has a network of criminal associates that he can direct to commit crimes on his behalf." (Detention Ltr. at 24.) That general statement, without more, is insufficient to warrant Mr. Campos' detention. *See United States v. Gallo*, 653 F. Supp. 320, 324 (E.D.N.Y. 1986) (defendants who indicted on RICO charges and had alleged connections to organized crime, were released on bail although they "were found to constitute a danger to a potential witness").

## VI. Mr. Campos' Substantial Bail Package Ameliorates Any Risks

Should the Court find that Mr. Campos poses some risk of obstruction or danger, the substantial bail package proposed more than reasonably ameliorates any such risk. Specifically, Mr. Campos proposes a $4.5 million bond, co-signed by eight financially responsible people, and secured by four primary residences owned by Mr. Campos' closest family and friends:[7]

- the unencumbered Eastchester, New York apartment home of Mr. Campos' mother,

---

[6] The only other allegation of Mr. Campos' conduct to assist another person to violate his supervised release conditions derive from gossip and complaining by a co-defendant: comments allegedly made on April 16, 2019, years after any potential violation could have occurred. (Detention Ltr. at 23.) The government cannot meet their burden based on these wholly unsubstantiated statements.

[7] Andrew Campos' wife, Lorraine, also holds title to their family home in Westchester County where Mr. Campos and his wife live with their four daughters, ages 17 to 22 (two of their daughters are currently matriculated in local Connecticut and New York universities, but return home when school is out of session). While there is substantial equity in the family residence, the government has objected to its use as collateral for bail because the government alleges that it is forfeitable property under the Indictment. However, at this point, the property has not been seized and Mr. Campos is presumed innocent of the charges. The property retains powerful moral suasion over Mr. Campos during the litigation of this matter as it is the home of his four children, and any sudden upheaval regarding the family home would cause them severe hardship. We are prepared to offer this property as additional collateral to the bail if deemed appropriate by the Court.

      Elvira. This property is co-owned with Ms. Campos' wife, Lorraine;

- The unencumbered Bronx home of Mr. Campos' father-in-law, Paul Lembo; and

- The family homes of two lifelong friends of Mr. Campos, one of which is located in Westchester County, and the other in Rockland County.[8]

      This substantial bail package, risking the family homes of Mr. Campos' immediate family, including his mother, father-in-law, and potentially his wife and children, as well as the homes of two of his lifelong friends, who both have minor children still residing with them, presents considerable moral suasion for Mr. Campos' compliance with his conditions of release. *See, e.g., United States v. Batista*, 163 F. Supp. 2d 222, 224 (S.D.N.Y. 2001) ("Appropriate factors to consider when weighing whether a proposed suretor exercises moral suasion vary from case to case, but may include the strength of the tie between the suretor and defendant (i.e. family or close friend, close or estranged), the defendant's roots in the community, and the regularity of contact between suretor and defendant"); *United States v. Sierra,* No. 99 CR. 962, 1999 WL 1206703 (S.D.N.Y. Dec. 16, 1999) (in a presumption case, granting bail based, in large part, on the moral suasion exerted by friends and family acting as bail suretors).

      In addition to these financial components, Mr. Campos will consent to home confinement, electronic monitoring, and any other reasonable conditions sought by Pretrial Services to ameliorate any risk of dangerousness or obstructive conduct.

      This significant package is more than sufficient to reasonably deter Mr. Campos from committing any crimes or attempting to obstruct the proceedings during his pretrial release. *See, e.g., Esposito*, 309 F. Supp. 3d at 31 (although the defendant posed some risks "these risks can be reasonably mitigated by the bail conditions set forth in the Bail Order."); *Dreier*, 596 F. Supp. 2d at 833-35 (releasing defendant on substantial conditions, including home confinement, and a $10 million personal recognizance bond, despite finding "that [the defendant], if released without conditions, would pose a genuine risk. . . ."). Indeed, this proposal substantially similar to the bail package ordered in *United States v. Cammarano*. *Cammarano*, 18-cr-15 (AKH), Appearance Bond [Dkt. 75] (S.D.N.Y. Feb. 7, 2018) (conditions of release set at $4 million, secured by two properties, home incarceration, and location monitoring).

      Finally, citing a series of cases involving organized crime defendants charged with numerous instances of brutal violence, the government argues that Mr. Campos should be denied bail because "the Second Circuit repeatedly has rejected "elaborate" bail packages for dangerous defendants, including members of organized crime families shown to be involved in violent criminal activities." (Detention Ltr. at 4.) The government, however, overstates the relevance of those cases, which uniformly involved vastly more violent offenses than those alleged here. *See*

---

[8] The details of these properties, their owners, and all supporting documentation will be forwarded directly to the government for its review and investigation prior to any appearance before the Court on this bail appeal.

*United States v. Dono*, 275 F. App'x 35, 35–36 (2d Cir. 2008) (in a case involving a presumption of dangerousness, defendants who had connections to the "Colombo organized crime family" were arrested for "assaulting two individuals . . . and with using a firearm during the assault"); *United States v. Ferranti*, 66 F.3d 540, 541 (2d Cir. 1995) (defendant "stood accused of conspiracy to commit arson, arson resulting in death," among other crimes); *United States v. Orena*, 986 F.2d 628, 628 (2d Cir. 1993) (defendants indicted for "RICO charges based on predicate acts of murder, conspiracy to murder, loansharking, and illegal possession of weapons"); *United States v. Colombo*, 777 F.2d 96, 97 (2d Cir. 1985) (a 71 count indictment charged "murder, robbery, narcotics violations, arson, extortion, threats, assaults, illegal gambling, bribery, interstate theft and transportation of stolen goods, extortion and mail/wire fraud"); *United States v. Cantarella*, No. CR02-0307 (S-2)(NGG), 2002 WL 31946862, at *1 (E.D.N.Y. Nov. 26, 2002) (indictment alleged "the following violent acts: (1) a 1991 arson/arson conspiracy, (2) a 1994 kidnaping/robbery, (3) a 1995 kidnaping/robbery conspiracy," among others); *Agnello*, 101 F. Supp. 2d at 111 (detailing multiple acts of arson and attempted arson directly committed or instructed by the defendant); *United States v. Masotto*, 811 F. Supp. 878, 882 (E.D.N.Y. 1993) (indictment contained allegations of violence, including arson, robberies, and death threats).

## VII. Conclusion

The government simply has not carried its burden of demonstrating that the proposed combination of conditions presented here are insufficient to ameliorate any risks posed by Mr. Campos' pretrial release. This Court should, therefore, order Mr. Campos' release on these substantial conditions. *See* 18 U.S.C. § 3142(c) (the "judicial officer *shall* order the pretrial release of the person -- . . . (B) subject to the *least restrictive* further condition, or combination of conditions, that such judicial officer determines will reasonably assure . . . the safety of any other person and the community…") (emphasis added).[9]

Respectfully submitted,

/s/ HEM
Henry E. Mazurek
Ilana Haramati
Meister Seelig & Fein LLP
125 Park Avenue, Suite 700
New York, New York 10017

*Counsel for Defendant Andrew Campos*

---

[9] The defense is available to be heard on Mr. Campos' bail appeal at a date and time convenient to the Court. We will contact the Court's docket clerk to schedule argument.