

U.S. Department of Justice

United States Attorney
Eastern District of New York

KDE  
F.#2015R00270

271 Cadman Plaza East  
Brooklyn, New York 11201

December 13, 2019

By Hand and ECF

Honorable Frederic Block  
United States District Judge  
United States District Court  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

        Re:    United States v. Andrew Campos  
                 Criminal Docket No. 19-575 (FB)

Dear Judge Block:

        The government respectfully submits this letter in opposition to the defendant Andrew Campos's appeal from the Honorable Ramon E. Reyes, Jr.'s order detaining Campos pending trial. See Def. Ltr., ECF Dkt. No. 86. For the reasons set forth below and in the government's detention memorandum, Campos is a danger to the community and poses a substantial risk of obstruction of justice who cannot be trusted to abide by the terms of release. Therefore, in accordance with the recommendation of Pretrial Services, the government respectfully submits that the Court should affirm Judge Reyes's order of detention pending trial.

I.       Background

        On December 4, 2019, a grand jury returned an indictment charging Campos and others with, among other things, racketeering conspiracy for a multitude of crimes he committed as part of his membership in the Gambino organized crime family of La Cosa Nostra (the "Gambino family"). See Indictment, ECF Dkt. No. 15. Among other things, Campos is charged with extortionate collection of credit, obstruction of justice and a variety of different frauds, including honest services wire fraud, relating to, among other things, Campos's operation of CWC Contracting Corp., a carpentry and drywall company. See id.

        Campos was arrested on the morning of December 5, 2019. See Minute Entry, ECF Dkt. No. 31. That day, the government filed a detention memorandum seeking to have Campos and certain other defendants detained as dangers to the community and/or posing a

substantial risk of obstruction of justice.  See Detention Memo., ECF Dkt. No. 17.  As detailed therein, Campos, who has already served time in federal prison, is a powerful captain in the Gambino crime family who has earned millions of dollars in ill-gotten wealth, which he has distributed to other members and associates of La Cosa Nostra.  See Id.

On December 5, 2019, Campos was arraigned on the indictment.  See ECF Dkt. No. 31.  That same day, Campos requested that he be released on a substantial bail package, which is materially the same as the one proffered in his appeal to Your Honor.  Following extensive argument, Judge Reyes granted the government's motion for detention, finding that it "satisfied its burden to prove by a preponderance on obstruction of justice and clear and of convincing danger to the community."  Dec. 5, 2019 Tr., Ex. A, at 32.  With respect to the package proposed by Campos, Judge Reyes explained that "the Second Circuit has been clear for a long time[ that e]laborate bail packages in these types of cases are insufficient.  In fact, they have . . . affirmed the rejection of even more substantial package with more conditions."  Id.  Therefore, Judge Reyes held that the proposed package could not ensure Campos's compliance with any conditions of release and ordered him detained pending trial.  This appeal followed.

## II. Analysis

The government's detention memorandum sets forth the reasons why, as both Judge Reyes and Pretrial Services concluded, Campos is a danger to the community and a substantial risk of obstruction of justice who cannot be released pending trial.  Therefore, the government does not repeat here the myriad reasons why Campos cannot be trusted to abide by any terms of pretrial release.  Rather, the government responds briefly to the arguments raised by Campos in his appeal from Judge Reyes's order.

### A. Campos Misstates the Facts of the Case

Throughout his appeal, Campos misstates the facts of the case in an attempt to downplay the seriousness of the allegations in the indictment.  For instance, Campos claims that the indictment "essentially presents an economic crimes case . . . fairly common-place in the New York construction industry."  Def. Ltr. at 2.  According to Campos, the indictment contains "boilerplate language" relating to the operation of the Gambino crime family that is "disconnected" from the relevant predicate acts.  Id. at 2-3.  This is false.

