

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

KDE/KCB
F.#2015R002701

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 10, 2020

<u>By E-mail and ECF</u>

The Honorable Rachel P. Kovner
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    <u>United States v. Andrew Campos</u>
                  <u>Criminal Docket No. 19-575 (FB)</u>

Dear Judge Kovner:

        The government respectfully submits this letter to notify the Court of a violation of the defendant Andrew Campos's conditions of release and request that the Court revoke the defendant's bond and order him remanded pending trial.[1]

I.        <u>Background</u>

        A.        <u>The Charges and Procedural History</u>

        On December 5, 2019, the defendant was arrested and presented before the Honorable Ramon E. Reyes, Jr., having been charged with, among other crimes, racketeering conspiracy, including predicate acts of extortionate collection of credit, wire fraud and obstruction of justice. <u>See</u> Ind., ECF Dkt. No. 15. As detailed in the government's detention memorandum, the defendant is a powerful captain in the Gambino organized crime family of La Cosa Nostra (the "Gambino family") who, after having served 21 months in federal prison, has again used his position in that enterprise to enrich himself and other members and associates of organized crimes through a multitude of offenses, including many relating to his firm, CWC Contracting Corp. <u>See</u> Detention Mem., ECF Dkt. No. 17. In addition to the allegations in this case – which include earning millions of dollars of illicit proceeds,

---

[1] The government understands that the Honorable Frederick Block, to whom this case is assigned, is currently unavailable. Accordingly, the government makes the instant application to the Honorable Rachel P. Kovner, who is the miscellaneous district judge.

extorting a witness of over $100,000, retaliating against a witness for having testified in the grand jury and managing other important affairs of the Gambino family – Campos had been observed in 2017 meeting with a former co-defendant in violation of that person's terms of supervised release. See id. at 20-21. At the December 5 arraignment, Judge Reyes ordered the defendant detained pending trial.

The defendant appealed Judge Reyes's detention order to Judge Block, who heard oral argument on the motion on December 19, 2019. See Ex. A (Tr. of Dec. 19 Hr'g). During the oral argument, defense counsel maintained that the proposed bail package afforded sufficient moral suasion over the defendant such that he would abide by any terms of release. See, e.g., id. at 6:18-21 ("So what we've presented here, after a balancing of the 3142(g) factors, we believe is an incredibly substantial package of sureties that carry huge moral suasion on Mr. Campos."). Among other things, the government expressed its concern that the defendant would be able to continue to commit crimes and manage the affairs of the Gambino family by, among other things, using unmonitored cellular telephones. See, e.g., id. at 11:3-16. The Court later asked counsel:

> THE COURT: Does your client realize if there is <u>one slip up</u>, one phone call to somebody he should not be speaking to, <u>anything at all</u>, that all these folks are going to lose their home. Does he realize that?
>
> MR. MAZUREK: Yes, he does.
>
> THE COURT: <u>That will happen</u>.

Id. at 20:24-21:5 (emphases added).

On December 23, 2019, the Court vacated Judge Reyes's detention order and directed that the defendant be released on certain strict conditions (the "Release Order"). The Court held that those conditions would "severely limit [the defendant's] ability to engage in other crimes or acts of obstruction without the government's knowledge," and the "risk of [the suretors' financial] loss should Campos violate any of the conditions of his release" was sufficient moral suasion to ensure the defendant's compliance. Release Order, ECF Dkt. No. 104, at 3-4.

As relevant here, the Court ordered that the defendant be released on a $4.5 million bond, placed on home detention and "subject to electronic monitoring of his cellular telephone and other internet-enabled devices by Pretrial Services." Id. at 5. The Release Order specified that "[t]he defendant shall not access any cellular telephones or other internet-enabled devices belonging to his wife and children. All such devices shall be protected by passwords to which the defendant does not have access." Id. The defendant was released on December 26, 2019. See Bond, ECF Dkt. No. 112. Consistent with the Release Order, the executed bond specified that the defendant was "subject to electronic monitoring of cell phone and internet enabled devices by PTS [i.e., Pretrial Services]. Cell

phone or other internet devices belonging to his wife and children shall be password protected [to] which the [defendant] does not have access." Id. Subsequent to his release, the defendant affirmed to Pretrial Services that he would not use any cellular devices but would instead use a computer (that would be monitored) and a landline (that would not be monitored). Therefore, the defendant is not permitted to use any cellular telephones. The Release Order cautioned the defendant that "violating any of the foregoing conditions of release may result in the immediate issuance of a warrant of arrest, a revocation of the order of release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both." Release Order at 6.

      B.      The February 10 Use of a Cellular Telephone

On February 6, 2020, the defendant filed a motion, with consent of the government, seeking permission to take one of his daughters to a medical appointment in Connecticut (the "Connecticut Doctor") on February 10, 2020. See Ltr., ECF Dkt. No. 143. On February 7, 2020, the Court granted this request.

On February 10, law enforcement officers conducted surveillance on the defendant to ensure his compliance with the terms of his release. Specifically, at approximately 11:40 a.m., a Special Agent with the Federal Bureau of Investigation observed the defendant and his daughter arrive in the publicly-accessible waiting area of the Connecticut Doctor's office. After the daughter checked in, she sat next to the defendant. At approximately 12:24 p.m., the agent observed the defendant, seated next to his daughter, with his head down using a cellular telephone. (See Ex. B (photograph of the defendant in a tan shirt and black jacket in the center of the picture).[2])

At approximately 12:30 p.m., the defendant and his daughter got up and went into another, not publicly-accessible area of the office (the "Back Area"). By at least approximately 2:23 p.m., the defendant had returned from the Back Area and was seated alone in the public waiting area. At approximately 2:41 p.m., the defendant – without having been called by any staff – got up and went back to the Back Area. At approximately 3:43 p.m., the defendant and his daughter returned to the waiting room, left the Connecticut Doctor's office, went to their vehicle and the defendant drove them away.

