1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
2  ------------------------------x
                                    19-CR-575(FB)
3  UNITED STATES OF AMERICA,
                                    United States Courthouse
4                                   Brooklyn, New York

5          -against-               December 19, 2019
                                    2:30 p.m.
6  ANDREW CAMPOS,

7          Defendant.

8  ------------------------------x

9          TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPEAL
              BEFORE THE HONORABLE FREDERIC BLOCK
10             UNITED STATES SENIOR DISTRICT JUDGE

11 APPEARANCES

12 For the Government:        UNITED STATES ATTORNEY'S OFFICE
                              Eastern District of New York
13                            271 Cadman Plaza East
                              Brooklyn, New York 11201
14                            BY:  KEITH EDELMAN, ESQ.
                                   KAYLA BENSING, ESQ.
15                            Assistant United States Attorneys

16 For the Defendant:        MEISTER SEELIG & FEIN LLP
                              125 Park Avenue
17                            New York, New York 10017
                              BY:  HENRY MAZUREK, ESQ.
18                                 ILANA HARAMATI, ESQ.

19 Also present:             SHAVOY AKINSON, Pretrial Services

20
   Court Reporter:           Rivka Teich, CSR, RPR, RMR, FCRR
21                            Phone:  718-613-2268
                              Email:  RivkaTeich@gmail.com
22
   Proceedings recorded by mechanical stenography.  Transcript
23 produced by computer-aided transcription.

24

25

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

1          (In open court.)

2          THE COURTROOM DEPUTY:  All Rise.  Criminal cause for

3     bail appeal, United States of America V. Andrew Campos.

4          I would ask the parties to state your appearances.

5          MR. EDELMAN:  Good afternoon, your Honor.  Keith

6     Edelman and Kayla Bensing.

7          THE COURT:  Good afternoon.

8          MR. MAZUREK:  Good afternoon, your Honor, Henry

9     Mazurek and Ilana Haramati.

10          THE COURT:  I should make a public disclosure that I

11     recently married Mr. Edelman's father, and I had not seen him

12     for 30 years before I did that.  But I guess I do have that

13     type of relationship with the family.  I don't know

14     Mr. Edelman at all.  I met him briefly at the wedding.

15          MR. EDELMAN:  I made a similar disclosure to defense

16     counsel before.

17          THE COURT:  If you have any problems, don't hesitate

18     to let me know.

19          MR. MAZUREK:  Thank you, your Honor.  Your Honor,

20     Mr. Campos is now with us.

21          THE COURT:  I'm going to give this proper attention

22     of course.

23          Let me ask the Government -- I should really first

24     ask Mr. Mazurek, Judge Reyes of course conducted a hearing.  I

25     think that the transcript runs about 34 pages.  He made

1  findings.  There was a lot that he considered, a lot of

2  material that had been presented.  Give me the reasons why I

3  should not be similarly persuaded and why you think that Judge

4  Reyes was not correct.

5       I know I have to make de novo determinations, but

6  this is a good jumping-off point.  We have a good Magistrate

7  Judge who gave a lot of time and attention to this.  I don't

8  think it's likely, but I want to hear why you think he was

9  wrong.

10       Mr. Mazurek, you have the floor.

11       MR. MAZUREK:  Thank you, Judge.  There are a number

12  of things that I would like to raise as the reasons why a de

13  novo review here, your Honor, should find that the Government

14  has not met its burden under the Bail Reform Act is moving for

15  dangerousness as a reason for pretrial detention here.

16       As your Honor is aware, that burden is higher on the

17  Government when they move under dangerousness under clear and

18  convincing evidence.  We've also moved for the tension based

19  on serious risk of future obstructive behavior.

20       I'll start by saying under the 3142(g) factors, the

21  Court has to review under the Bail Reform Act, your Honor.

22  One significant difference in the presentation that we made to

23  your Honor from the one that was made at the time of initial

24  presentment of Mr. Campos, is that the conditions that we have

25  proposed are more restrictive and also carry even greater

1    moral suasion on this defendant.  The bail properties and the

2    bail that we now propose is almost three times higher from

3    what was originally available to us at the time --

4           THE COURT:  Mr. Edelman, is it the Government's

5    position there is no bail package at all that could possibly

6    be offered that would warrant letting him sit at home instead

7    of him sitting in jail?

8           MR. EDELMAN:  That's correct, your Honor.  We

9    believe, and we can go in more detail, we believe there are no

10   conditions the Court can impose that will reasonably ensure

11   Mr. Campos' compliance with all terms of release.

12          THE COURT:  I don't know whether the Second Circuit

13   has ever come down and said that.  I know that they don't

14   necessarily support the notion that a substantial bail package

15   is sufficient to justify releasing somebody from

16   incarceration.  I don't think they ever said it's lights out

17   under all circumstances.  You can educate me if I'm not

18   correct.

