

U.S. Department of Justice

United States Attorney
Eastern District of New York

KDE/KCB
F.#2015R00270

271 Cadman Plaza East
Brooklyn, New York 11201

August 28, 2020

By E-mail and ECF

Honorable Frederic Block
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Andrew Campos
               Criminal Docket No. 19-575 (FB)

Dear Judge Block:

      The government respectfully submits this letter in opposition to defendant Andrew Campos's motion to eliminate his home-detention bail condition.  See Def. Ltr., ECF Dkt. No. 197 ("Def Br.").  For the reasons set forth below and in the government's previously filed detention memorandum, the government joins Pretrial Services in opposing the motion.

I.      Background

      On December 4, 2019, a grand jury returned an indictment charging Campos and others with, among other crimes, racketeering conspiracy for a multitude of crimes that Campos committed as part of his membership in the Gambino organized crime family of La Cosa Nostra (the "Gambino family"), as well as his operation of CWC Contracting Corp. ("CWC"), a carpentry and drywall company.  See Indictment, ECF Dkt. No. 15. Specifically, Campos is charged with racketeering conspiracy, wire fraud relating to payroll tax violations, money laundering and money laundering conspiracy relating to cashing checks for work never performed, wire fraud relating to tax evasion, extortionate collection of credit conspiracy and extortionate collection of credit relating to a John Doe victim, money laundering and money laundering conspiracy relating to the construction of Campos's residence, wire fraud, including honest services wire fraud, relating to a construction company, wire fraud for overbilling two additional, separate construction companies, obstruction of justice conspiracy and obstruction of justice relating to instructing an individual to falsely take responsibility for cashing additional checks, and false statements

conspiracy.  See id.; see also Detention Mem., ECF Dkt. No. 17, at 5-6 (detailing Campos's charges); id. at 9-24 (setting forth the government's factual proffer).

Campos was arrested on the morning of December 5, 2019.  See Minute Entry, ECF Dkt. No. 31.  That day, the government filed a detention memorandum requesting that Campos and certain other defendants be detained as dangers to the community and/or posing a substantial risk of obstruction of justice.  See generally Detention Mem.  As detailed therein, Campos, who had already served time in federal prison, is a powerful captain in the Gambino crime family who has earned millions of dollars in ill-gotten wealth, which he then distributed to other members and associates of La Cosa Nostra.  See id.

On December 5, 2019, at Campos's arraignment and following extensive argument, Magistrate Judge Ramon E. Reyes, Jr. ordered the defendant detained, finding that the government had "satisfied its burden to prove by a preponderance on obstruction of justice and clear and of convincing danger to the community."  See Dec. 5, 2019 Tr., attached as Ex. A, at 32.  The defendant appealed to Your Honor.  See Def. Ltr., ECF Dkt. No. 86 ("Def. Dec. Br.").  The government opposed.  See Gov. Ltr., ECF Dkt. No. 95 ("Gov. Dec. Br.").  On December 23, 2019, over the government's objection, the Court ordered that the defendant be released pending trial under strict conditions.  See Mem. & Order, ECF Dkt. No. 105.  The Court ordered the defendant's release based on a finding that "the additional security offered by Campos warrants his release on the terms set below," which included:

> The defendant . . . is subject to the following location restriction program with location monitoring, as directed by Pretrial Services:  Home Detention: restricted to home at all times, except for attorney visits, court appearances, medical treatment, religious services or other activities approved by Pretrial Services.  The defendant must stay at his residence at all times except for approved activities and may not leave for approved activities without providing prior notice to Pretrial Services, except in cases of medical emergencies. . . .
>
> The defendant shall give the government and Pretrial Services access to the real-time feed and recordings of the video security system at his home.

Id. at 1, 5.

As it explained at the December 19, 2019 conference on the defendant's detention appeal, the government was and remains particularly concerned with the defendant's ability to continue to conduct the affairs of the Gambino organized crime family and obstruct the ongoing investigation and prosecution by, among other things, passing messages to/through other Gambino crime family members and associates.  In overruling the government's concerns, the Court required the installation of video cameras and the monitoring of all Internet-enabled devices, among other conditions, to "severely limit the defendant's] ability to engage in other crimes or acts of obstruction without the government's knowledge."  Id. at 3.  Indeed, the Court's imposition of these conditions came after extensive oral argument and supplemental briefing as to the defendant's consent to fund

security cameras at his residence, because, in the Court's estimation, "[t]he fact that [surveillance cameras are] there and Mr. Campos knows in each room that the Government can tap into at any time" provided assurance that the release conditions could reasonably assure the safety of the community. See Dec. 19, 2019 Tr., attached as Ex. B, at 26; see also id. at 27 (Court detailing desire that parties would "explore possibilities of how I can have a comfort level in terms of letting him out of jail").