The indictment's introductory paragraphs are not mere "boilerplate" – they are a description of an ongoing, powerful criminal enterprise, including its structure and the methods and means by which it earns illicit proceeds for its members and associates.  That this language has been used in many prosecutions "in the last 25 years," Def. Ltr. at 2, does not mean they are to be ignored; instead, this reveals that the Gambino family is alive and well, earning millions of dollars in illegal profits for its members and associates, including Campos.  For instance, through his various offenses frauds, Campos was able to enrich other members of the Gambino crime family – including, for instance, by performing work at the home of a relative of soldier and co-defendant James Ciaccia; at a location operated by a

2

friend of soldier and co-defendant Richard Martino; and at a location in New Jersey owned by Francesco Cali, the underboss of the Gambino crime family at the time of his death in March 2019.

Accordingly, Campos is not charged in a run-of-the-mill economic crimes case. He committed a variety of crimes – including various forms of fraud and money laundering – to enrich himself and other members and associates of a long-running and profitable criminal enterprise. This alone is sufficient to constitute a danger to the community, as Congress has directed that "dangerousness" is not limited to just acts of violence. See Senate Report at 3195 ("[L]anguage referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.").

In any event, Campos is charged with more than just non-violent offenses as the indictment alleges his participation in the extortionate collection of credit from John Doe as well as efforts to obstruct justice, and Campos's attempts to minimize this misconduct are unavailing. In describing the extortion offenses, Campos claims these rely on the "uncorroborated testimony of a single individual, one of the government's cooperating witnesses." Def. Ltr. at 3. According to Campos, his collection of the debt owed by Doe by withholding money due to Doe for services rendered is nothing more than offsetting "earlier credits extended to [Doe's] company by CWC as pre-payments for expected construction work." Id.

Simply put, this proffer is false. For one thing, the evidence in support of these offenses does not consist solely of Doe's "uncorroborated" statements. Rather, it includes, among other things: (i) consensual recordings, including Campos's discussion of the money Doe owed to Campos; (ii) wiretap recordings of, among others, co-defendant Vincent Fiore, who directly threatened Doe with physical violence; and (iii) a spreadsheet maintained by Fiore documenting the collection of money from Doe each week. Therefore, the government proffers, and the evidence indicates, that Campos and Fiore collected over $100,000 from Doe through implicit, and at times explicit, threats of violence.

Campos notes that there are no allegations that he personally threatened Doe to collect the money, but overlooks the fact that, by virtue of his high-ranking position in the Gambino crime family, he did not need to himself make such threats because he had others and his disposal, particularly Fiore, to do so. Indeed, Campos all but ignores the wiretap conversation quoted in the detention memorandum in which Fiore repeatedly threatened to "knock [Doe's] fucking teeth out," stating that Doe will have to "deal with him," i.e., Campos.[1] Campos therefore was able to profit off of the threats committed by others. This

---

[1] For this reason alone, Campos's attempts to distance himself from the use of threats of violence are misplaced. See Def. Ltr. at 3-4. Although Campos made not have made these specific statements, the fact that Fiore directed Doe to report to "him," i.e., Campos, is powerful evidence of Campos's involvement in the extortionate collection of credit.

3

power and ability to use other criminals to do his bidding – precisely how La Cosa Nostra operates – reinforces the need to detain Campos pending trial.

The same is true with respect to Campos's of obstruction of justice. Campos again claims, without any basis, that these allegations are supported only by "uncorroborated statements of the cooperating witness" and only "indirect" evidence of Campos's involvement. Def. Ltr. at 4. The government is prepared to prove Campos's participation in these crimes through, among other things, the testimony of multiple witnesses and consensual recordings documenting the obstructive efforts, which is persuasive evidence of Campos's personal involvement. For instance, in a recorded conversation, Fiore told an individual that, as a "personal favor to Andrew," he had to fire a laborer because the government had the laborer "down to the grand jury" and testified even though, as Campos wished, the worker "could've pled the Fifth." Fiore's documented references to the wishes of Campos, Fiore's captain in the Gambino crime family, are direct, overwhelming proof of Campos's involvement in an effort to retaliate against a witness for testifying in the grand jury. See 18 U.S.C. § 1513(e) (stating that "[w]hoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense" shall be punished). Therefore, Campos's attempts to hide behind Fiore and place the blame at his feet for passing along Campos's message should be rejected.