Thereafter, the defendant and his daughter arrived back at the defendant's home and agents stopped the defendant and searched his person. The defendant did not have any cellular devices on his person and gave consent to search his vehicle, which also did not have such devices. The defendant's daughter declined to give consent to search her cellular telephone. The defendant asked an agent why he had been stopped, and the agent informed him, in sum and substance, that he had been seen using an electronic device. The defendant denied doing so.

---

[2] Although the photograph does not explicitly picture the telephone, it does reveal the defendant's head down, with his right wrist in front of him, looking at an object, which the agent observed was a cellular telephone.

II.   Applicable Law

    A.   General Principles

In its detention memorandum, the government detailed the principles governing pretrial release and does not repeat them here. See Detention Mem. at 2-5. The government does stress, however, two principles articulated by the Second Circuit that are particularly relevant here: (i) organized crime defendants are especially likely to violate the conditions of bail, see id. at 3; and (ii) elaborate bail packages that seek to "replicate a detention facility without the confidence of security such a facility instills," particularly those that enable a wealthy defendant to enjoy pretrial release whereas a poorer but similarly-situated defendant would not, are inappropriate. United States v. Millan, 4 F.3d 1039, 1049 (2d Cir. 1993) (internal citations and quotation marks omitted); see generally United States v. Boustani, 932 F.3d 79 (2d Cir. 2019) (holding that the Bail Reform Act does not permit two-tiered bail systems where wealthy defendants are effectively released to "self-funded private jails").

    B.   Standard for Bond Revocation

Under 18 U.S.C. § 3148(a), "[a] person who has been release[d] under [18 U.S.C. § 3142] and who has violated a condition of his release, is subject to a revocation of release, an order of detention, and a prosecution for contempt of court." 18 U.S.C. § 3148(a). A proceeding for revocation of an order of release may be initiated by the government "by filing a motion with the district court." Id. Section 3148(b) further provides, in relevant part, that if the Court finds that: "(A) based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or (B) the person is unlikely to abide by any condition or combination of conditions of release," then the Court "shall enter an order of revocation and detention."[3] The Court retains discretion to hold an evidentiary hearing on the revocation, but may revoke a defendant's bail without such a hearing where the Court makes a sufficient finding on the record before it. See United States v. Galanis, 656 F. App'x 560, 562 (2d Cir. 2016) (summary order) (affirming the district court's revocation of bail without an evidentiary hearing, finding that the district judge "acted within his discretion in proceeding based on the government's proffer and his review" of the evidentiary record).

---

[3] Section 3148(b) also provides that "[t]o the extent practicable . . . [the defendant] shall be brought before the judicial officer who ordered the release and whose order is alleged to have been violated." As set forth above, although Judge Block ordered the defendant's release on December 23, 2019, the government understands that Judge Block is currently unavailable. The government thus directs this application to Judge Kovner, the miscellaneous district judge.

4

III.     Analysis

The government has repeatedly argued that the defendant cannot be trusted to abide by any terms of release. Given his long-time, high-ranking status in a violent criminal enterprise, his prior federal conviction, the serious nature of the instant offenses and his repeated efforts to obstruct justice and help evade court-authorized supervision, the government has requested that the defendant be detained pending trial. The government envisioned that if released, the defendant could, among other things, use a family member's unmonitored cellular telephone in contravention of any court order. See, e.g., Dec. 20, 2019 Ltr., ECF Dkt. No. 102, at 3 (arguing that "asking Campos's family members to promise not to give their father or husband access to their devices shifts all responsibility for compliance to Campos and his family, and does so in a way that makes oversight of that compliance by Pretrial Services or the government almost impossible").

Unfortunately, the defendant has proven the government correct. Less than two months after his release from custody, and during his first court-authorized trip outside the home, the defendant was caught using a cellular telephone in direct contravention of his terms of release. Although the government is still investigating the nature of the unauthorized use of the cellular telephone, the fact that it occurred at all – coupled with his false denial to law enforcement – shows that the defendant cannot be trusted to abide by any terms of release. Indeed, despite counsel's repeated assurances to the contrary, the purported moral suasion instilled by his friends' and family members' role as sureties was not sufficient to ensure that the defendant abided by the terms of release. That the government was able to observe the defendant's illicit use of a cellular device on this one occasion – when the defendant was in public and, one would expect, would be on his best behavior – reinforces the government's concern that the defendant is able to have much more extensive, unmonitored communications while in the privacy of his own home.

In short, in light of all of the facts and circumstances of this case, the defendant's blatant disregard for the terms of his release, despite the severe financial consequences on his suretors, reveals that the defendant is "unlikely to abide by any condition or combination of conditions of release." 18 U.S.C. § 3148(b)(2)(B). As such, the Court "shall enter an order of revocation and detention." Id. § 3148(b).

IV.    Conclusion

        For the reasons set forth above and in its prior submissions, the government respectfully requests that the Court revoke the defendant's bond and that he be detained pending trial.

        Respectfully submitted,

        RICHARD P. DONOGHUE
        United States Attorney

By:       /s/
        Keith D. Edelman
        Kayla C. Bensing
        Assistant U.S. Attorneys
        (718) 254-6328/6279

cc:    Clerk of Court (FB) (by ECF)
        Defense Counsel (by ECF)

Encl.