19          MR. EDELMAN:  I believe the Second Circuit has said

20   that organized crime defendants pose a particular risk, such

21   that the elaborate bail packages that recreate what a prison

22   would be like except the defendant is at home are disfavored

23   particularly in these cases.  The reason why --

24          THE COURT:  There's a difference between disfavored

25   and saying under no circumstances.  Can there ever be a bail

BAIL APPEAL

1   package or conditions of release that will protect the public,

2   et cetera, et cetera?

3          MR. EDELMAN:  I agree, your Honor.  In this case

4   under these particular facts there are no set of conditions

5   that can do so.  One of which, one of the primary reasons for

6   that is Mr. Campos' ties and high position in the Gambino

7   crime family.

8          THE COURT:  I understand all of those things.  I

9   want to know, as a legal matter, what the Second Circuit's

10  position is.  I don't think they ever said that under no

11  circumstances can you give someone bail because they have are

12  member of the Gambino crime family.

13         MR. EDELMAN:  It's not an automatic, if somebody is

14  a member of organized crime they automatically cannot be

15  granted bail.  In fact, there are other members of organized

16  crime in this case that we've consented to because the facts

17  are different.

18         THE COURT:  Because it's a fact-specific inquiry.

19  It's not all inclusive as a matter of law dynamic.

20         MR. EDELMAN:  I agree.

21         THE COURT:  Continue.

22         MR. MAZUREK:  Thank you, your Honor.  Just in quick

23  reply to what the Government mentioned about the cases that

24  they cited on page seven of our December 11 submission to the

25  Court, I think those cases are fairly distinguishable under

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

1  the facts.

2          I agree with your Honor that I think that this case

3  has to be a fact-specific inquiry before you determine that

4  there no conditions that can satisfy the Court that Mr. Campos

5  would not be a danger or obstruct justice in future

6  proceedings here.

7          In fact, I do believe that the conditions -- let me

8  go back.  What the Government is saying is that they want to

9  create a presumption that doesn't exist in the Bail Reform

10 Act.  Their presumption is if you make charges that there is

11 an affiliation with organized crime or as a gang member, then

12 that should be a presumption against bail.  The only

13 presumptions against bail are for the statutory offenses that

14 are identified in the Bail Reform Act, this is not one.

15         This is a case where there is a presumption for

16 bail.  As your Honor is also aware, 3142(j), there is a

17 presumption of innocence throughout of these proceedings.

18         So what we've presented here, after a balancing of

19 the 3142(g) factors, we believe is an incredibly substantial

20 package of sureties that carry huge moral suasion on

21 Mr. Campos.

22         We included conditions that require him to be under

23 strict home detention under electronic monitoring.

24         THE COURT:  Let me interrupt again.  Tell me how

25 your bail package now differs from what was presented to Judge

1  Reyes.

2          MR. MAZUREK:  We have additional suretors.  We have

3  two sets of homes, family homes, close family friends who have

4  children still at their home.  These people have known

5  Mr. Campos and his family for almost his entire adult life.

6  They carry -- the one family who is here, Mario Simone and his

7  wife, live in Nanuet, New York.  They've come down to be here

8  today.  They offered their family home, an equity value of

9  almost $500,000 after mortgage on the property.  Roger

10  Pagnelli and his wife Joanne live in Rye, New York, and have a

11  property that is worth close to equity value over $3 million.

12  They have now come forward and said they are willing to put

13  their family home at stake in this case.  In addition, Paul

14  Dembo, who is Mr. Campos' father-in-law, his wife's dad, is

15  here with his wife.  They have agreed to put their home in the

16  Bronx, which is almost a million dollars in equity, as surety

17  for Mr. Campos' bail.

18          Your Honor, when we first appeared at the time of

19  the initial presentment, obviously the arrest was unannounced,

20  we gathered as much as we possibly could at that time.  I made

21  a presentation for bail at that time.

22          Since then, even more people, the ones I've just

23  identified, have come forward and said they are willing to

24  speak and put their livelihoods, their biggest assets, their

25  family home on behalf of Mr. Campos.  I think that this is

1    significant and a substantial difference.

2            Also, one other thing, your Honor, is that what was

3    not immediately known to us or available or understood at the

4    time of the date of arrest, is that the Government presents

5    this substantial, this heavy-weighted Indictment of about 50

6    pages, that really required some parsing through, which I did

7    not originally have at the time an opportunity to do at the

8    initial presentment.  As we indicated in our papers, this is a

9    largely economic crimes case.

10            THE COURT:  There are allegations here of extortion

11   and threats of extortion and things that accompany that type

12   of dynamic.  It's largely economic, but not 100 percent.