The defendant now seeks reconsideration of the Court's carefully fashioned conditions of release, despite the lack of any intervening material change in circumstances. As set forth below, the Court should deny the motion in its entirety without a hearing.

II. Argument

As the Court is aware, detention hearings "may be reopened, . . . after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). "A bail hearing should not be reopened on the basis of information that was available to the defendant at the time of the [initial] hearing." United States v. Lewis, No. 16-CR-0212, 2016 WL 6902198, at *2 (S.D.N.Y. Nov. 16, 2016). "New and material information for Section 3142(f)(2)(B) purposes consists of something other than a defendant's own evaluation of his character or the strength of the case against him: truly changed circumstances, something unexpected, or a significant event." United States v. Quinones, No. 13-CR-83, 2016 WL 1694998, at *1 (W.D.N.Y. Apr. 28, 2016); accord United States v. Esposito, 354 F. Supp. 3d 354, at 358-59 (S.D.N.Y. 2019).

The defendant asserts that three grounds justify the Court's reconsideration of the conditions of his release: (1) the COVID-19 pandemic; (2) compliance with his bail conditions to date; and (3) the defendant's evaluation of the discovery produced in this case. None of these factors constitute material changed circumstances and none should change the Court's careful analysis as to the conditions of release that will ensure the safety of the community and prevent the defendant from again obstructing the government's investigation.

    a. <u>The Defendant's Release Conditions Should Not Be Relaxed Due to the COVID-19 Pandemic Beyond the Instant Accommodations</u>

The defendant first asserts that the onset of the COVID-19 pandemic in the New York City area constitutes a "changed circumstance" warranting relaxation of the defendant's home detention. Def. Br. 1. Setting aside the questionable logic and risk to public health of allowing the defendant greater freedom of movement in public spaces in the midst of a pandemic, the defendant has failed to establish that the current health crisis constitutes a changed circumstance for a defendant who is not in custody but, rather, in his own residence.

3

The defendant principally relies on a purported delay in bringing his case to trial, asserting that he has been unable to push his case forward due to the pandemic. But although there have been some delays since the onset of the pandemic – none of which the defendant has objected to or otherwise asked relief from – the parties have made substantial progress during this period, including producing (and the defense reviewing) tremendous amounts of discovery, engaging in plea negotiations, negotiating and agreeing to modifications to the protective order and other conditions of release, all of which have advanced the case.[1] And although the defendant asserts that he has been subject to "onerous" conditions for months due to the COVID-19 pandemic, common sense belies this claim. At the onset of the COVID-19 pandemic in March 2020, all New Yorkers – not just this defendant – were instructed to remain at home. Indeed, the Governor did not authorize any kind of reopening until early June 2020. See "Governor Cuomo Announces New York City to Enter Phase 1 of Reopening on June 8," available at https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-city-enter-phase-1-reopening-june-8-and-five-regions-enter (last accessed Aug. 26, 2020). In any event, the defendant is not in this position "through no fault of his own," Def. Br. 1, but, rather, because of his commission of the crimes charged in the indictment and his long-lasting commitment to the Gambino crime family.

Perhaps most indicative of the lack of necessity for the instant motion, despite the limitations on travel in New York State and the Court's imposition of home detention, the government has consented to almost every request the defendant has made to travel, including an early April request to allow the defendant to run local errands with prior notice and approval from Pretrial Services at local groceries and pharmacies; numerous requests to go to doctor's appointments; and at least three requests to attend events with family members. Indeed, the sole request pointed to by the defendant that has not been consented to was a visit to his grandmother, who, the government has learned for the first time in the defendant's instant motion, has apparently been unable to leave her home. Of course, the defendant still could have sought relief from the Court in that instance, rather than now seeking wholesale removal of his home detention in favor of free travel throughout Westchester County, subject only to the imposition of a curfew. However, apart from visitation with his grandmother and unspecified assistance in the medical care of his mother-in-law, the defendant has pointed to no reason why the Court should risk the safety of the community—including, of particular concern here in light of the defendant's obstruction of

---

[1] Curiously, the defendant also disputes this Court's determination that this case is complex. Compare Def. Br. at 1 n.1 (attempting to minimize evidence as to one of numerous schemes alleged in the indictment); with Jan. 16 Tr. at 56 (Court declaring that case was "obviously complex litigation"). Indeed, despite defense counsel's pronouncements, the government has produced voluminous discovery to defense counsel, consisting of hundreds of thousands of pages of records along with over 100 hours of audio recordings, and has responded to numerous requests by defense counsel for additional material or reproductions of material in a different format—almost all of which the government has been able to accommodate.

this investigation, the witnesses in this case and the public at large given the defendant's long-standing membership in the Gambino crime family—and refashion the carefully considered conditions of release.