So too should Campos's argument that he should be released because his obstruction of justice occurred in November 2019, months after the search of CWC's office in June 2019. See Def. Ltr. at 4 (observing that the obstructive conduct occurred "just last month"). To the contrary, the fact that Campos has so recently retaliated against a witness for testifying in the grand jury is powerful evidence that he is likely to do so in the future now that he has been charged and faces a substantial time in prison.[2]

---

Similarly, although Campos told Doe that Campos would leave Doe's prior creditor (and not Doe) "on the sidewalk" to "die that day," they reveal Campos's dangerousness and willingness to resort to violence. As Doe himself owed Campos money, Campos's threats constitute, at a minimum, an implied threat to Doe if he did not repay the loan. See 18 U.S.C. § 891(7) (defining "extortionate means" as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person").

[2] Campos notes that these acts occurred in the past, observing that "the past . . . does not necessarily presage future conduct." Def. Ltr. at 10. True, the government cannot predict the future and can only report what has happened in the past. But the fact that Campos has on multiple occasions, including just weeks ago, obstructed the ongoing investigation indicates there is a "serious risk" that he will do so in the future.

4

Accordingly, when properly framed, Campos stands charged of a litany of serious offenses that were committed to further the goals of a violent and criminal enterprise. Given those crimes – including extortionate collection of credit and multiple acts of obstruction of justice – the nature and circumstances of the offenses weigh heavily in favor of detention. See 18 U.S.C. § 3142(g)(1).

B. Campos Ignores the Relevance of His Facilitation of Martino's Violations of His Supervised Release

In his bail appeal, Campos claims that because he was not found to have violated his pre-trial or post-incarceration supervised release stemming from his prior federal conviction, he should be trusted to again be on bail pending trial. See Def. Ltr. at 10-11. In doing so, Campos downplays the repeated, documented instances in which Campos facilitated co-defendant Richard Martino's evasion of his court-authorized supervised release by, among otherings, meeting together and passing messages to one another. See Detention Memo. at 20-21. Campos claims that because these violation occurred in 2017 – approximately six years after he completed his own term of supervised release – these serve only to "tarnish Mr. Campos for aiding in another person's supervised release violations" and should be "accorded little weight." Def. Ltr. at 11.

In fact, Campos's repeated meetings and communications with Martino in violation of Martino's terms of supervised release – as confirmed by, among other things, wiretap recordings and physical surveillance – demonstrate Campos's ability and desire to evade court-authorized supervision. This is extremely relevant in determining whether Campos can be trusted to abide by any terms of release. As detailed in the government's detention memorandum, Campos and Martino used intermediaries – including co-defendant Frank Tarul – to pass messages to one another and set up clandestine and forbidden meetings. This is precisely the conduct that Campos can, and is likely to, commit if released on bail despite any conditions of release the court might impose. Therefore, Campos's demonstrated capability and willingness to evade court-authorized supervision counsels strongly against his release in the instant case.

C. Campos's Commitment to the Gambino Crime Family Is Extremely Probative of His Dangerousness

Throughout his bail appeal, Campos also tries to cast aside the importance of the extensive evidence of his high-ranking position within the Gambino crime family. For instance, Campos asserts that the government is "presum[ing] a defendant's dangerousness based solely on alleged ties to organized crime." Def. Ltr. at 5. In actuality, the government contends that a defendant's long-standing membership in organized crime, in conjunction with other factors, weighs heavily in favor of detention because, as courts have recognized, illegal businesses operated by La Cosa Nostra require constant attention and protection and "a strong incentive on the part of its leadership to continue business as usual." United States v. Salerno, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986). Indeed, a member of La Cosa Nostra must pledge life-long allegiance to his crime family even above his own blood family,

5

further revealing that detention is appropriate since a high-ranking member is likely to continue to commit crimes even after an arrest. See United States v. Colombo, 777 F.2d 96, 99 (2d Cir. 1985) ("In light of Congress' direction that '[w]here there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate.'" (quoting Senate Report at 3189)).