13            MR. MAZUREK:  I said largely.  You're absolutely

14   correct, your Honor, in your description of it.  There is only

15   one count of extortion.  That count of extortion as to my

16   client has thin evidence.  The only evidence is based on the

17   testimony of a cooperating witness who is alleged to have

18   extorted.

19            THE COURT:  Let me ask -- I go back and forth as

20   things pop into my head.  When I first took the bench, I used

21   to say, "I don't mean to interrupt but," but then I realized I

22   do mean to interpret, that's what I'm supposed to do.

23            I'm trying to get a handle in the practical realm of

24   things as to what risks there really are if he's sitting at

25   home instead of jail.  He's not in the SHU, so to speak.  He's

1   not detained that way.  He has access to the general jail

2   population.  He has people who are allowed to visit him.  He

3   can talk to these folks privately.  What is the real

4   difference between him sitting in jail and sitting at home?  I

5   guess he would prefer the food at home than in jail, but what

6   else, really, do we have to worry about as a practical matter.

7   The use of the telephone I suspect is what you're going to

8   say, right?

9         MR. EDELMAN:  That is one of the many risks I think

10   that are posed if the defendant is released versus in jail.

11         If Mr. Campos is in jail his visitors have to be

12   preapproved, we know who he is meeting with.  His telephone

13   calls are recorded, his e-mails are recorded or downloadable

14   by the Government.  So there is an extra strong layer of

15   protection that Mr. Campos is not going to continue to commit

16   crimes, as well as operate the affairs of the Gambino crime

17   family.

18         THE COURT:  Let me stop you.  Because I'm just not

19   as technically on top of the world as younger people are.  The

20   technology is so fast-moving that it's hard to keep up with

21   it.

22         But isn't there means, for lack of a better word, to

23   bugging his home to hear exactly what goes on while he's

24   sitting at home?

25         MR. EDELMAN:  I believe that is probably

BAIL APPEAL

1    technologically feasible.  I'm not -- that's something that

2    pretrial --

3          THE COURT:  I'm exploring these things.  There is

4    the presumption of innocence.  We understand that someone who

5    is charged with being a capo of a crime family, there is a lot

6    of demonizing that goes along with that and imagery.  I

7    understand all that.  I had the Peter Gotti trial.

8          MR. MAZUREK:  I was there too, working with Gerry

9    Shargel.

10         THE COURT:  I remember that.

11         As a practical matter, a real risk of danger, if we

12   do have this technical capacity to find out what he's doing at

13   home.  The only difference between him and the home is the

14   food I guess and the creature comforts of being at home

15   instead of jail.  If we can find out exactly what he's doing

16   while at home, I imagine we can find that out, or that is

17   something that is not so difficult to ascertain.

18         Am I technologically off-base or is it something to

19   inquire about?

20         MR. EDELMAN:  Perhaps something we can inquire

21   about, but it's still insufficient.  There are still many

22   other means that Mr. Campos can commit crimes, speak to

23   people --

24         THE COURT:  Give me an idea.  He can speak to people

25   in jail.  He's going to have visitors.  He knows people can

1   easily be conduits to give information to other people.  That

2   doesn't impress me too much.  What else?

3        MR. EDELMAN:  Sure.  If he's at home someone can

4   purchase for him, or he can purchase, a one-time usable

5   cellphone that we're not going to have any inkling of what the

6   number is, who he's speaking to, he will be able to

7   communicate with others.

8        THE COURT:  So stop, cellphones I guess will be

9   something.  I'm trying to find out what we have to be

10  realistically concerned about instead of theoretically.

11       MR. EDELMAN:  I don't think it's technologically

12  feasible to bug every area of his house.  If he wanted to have

13  an illicit conversation, he and the person who comes over or

14  him on a cellphone can go the bathroom or the basement or some

15  area.  I don't know if that's ever going to be practical to

16  implement.

17       THE COURT:  I don't know.  I don't know.  But we

18  have such technology, this could be taken care of.  When you

19  couple that with considering the fact that there are folks

20  that are going to lose their home and the family resides at

21  their home, he really has an awful lot to lose in terms of

22  losing face with his family if he causes them to lose their

23  homes.

24       Do you think it's a powerful consideration?  I'm not

25  giving kudos for the allegations against him.  I'm going to be

1  presiding over the trial, and I'll be dealing the sentence

2  appropriately if convicted.  But at the same time, I think

3  there has to be a sense of overriding fairness and decency of

4  these cases as well.  When they have these folks who can lose

5  their home, my sense is that he's not going to want to run

6  that risk.  I may being wrong.  I think this cuts a little

7  deeper.

8      MR. EDELMAN:  Two responses.  One, your Honor, is,

9  yes, that is a factor, that is something for your Honor to

10  consider.  But also the fact that he's got a lot to lose by

11  virtue of this case.  He has his liberty to lose for a very

12  long period of time.