The two cases cited by the defendant warrant no different conclusion. Those cases pertain to the grant of bail in March and April 2020, when COVID-19 was at its height in New York City, for incarcerated defendants, for whom the risk of infection is greater. See United States v. Jackson, 19-CR-356 (ARR), 2020 WL 105674, at *3 (E.D.N.Y. Apr. 17, 2020) (releasing defendant from custody in high-risk category for developing serious case of COVID-19, noting that defendant "ha[d] a strong incentive to stay at home and maintain social isolation: just going outside would put him at risk for a deadly disease"); United States v. Stephens, No. 15-CR-95 (AJN), 2020 WL 1295155, at *1-3 (S.D.N.Y. Mar. 19, 2020) (releasing defendant from custody after court learned arresting officer identified an individual other than defendant as perpetrator, thus weakening government's case, and ruling that COVID-19 pandemic constituted a compelling reason necessitating defendant's release in light of defendant's inability to meet with counsel in advance of upcoming hearing). The defendant, of course, unlike those in Jackson and Stephens, has been in his own home since December with freedom to leave with prior notice and approval.

In short, the COVID-19 pandemic does not constitute a changed circumstance in this case, and, in any event, has no "material bearing on the issue whether there are conditions of release that will reasonably assure . . . the safety of any other person and the community" or minimize the risk of the defendant's continued obstruction of justice. 18 U.S.C. § 3142(f)(2)(B).

      b.     <u>The Defendant's Compliance with His Release Conditions Does Not Warrant Eliminating Home Detention</u>

The defendant next asserts that, because he has not violated the bond to date, his release conditions should be relaxed. As an initial matter, compliance with the conditions of the bond is the baseline expectation for a defendant's release. That the government is unaware of any new instances of the defendant obstructing justice, committing other crimes or otherwise violating the bond at most shows that the home detention conditions in place have hopefully proven effective to date, and that the Court's previous determination that these conditions were the least restrictive measures necessary to ensure the safety of the community was correct.

Nonetheless, the government disputes the defendant's characterization of his compliance with the conditions of the bond as an "objective record that the Court can rely on." Def. Br. 4 n.5. Although the Court can consider the absence of any proven violation, this does not mean it should also conclude that there have in fact been no such violations. For the reasons raised in the government's opposition to the defendant's release to home detention, even with conditions previously imposed, it is impossible to fully evaluate the defendant's compliance because, among other things, even with a video monitoring system that informs the government who has entered the defendant's residence, the government

5

cannot monitor what those individuals bring inside or what they might discuss with the defendant while inside. Moreover, because the defendant has chosen to use a landline rather than a cellular telephone, there has been no monitoring of the defendant's electronic devices, and the government must rely on his family members' assurance that they will not let him use their devices. Although these conditions provide at least some form of monitoring and deterrence, they cannot guarantee compliance and instead the Court must rely on the defendant's own evaluation of his compliance. Under such circumstances, courts have rejected that the defendant's "own evaluation of his character or the strength of the case against him" constitute changed circumstances warranting reconsideration of a defendant's bail conditions. See, e.g., Esposito, 354 F. Supp. 3d at 361 (holding that defendant's "record of compliance with the conditions of his pretrial release" did not constitute "new information" warranting reconsideration of conditions of pretrial release).

The defendant nonetheless urges that his compliance constitutes a material changed circumstance because "past behavior best predicts future behavior." Def. Br. 5. Of course, this ignores the defendant's own criminal history, which includes his commission of the instant crimes after being incarcerated following his commission of other crimes on behalf of the Gambino crime family. See Detention Mem. at 10 (detailing the defendant's prior conviction to wire fraud conspiracy in 2005 for which was sentenced to approximately 21 months' imprisonment for his participation in a massive scheme to defraud users of adult entertainment websites and telephone services alongside other members and associates of the Gambino family). Nor does the defendant address his role in the evasion of court-ordered supervision for co-defendants Richard Martino and Vincent Fiore. Specifically, as detailed in the detention memorandum, Campos aided Martino in violating his supervised release term following Martino's release from prison in 2014 by using sophisticated methods to meet on multiple occasions, despite the standard condition that Martino could not associate with felons, like Campos, while on supervised release. See Detention Mem. at 20-21 (detailing contact at length). Similarly, Fiore associated with Campos following Fiore's release to a half-way house—also violating the conditions of his release. See id. at 20-21, 23 (Fiore stating that he "wasn't in the halfway house 15 fucking minutes, Andrew [i.e., Campos] comes and picks me up" to discuss a loan).