Here, Campos does not – and cannot – dispute the overwhelming evidence of his powerful position within the Gambino family. As set forth in the government's detention memorandum, Campos is a captain in this criminal organization who, among other things, attended multiple meetings with other high-level Gambino family members in the wake of Cali's murder. See Detention Memo. at 11-12. In addition, Campos has for years kept in his bedroom closet photographs of himself and Martino visiting in prison Frank LoCascio, who was the underboss of the Gambino family under boss John Gotti and is currently serving a life sentence for, among other offenses, murder. See id., Ex. A. The fact that Campos has remained so committed to this organization – even after serving 21 months in federal prison following his prior conviction in this District – shows that, like other members of La Cosa Nostra, Campos is committed to committing crimes on its behalf, and is likely to continue to do so going forward. Therefore, in light of all of the circumstances of this case, Campos's commitment to the Gambino crime family also weighs heavily in favor of detention.

D. Campos's Cited Authority Is Inapposite

Campos cites a variety of cases in support of his appeal from Judge Reyes's detention order, and while each case is unique and has its own distinguishing facts and circumstances, the government notes that much of Campos's cited authority is inapposite.

For instance, Campos relies heavily on United States v. Persico, 376 F. App'x 155 (2d Cir. 2010), for the proposition that the Second Circuit has "rejected the government's argument[ i.e.,] presuming a defendant's dangerousness based solely on alleged ties to organized crime." Def. Ltr. at 5. In that case, the district court misapplied the Bail Reform Act, erroneously concluding that attempted extortion, in violation of 18 U.S.C. § 1951, meant that the defendant was presumed to be dangerousness under the law. See 376 F. App'x at 156. The Second Circuit ultimately did not determine whether the district court's determination of the dangerousness of the defendant, who had no criminal history and whose meetings with members of the Colombo crime family were often with blood relatives, was clearly erroneous. See id. at 157 ("[W]e need not determine whether the instant facts require us to reverse the district court's ruling . . . ."). Rather, given the legal error in applying a presumption of dangerousness, the Court vacated the detention order and directed the district court to "reconsider [the defendant's] application for release." Id.

Here, by contrast, neither Judge Reyes nor this Court has made any legal error in applying the Bail Reform Act. Campos has already served time in federal prison for prior crimes he committed as part of his membership in the Gambino crime family, and has met with numerous other members of the Gambino crime family and La Cosa Nostra members

6

who are not his relatives. Unlike Persico, Campos has also committed multiple acts of obstruction of justice. Therefore, that case does not support Campos's appeal.

Campos's reliance on United States v. Esposito, 309 F. Supp. 3d 24 (S.D.N.Y. 2018), is also misplaced. In this non-binding decision, the defendant, who had no criminal history, had been charged with the same crimes as those who had been granted bail. After the government appealed the magistrate judge's release order, the parties ultimately agreed that the defendant could be released and only disagreed about whether the defendant had to pay for an armed guard to be outside the defendant's home. See id. at 29-30. Here, of course, there is no agreement, and Campos has a prior federal conviction, has been willing and capable of evading court-authorized supervision and is charged with obstructing justice, facts which distinguish the instant case.

III. Conclusion

For the foregoing reasons, and for those detailed in the government's detention memorandum, the government respectfully requests that, in accordance with the recommendation of Pretrial Services, the Court affirm Judge Reyes's permanent order of detention entered as to the defendant Andrew Campos.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:  \_\_\_/s/_____
Keith D. Edelman
Kayla C. Bensing
Assistant U.S. Attorneys
(718) 254-6328/6279

cc: Clerk of Court (by ECF)
Defense Counsel (by ECF)