13      And he's shown in the obstruction allegations, he's

14  shown he has taken methods to obstruct the ongoing

15  investigation.  So he's already taken efforts to try to help

16  himself to reduce his liability as much as possible.

17      THE COURT:  How specifically has he done that?

18      MR. EDELMAN:  Two allegations that we detailed in

19  our papers.  The first is Mr. Campos learned that someone

20  testified in the Grand Jury, and what Mr. Campos did in

21  retaliation because that person chose to testify.

22      THE COURT:  I don't think there were any threats or

23  harm visited upon that person.  I may be wrong.

24      MR. EDELMAN:  Economic harm.  He had him taken off

25  of work.  That person testified rather than take the Fifth.

BAIL APPEAL

1    THE COURT:  It was an economic situation, not a

2    violent situation.  Go ahead.

3    MR. EDELMAN:  Second iteration is Mr. Campos, as

4    well as another co-defendant, directed someone to lie to

5    falsely take responsibility for some of the crimes that they

6    committed together.  And in return, would be paying for his

7    legal expenses and financial penalties.

8    THE COURT:  He could do that while he's in jail as

9    well.

10   MR. EDELMAN:  In jail no one is going to say there

11   is a zero risk, but that is the best possible way of

12   minimizing risk.

13   THE COURT:  There is a lot of balls in the air here,

14   a lot of factors.  I want to weigh them all and see how it

15   shakes out.

16   You want to response to that now, Mr. Mazurek?

17   MR. MAZUREK:  With respect to the obstruction

18   evidence?

19   THE COURT:  That and with respect to the fact that

20   if he's at home he may have more access to able to do bad

21   things than if he were in jail.

22   MR. MAZUREK:  Let me say this, that the Bail Reform

23   Act says this is a presumption of bail case and actually

24   instructs the Court that it shall set bail based on the least

25   restrictive conditions to reasonably assure the Court against

1  dangerousness or obstruction.

2        What I think your Honor has said regarding the kinds

3  of things that Mr. Campos is able to do in the home versus

4  jail, is quite similar.  He obviously is allowed to get visits

5  at jail, allowed to speak with other inmates in jail.  Even in

6  fact I have to say there have been cases that out of the MDC

7  where there is a lot contrabands found.

8        THE COURT:  Bad things in jail too.  I understand

9  that.  What about the notion of using a technology?  Would he

10 be amenable?

11       MR. MAZUREK:  We would be willing.  In fact it's

12 interesting that you note that, your Honor.  We have another

13 case in the Southern District of New York where bail was set

14 for an individual where we've agreed to have the Government

15 have a monitored landline phone as a condition of bail and no

16 cellphones in the home.

17       THE COURT:  How would you know whether that was

18 complied with, whether there is cellphones or not in the home?

19 How would you know that?

20       MR. MAZUREK:  Well, your Honor, one of the -- there

21 is no fool-proof method of things.  Just like you cannot have

22 a fool-proof method that inmates can't get access to --

23       THE COURT:  Someone can visit, bring a cellphone and

24 that person would have access.

25       MR. MAZUREK:  There would be a strong ground of

1  deterrence on Mr. Campos' perspective because there is a moral

2  suasion that all of these people are putting up their homes.

3      THE COURT:  How does the Government find out if he

4  had a cellphone and whether he was using it?

5      MR. MAZUREK:  Again, I don't know that there can be

6  a fool-proof method to do it.

7      You're allowed to -- we could have pretrial have

8  unannounced visits to the home to have the ability to make

9  sure there are no cellphones in that location.  The other

10 thing that we can do is limit of Internet access in the home.

11     THE COURT:  That can be controlled.  So pretrial

12 services is here I understand, yes?

13     MR. EDELMAN:  Yes, Shavoy Akinson is here.

14     THE COURT:  Would you like to step up here so I can

15 chat with you?

16     MR. AKINSON:  Good afternoon.

17     THE COURT:  You speak in a soft voice, I want to

18 make sure I hear you clearly.

19     So you heard me ask some questions just now.  And

20 one of the things that crosses my mind with the technology we

21 have these days, whether we can have a comfort level that we

22 can employ that technology to guard against anything

23 happening.  In the old days we didn't have it; we have it now.

24 I'm just wondering have you considered that?  What can happen

25 at home, what we can do to provide listening devices or TV

BAIL APPEAL

1  monitors or anything of that nature?  Is there anything like

2  that that we can consider here?

3  　　　　MR. AKINSON:  Judge, I would say no, because that is

4  beyond the resources that we have here.  Pretrial has --

5  　　　　THE COURT:  I don't know whether it's appropriate

6  for the defendant to fund those resources.