These instances – combined with Campos's history of committing crimes on behalf of the Gambino family – demonstrate that he cannot be trusted to abide by court-imposed conditions. Thus, the defendant's assurance that he has complied with the conditions of his release for approximately eight months – a large portion of which coincided with the majority of New Yorkers subject to stay-at-home orders – does not constitute a material changed circumstance warranting elimination of home detention.

c.  The Weight of the Evidence Disfavors Relaxing the Release Conditions

Finally, the defendant renews his attempt to downplay the seriousness of the allegations in the indictment, just as he did when appealing Judge Reyes's determination that the defendant should remain incarcerated pending trial. See generally Def. Dec. Br. at 2-4. Indeed, the defendant makes the exact same arguments he made in December as he does now

– even recycling the same language used – in asserting that the indictment presents an "economic crimes case," contains "boilerplate language" relating to the operation of the Gambino crime family, and that the extortion charges are supported by "thin" evidence. Compare Def. Dec. Br. 2-4, 8; with Def. Br. 5-6. As an initial matter, that the defendant is making duplicative arguments to those he made in December – claiming the instant prosecution is essentially a lowly tax case – should end the § 3142(f)(2)(B) inquiry. The defendant has failed to point to information that was "not known to [him] at the time of the hearing." 18 U.S.C. § 3142(f)(2)(B). Thus, the defendant's assertion as to the weight of the evidence fails on that basis alone.

In any event, as the government explained in opposing the defendant's appeal, even considering the defendant's arguments, they do not have "a material bearing on the issue whether there are conditions of release that will reasonably assure . . . the safety of any other person and the community," nor do they ameliorate the risk of obstruction of justice by this defendant.[2] 18 U.S.C. § 3142(f)(2)(B); see also Gov. Dec. Br. (addressing same arguments). For example, just as the defendant argued in his bail appeal, he reasserts that the extortion offenses with which he is charged lack robust evidence. Def. Br. 5; see Def. Dec. Br. at 3 (claiming that extortion offenses rely on "uncorroborated testimony of a single individual, one of the government's cooperating witnesses"). The government will not repeat its evidence here again, as it has already responded to the defendant's renewal of these claims in the government's proffer of its evidence in its detention memorandum and again in responding to the defendant's appeal of the magistrate judge's detention order. See Gov. Dec. Br. at 3-4 (describing extortion claim and evidence supporting it, including consensual recordings, including Campos's discussion of the money Doe owed to Campos; wiretap recordings of, among others, co-defendant Vincent Fiore, who directly threatened Doe with physical violence; and a spreadsheet maintained by Fiore documenting the collection of money from Doe each week).

In a bizarre twist of logic, the defendant attempts to paint the government's claimed threats of violence by Campos in a harmless light. See Def. Br. 5. Specifically, in the detention memorandum, the government recounted that the defendant threatened another individual, from whom the defendant had paid off a loan on Doe's behalf, and then used extortionate means to collect that money from Doe. In connection with this scheme, the defendant informed the initial creditor that if he hurt Doe after the initial creditor knew that Campos was paying off the loan, Campos would leave the initial creditor "on the sidewalk."

---

[2] Ironically, in December 2019, the defendant claimed the weight of the evidence was the least important bail factor but now tries to use it to his advantage and claim it supports the instant motion. Compare Def. Br. at 2 n.1 (arguing that "the lack of evidence on the kickback charges favor the requested bail modification under the 18 U.S.C. § 3142(g) factors, because the discovery does not show compelling 'weight of the evidence' against Mr. Campos on the cornerstone charges of the government's indictment"), with Def. Dec. Br. at 8 (quoting a case for proposition that "many courts have suggested that the weight of the evidence is the least important of the various factors").

Even more graphically, Campos stated that if the initial creditor made Doe a "sacrificial lamb," then the individual would "die that day." Such threats, among other evidence, make clear that the defendant used, at a minimum, extortionate means to collect the money from Doe. See 18 U.S.C. § 891(7) (defining "extortionate means" to include "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person"). But according to the defendant, because he did not threaten Doe's life—but rather the initial creditor's life—the defendant's disturbing and graphic threat to kill another human being "justifies a relaxation of the strict liberty constraints currently imposed against him." Def. Br. 5. The logic does not hold.