7  　　　　MR. AKINSON:  Judge, that's a question that I can't

8  answer.  I never had that before.

9  　　　　THE COURT:  Is there technology, aside from the

10  funds, that is available so we can actually create an

11  environment in the home where we can feel fairly comfortable

12  that nothing untoward is going to happen?

13  　　　　MR. AKINSON:  There is no way to reasonably assure

14  that, your Honor.  I want to add, though, that we could

15  monitor a cellphone, but again, we cannot reasonably assure

16  that there is no other cellphones in the house that he would

17  not have access to.

18  　　　　THE COURT:  Is there any way of monitoring cellphone

19  use?

20  　　　　MR. AKINSON:  Yes.

21  　　　　THE COURT:  How?

22  　　　　MR. AKINSON:  We install the necessary software on

23  it and it would be monitored remotely from our office.  But --

24  　　　　THE COURT:  Can you do that?

25  　　　　MR. AKINSON:  Yes, judge.  But we were not able to

1  transcribe audio calls, from what I understand, only e-mails.

2          THE COURT:  I'm trying to educate myself.  You can

3  certainly put listening devices in the home.

4          MR. AKINSON:  Not that I'm aware of.  I can speak to

5  my supervisor.

6          THE COURT:  They could be installed.  Presumably the

7  Government is good at bugging places all the time.

8          MR. AKINSON:  Maybe the Government, but not

9  Pretrial.

10          THE COURT:  It's not your world, right?

11          MR. AKINSON:  That's correct, Judge.

12          THE COURT:  Now so from a technical point of view,

13  you don't have the knowledge to really interact with me about

14  what technology might be at our disposal to secure the home so

15  to speak.

16          MR. AKINSON:  That's correct.

17          THE COURT:  So I could talk to somebody else about

18  that, right?

19          MR. AKINSON:  Yes.

20          THE COURT:  I was curious whether you get involved

21  with this type of stuff.

22          MR. AKINSON:  Not at all.

23          MR. MAZUREK:  Judge --

24          THE COURT:  If we could provide the technology, such

25  as listening devices or TV cameras or whatever, it happens all

1  the time today, would that make a difference in how you feel

2  about this case?

3      MR. AKINSON:  Judge, I'm unable to say right now.  I

4  would have to consult with my supervisor.

5      THE COURT:  Aren't you glad you came to court today?

6  You're not comfortable about that.

7      MR. AKINSON:  I'm not comfortable about it at all.

8  I want to able to, if there is a condition imposed, I would

9  stand in court confident knowing walking out we can monitor

10  it, reassure you that condition is being monitored

11  effectively.

12      THE COURT:  It strikes me -- so I have a little baby

13  granddaughter, we have cameras all over the place.  I can look

14  from here to find out what is going on at her home right now.

15  And it just struck me as, wow, we can do all these things, I

16  can see whether the babysitter is acting correctly, changing

17  her diapers properly, I can do all of that.

18      It just seems that we should have the ability to do

19  that in these types of cases when we confine people at home

20  instead of in prison.  They have a presumption in their favor.

21  If we can really feel comfortable that they will be in the

22  home and we can watch them, why not do that?

23      MR. AKINSON:  Judge, I hear you.

24      THE COURT:  You don't want to take a --

25      MR. AKINSON:  I hear you.  Those technical

1  advancements, we're not, that's not in our resources at this

2  point.

3          THE COURT:  That's okay, that's why we talked about

4  it.

5          I don't want to make you feel even more

6  uncomfortable, you can sit down.

7          What do you think about that.  I can see what is

8  going on my home right now.

9          MR. EDELMAN:  I appreciate that, your Honor, but I

10  think we're at the point -- we're doing what the Second

11  Circuit said we should not be doing, which is trying to

12  recreate a prison-like environment, that essentially at bottom

13  still rests on trusting that the defendant will abide by the

14  conditions.  Even one camera in one area of the home, there

15  will be other places the person will go.  Mr. Campos lives in

16  a very large home, multiple children, the resources it would

17  require to sit and monitor --

18          THE COURT:  What if the defendant were willing to

19  fund those resources?

20          MR. EDELMAN:  I submit just the man-power of sitting

21  listening to hours and hours of conversation on the off-chance

22  that Mr. Campos drops his voice and goes into another room and

23  has a conversation he's not supposed to have.  We're into the

24  sector of allowing a wealthy defendant to construct his own

25  prison.  That is the sort of thing -- we detailed this in the

BAIL APPEAL

1   letter that the Second Circuit --

2           THE COURT:  The Court turns a thumb down on that.

3           But I'm curious, I'm trying to explore all of these

4   things, we have a modern world today of technology.  Maybe

5   when the Bail Reform Act was initially created that technology

6   was not before Congress.  Just like the statute is still on

7   the books that the Government has doesn't have to turn over

8   3500 material until the witness testifies; and now with

9   technology the 3500 could be five gigabytes.  I think we

10  should update our thinking about what we can do in our modern

11  world to honor the law.  And the law is that the defendant,

12  regardless of what trappings he comes with, is presumed

13  innocent.