Regardless, as the government noted in its December opposition, by virtue of the defendant's high-ranking position in the Gambino crime family, he did not need to threaten violence against Doe himself because he had others at his disposal, particularly Fiore, to do so. Gov. Dec. Br. at 3. Indeed, Campos once again ignores the recorded conversation quoted in the detention memorandum in which Fiore repeatedly threatened to "knock [Doe's] fucking teeth out" because Doe's payroll expenses would be too high, affecting his ability to repay his debt to Campos, adding that Doe will have to "deal with him," i.e., Campos, who profited from the threats made by others. The government maintains, as it did in December, that this power and ability to use other criminals to do his bidding – precisely how La Cosa Nostra operates – reinforces the need to detain Campos pending trial or, at the very least, continue home detention.

The remainder of the defendant's arguments have similarly already been addressed at length in the government's prior submissions. Specifically, the government has detailed at length the variety of criminal conduct with which the defendant has been charged, which reveals that – contrary to the defendant's self-interested view of the charges against him – he is charged with more than just non-violent offenses, as the indictment alleges his participation in the extortionate collection of credit from John Doe as well as efforts to obstruct justice. Needless to say, the government strenuously disagrees with the defendant's characterization of the other charges in this case, and such disputes may need to be resolved by a jury.[3] And the defendant's renewed complaint as to the indictment's introductory paragraphs, which the defendant once again calls "boilerplate," fail now as they did before: the indictment describes an ongoing, powerful criminal enterprise, including its structure and the methods and means by which it earns illicit proceeds for its members and associates, such

---

[3] As just one example, the defendant bemoans that the government "seeks to dress up [claims relating to paying workers in cash] by adding specious charges of so-called honest services wire fraud based on alleged personal favors by subcontractors to project managers and building-owner agents," which the defendant claims "did not include claims of transfers of large sums of money or assets" but instead were only "limited small-value gifts." Def. Br. 1-2 n.1. But as the government will establish at trial, if necessary, the bribes and kickbacks amounted to over hundreds of thousands of dollars in cash and in-kind benefits, some of which were fraudulently included in requests for payment relating to a legitimate project.

as, in this case, the defendant's ability to enrich other members of the Gambino family – some of whom are now his co-defendants in this case.

Even putting aside the strength of the financial and extortion charges, the defendant fails to even address, let alone try to explain away, the government's and the Court's concerns as to obstruction of justice. As previously detailed at length for the Court, the government's evidence of the defendant's obstruction of justice as recently as November of last year includes, among other things, the testimony of multiple witnesses and consensual recordings documenting the obstructive efforts, as detailed at length in the government's prior submissions.[4] In fact, now that the defendant has received discovery and learned the identity of some (but not all) of the government's witnesses, the defendant's incentive to obstruct the instant prosecution is greater than it was prior to his arrest when the other incidents of obstruction occurred.

Therefore, the defendant's obstruction of justice in this case provides a basis for pretrial detention in this case. See 18 U.S.C. § 3142(f)(2)(B) (providing that pretrial detention is warranted where there is "a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror"); see also United States v. LaFontaine, 210 F.3d 125, 134 (2d Cir. 2000) (describing obstruction of justice as "traditional ground for pretrial detention"); United States v. Rowe, No. 02-CR-756, 2003 WL 21196846, at *2 (S.D.N.Y. May 21, 2003) (finding that "witness intimidation is a type of activity that supports a finding of danger to the community," even absent "allegations of violence and threats against witnesses"). It certainly does not support a relaxation of the defendant's home incarceration.

---

[4] For example, in November 2019, Campos and Fiore directed an individual to falsely take responsibility for one of the schemes charged in the Indictment. See Detention Mem. at 18-19. That same month, Campos arranged to have a laborer fired because he believed that individual had testified in the grand jury, a violation of 18 U.S.C. § 1513(e), which criminalizes "interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense." See id. Although currently not charged, this retaliation for providing information to the government may be included in a superseding indictment. As the government detailed at the December 5 bail hearing, after the individual testified in the grand jury, co-defendant Vincent Fiore was recorded directing that the individual be fired "as a personal favor to Andrew." Fiore went on to explain that the defendant told him that the individual "didn't have to talk" and instead "could've pled the Fifth."

III. <u>Conclusion</u>

Accordingly, the government respectfully requests that the Court deny the defendant's application to reopen and relax the conditions of his release.

Respectfully submitted,

SETH D. DUCHARME
Acting United States Attorney

By:    /s/
Keith D. Edelman
Kayla C. Bensing
Assistant U.S. Attorneys
(718) 254-6328/6279

Encl.

cc:    Clerk of Court (by ECF)
      Defense Counsel (by ECF)