14          So you can talk more about this, I'm just sharing

15  with you some of my thoughts.

16          Do you want to say anything else?

17          MR. MAZUREK:  Yes, Judge.  Look what Congress has

18  told us in the Bail Reform Act, that the Court is to impose

19  the least restrictive conditions that reasonably assure you

20  that there is no threat of dangerousness.  It's not

21  100 percent assure, it's reasonably assure.  And I think

22  that's important when we talk about what is available to the

23  Court.

24          THE COURT:  Does your client realize if there is one

25  slip up, one phone call to somebody he should not be speaking

1  to, anything at all, that all these folks are going to lose

2  their home.  Does he realize that?

3          MR. MAZUREK:  Yes, he does.

4          THE COURT:  That will happen.

5          MR. MAZUREK:  That has incredible moral suasion.

6  He's the father of four young daughters, 17 to 22.  His mom

7  and wife are in court right now.  His Mom's dad is willing to

8  put up her house.  Two family friends, not even blood

9  relatives but people known him since he's a little kid and

10 trust him.  He's not going to cause risk to these people.

11         He's had a prior case.  In that case there was no

12 allegations of violence.  And guess what, on pretrial release

13 he was 100 percent in compliance with his pretrial release for

14 over a year.

15         THE COURT:  Should that be a factor in the past,

16 that he's complied with all sorts of pretrial releases?

17         MR. EDELMAN:  A factor, but what I submit is after

18 Mr. Campos was released, while his co-defendant from that

19 case, Richard Martino, was on supervised release, he and

20 Mr. Martino had illicit meetings that were violating

21 Mr. Martino's supervised release.

22         They did the same type of activity that we're

23 concerned about now.  They used I believe intermediaries to

24 set up meetings.  They met in locations and would leave not at

25 the same time.  Activities that show Mr. Campos was willing to

1    help another evade the terms of his supervised release.

2             So while he himself may not have been violated, that

3    is a factor for your Honor to consider.  It has also been

4    conclusively demonstrated he's willing to evade Court order

5    supervision at least for another person.

6             THE COURT:  Do you want to continue?

7             MR. MAZUREK:  There is no history of violence of

8    Mr. Campos.  The allegations in the Indictment are what they

9    are.  He's presumed innocent.  We haven't seen the discovery.

10   There is one cooperator who said he was extorted, but who did

11   a lot of work and made tons of money with the CWC Construction

12   Company.  The allegations involve the CWC Construction Company

13   which has now been brought out of business by the Government's

14   Indictment here.  There is no longer any access that

15   Mr. Campos has to continue to be an economic threat for any of

16   the crimes charged here.  That company is out of business.

17            There is no history of violence.  There is no

18   history of directing violence.  There is no direct evidence.

19   The Government has had, by their own admission, months and

20   months on wiretaps on cellphones.  They had an oral bug in his

21   office for a few months.  There is nothing that they've

22   reported in their detention memo to the Court with any

23   specific statements by Mr. Campos of violence.

24            Since Judge Reyes -- the original arrest in this

25   case -- three other defendants who the Government moved for

1   detention were ordered bailed by three different Magistrate

2   Judges.  Mark Kocaj, a co-defendant who was charged not only

3   in this Indictment but a second Indictment alleging specific

4   direct threats and extortion, which they have in his own words

5   on recordings was given a $600,000 bail, home detention

6   secured by property.

7          THE COURT:  Who was the Magistrate?

8          MR. MAZUREK:  In that case it was Magistrate

9   Bulsara.  Richard Martino, alleged to be a high-level member

10  of this Gambino crime family, went before a different

11  Magistrate, Magistrate Levy.  Despite the fact that the

12  allegations of the Government were that Mr. Martino was

13  surveilled violating his supervised release conditions, issued

14  bail, $4 million, secured by several properties, home

15  detention.

16         THE COURT:  Martino is really, the allegations

17  against him are on par in many respects as the allegations

18  against Mr. Campos.  He's on bail, why should he have to sit

19  in jail?

20         MR. EDELMAN:  Important differences between

21  Mr. Martino and Mr. Campos.  I do note this is over our

22  objection that Mr. Martino was released.

23         Martino is not charged in any extortion counts.

24  Mr.Campos is charged --

25         THE COURT:  One.

1          MR. EDELMAN:  Two counts, but one victim.

2    Mr. Martino not charged with obstructing the investigation.

3    Mr. Campos is charged with one incident of obstructing the

4    investigation, and another yet uncharged instance in which

5    Mr. Campos obstructed the investigation.  I submit those are

6    material differences.  And Mr. Campos is a captain in the

7    crime family.

8          THE COURT:  Well, Martino is way up there also.

9          MR. EDELMAN:  He's alleged in the Indictment to be a

10   long-time powerful soldier, but a soldier.

11         MR. MAZUREK:  His prior case, he had a prior case of

12   actual violence that he pled to, where Mr. Campos does not.

13         One other thing, just if can.  There is another

14   defendant who the Government moved is not in this Indictment

15   but alleged have been one of the alleged thugs who committed

16   this violence Adrial Lopez is charged in a separate complaint,

17   extorted the cooperating witness in this case, allegedly.

18         The Government moved for his detention.  My

19   understanding is, just this week, he was released on bail.

20   This guy, apparently the Government says has direct evidence

21   that he -- he had a prior criminal history of violence, and

22   they have direct evidence that he committed violence or

23   threatened violence against the same cooperating witness in

24   this case.  Magistrate Judge Gold, a third Magistrate Judge,

25   released him $600,000 bail, secured by property.  I'm not sure

1  whether he was given home detention or not.  That happened two

2  days ago.

3         Three separate Magistrate Judges in this district

4  issued bail over the Government's claim that no conditions

5  could satisfy a Court about the risk of dangerousness.  And

6  two of those individuals had direct evidence of violence, had

7  violence in their past criminal history, and they were allowed

8  to be released.

9         Look, I have huge respect, your Honor, for

10  Magistrate Reyes, but he's out-scored three to one in this

11  particular instance.

12         And the other problem that we have -- look, I'll

13  admit on the very first day I believed Andrew Campos was a

14  good candidate for bail.  I had his family in the courtroom.

15  They were willing to put up their houses.  I made a

16  presentation for bail.

17         Since that time we learned more about the case,

18  obviously.  The benefit the other defense lawyers had for

19  Mr. Martino, Mr. Kocaj and Mr. Lopez, was after that they were

20  able to review the evidence, review the allegations, also

21  obtain a more substantial bail package.

22         We've now done the same thing.  A big difference

23  from the day of the initial presentment when we first appeared

24  unannounced, and when Mr. Campos was woken at six morning, and

25  his family all made it to court by the afternoon in order to

1   put up their houses.

2   THE COURT:  First of all, I'm just curious, would he

3   be will to pay for cameras in his home, surveillance cameras?

4   MR. MAZUREK:  I don't know how much it would be, but

5   a reasonable cost.

6   THE COURT:  I have no idea.  I want to explore

7   information today, to have the Government to check out this

8   bail proposal.

9   You want to check out the homes.  You need some time

10  to do that, so it may weigh in my decision if you find this is

11  not an appropriate security then I went to know about them.

12  If you think it is, then I want to know that as well.  I want

13  to get that information from the Government.

14  We're going to take our time to think about this a

15  little bit.  I also want to you find out if there is any way

16  in which we can fund securing the premises.  I'm thinking

17  automatically of my granddaughter's cameras.  I don't think

18  they're that expensive.  The Government doesn't have to watch

19  it all the time.  The fact that it's there and Mr. Campos

20  knows in each room that the Government can tap into at any

21  time.

22  MR. MAZUREK:  There are privacy concerns.  There are

23  four young daughters at the home as well.  I want to think

24  about that as well, your Honor.  We believe that that kind of

25  level of surveillance is not necessary given his background

1    and allegations here.

2            THE COURT:  Think about it.  I'm trying to put

3    everybody in motion to explore possibilities of how I can have

4    a comfort level in terms of letting him out of jail.  That's

5    one thing that is crossing my mind; it may not be realistic.

6            MR. MAZUREK:  I understand that, your Honor.  I

7    respect that request.

8            Given the allegations here, this particular

9    defendant's background, lack of violence and lack of direction

10   of violence, I refer the Court to United States V. Persico

11   case, which I have personal knowledge of since I was one of

12   the, representing the defendant on that case in appeal in the

13   Second Circuit.

14           In that case the defendant Persico is alleged to be

15   a long-standing member of organized crime family.  The appeal

16   was based on the fact that District Judge Townes misapplied

17   the Bail Reform Act by making a presumption of detention in a

18   case where the statute didn't apply for that.  But in dicta,

19   it's interesting to note that what the Second Circuit stated

20   in that case that she also made findings of dangerousness

21   based on allegations of associations with an organized crime

22   family and when there was no evidence, direct evidence, that

23   the individual defendant before her had been involved in

24   violence, had threatened violence or had directed violence.

25   And that's very similar in this case.

1            What the Government relies upon in this case is only

2    evidence of a co-defendant talking about Mr. Campos, but no

3    direct evidence that Mr. Campos ever directed violence in any

4    way.  I know that's a decision down the road in terms of the

5    potential trial in this matter.  But the weight of the

6    evidence is one of the 3142(g) factors for the Court to

7    consider.

8            Also, your Honor, it's important because that thin

9    piece of evidence, which is the only allegation of violence in

10   this entire case, the 51-page Indictment and the multiple

11   counts, which really just apply to tax, payroll, honest

12   services-type fraud, that thin piece of evidence is not enough

13   to detain a person, I would submit, under clear and convincing

14   standard.

15           The Paulino case that we cited in our papers says

16   that for clear and convincing evidence, the Court has to have

17   a high degree of certainty, not just that Mr. Campos may have

18   been involved in danger in the past, but that he would be a

19   danger in the future.  If he --

20           THE COURT:  Again, let me ask you this, what kind of

21   assurance do I have that he will not be able to have many

22   people come to visit his home and be able to conduct the

23   affairs, allegedly, of illicit activities?

24           MR. MAZUREK:  It's the same as, there were

25   associational bars that were placed on Mr. Martino, the

1   alleged high-ranking member of the Gambino family, on home

2   detention, associational bars.  Look, co-defendants can meet

3   with their counsel, but they can't meet with anyone without

4   counsel present.  Those kinds of things would be monitored

5   just the way they always are.  Strict pretrial supervision,

6   unannounced visits to the home, and the Government's usual set

7   of resources.

8          But this is not the kind of case where there is an

9   allegation -- the organized crime cases cited by the

10  Government, which we distinguished in our papers, usually

11  involve murders, assaults and actual violence.  There is no

12  actual violence in this case.

13         THE COURT:  From looking at the papers, I'm going to

14  look at them more carefully in the next day or two, but what

15  does jump out, besides the one count of extortion which you

16  explained, there are no alleged acts of violence.  And when

17  you see that type of Indictment, Mr. Edelman, I think the

18  judge should really carefully consider whether or not the

19  presumption of innocence and the fact that there is a

20  presumption to give bail should not be seriously considered.

21  I want you to know where my mind is at now.

22         What we're going to do, we're not going to race to

23  judgment.  I want you to check out the bail package.  Then you

24  can submit to me, if you want, any follow up papers and I'm

25  going to make a decision.  I'm not going to do it today.  I

1  don't want to really, we have some things to think about here.

2          I'll try to get a decision out next week.  I guess I

3  can go to January 16, but you may want a decision before then.

4  See whether you can submit something to me by next Wednesday.

5  Is that putting you under pressure?

6          MR. EDELMAN:  That's Christmas.

7          THE COURT:  That's the problem, we have the holiday

8  season.

9          MR. EDELMAN:  We can do it by next Tuesday.

10          THE COURT:  Next Tuesday.

11          MR. MAZUREK:  Yes, your Honor, ideally we hoped for

12  a decision prior to the Christmas holiday.

13          THE COURT:  I had a feeling that you would like me

14  to make a decision before Christmas.

15          MR. MAZUREK:  Yes.

16          THE COURT:  I get it.  If can you get me stuff,

17  whatever else you want to submit to me, do it by Tuesday.

18          MR. MAZUREK:  Can we submit by Monday?

19          THE COURT:  Yes.  I don't want to kill your weekend.

20          MR. MAZUREK:  We'll kill our weekend to help our

21  client.

22          THE COURT:  Let's do it Monday.  I'll try to get a

23  decision out before Wednesday.  I have a lot to think about.

24  I want to go over your papers more carefully and check out the

25  bail package.

1      MR. EDELMAN:  Understood.

2      MR. MAZUREK:  And check out the cases that we cited

3  in terms of the other co-defendants.

4      THE COURT:  We've had a nice discussion.  I think

5  this is the way I should conduct these proceedings.  And if

6  there is anything else you wish to say, let me go to work.

7      MR. MAZUREK:  If you have any particular inquiries

8  as you go to work --

9      THE COURT:  I pretty much explored what is on my

10  mind, by and large anything.

11      Else you wish to say, Mr. Edelman, concluding

12  comments?  Mr. Mazurek?  Good to see you in court.

13      I'll try to get a decision out before Christmas.

14      MR. EDELMAN:  Thank you, Judge.

15      MR. MAZUREK:  Thank you, Judge.

16      THE COURT:  The next conference is January 16 at

17  2:30, I understand.  So we'll see you at that time for sure.

18      (Whereupon, the matter was concluded.)

19              *    *    *    *    *

20  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

21

22  Rivka Teich, CSR RPR RMR FCRR
    Official Court Reporter
23  Eastern District of New York

24

25