

NS:KCB
F.#2015R00270

February 3, 2022

By ECF and E-mail

The Honorable Ann M. Donnelly
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Andrew Campos
>       Criminal Docket No. 19-575 (AMD)

Dear Judge Donnelly:

    The government respectfully submits this letter in advance of the defendant Andrew Campos's sentencing, which is scheduled for February 10, 2022, at 2:30 p.m. In light of the factors set forth in 18 U.S.C. § 3553(a), the government requests that the Court impose a sentence of 46 months' imprisonment, $1 million in restitution and a substantial fine.

I.    Background

    By his own admission, the defendant Andrew Campos is an inducted member of the Gambino organized crime family of La Cosa Nostra ("LCN"). Specifically, he is a captain, responsible for overseeing multiple soldiers and associates, and also operated a carpentry company called CWC Contracting Corp. ("CWC"). As set forth in more detail below, Campos pleaded guilty to racketeering conspiracy for committing wire fraud and money laundering offenses in connection with his membership in the Gambino crime family. These crimes were committed after Campos (then an associate of the crime family) served 21 months in prison for taking part in a massive scheme to defraud users of "1-900" telephone numbers.

    A.    The Charged Offenses

    In connection with his membership in the Gambino crime family, and as shown by his plea to Count One of the indictment, charging him with racketeering conspiracy,

Campos committed multiple offenses related to his operation of CWC, a carpentry company he controlled. These offenses are summarized below.

### 1. Payroll Tax Scheme

Between at least June 2014 and December 2019, Campos helped orchestrate a massive scheme to defraud the Internal Revenue Service ("IRS") by failing to pay approximately $1.3 million in payroll taxes owed to the federal government. See Presentence Investigation Report ("PSR") ¶¶ 44-46. At times, some CWC employees were paid entirely in cash. At other times, the employees were paid partly by check, with withholdings having been made only for the portion of pay covered by the check, and in part by cash. For instance, on February 5, 2019, during a recorded conversation, Campos explained that "I don't care what name they [CWC workers] give me, just give me a name with a picture ID, so long as the payroll company accepts it, then I'm covered." Id. ¶ 44. Campos also added that if workers hesitated to be paid in part by check that they could no longer work for the company but that "We'll make up the difference but you pay them," i.e., that the workers will be paid supplemental cash payments without the required holdings having been made. Id.

To facilitate this scheme, Campos and others made extensive use of check-cashing businesses, cashing millions of dollars in checks issued by CWC and distributing the cash to CWC employees without making the required tax withholdings. For instance, between approximately June 2014 and December 2019, at Campos's direction, CWC-affiliated entities cashed over $12 million in payroll checks so that the cash could be distributed to workers, resulting in approximately $1.3 million in losses to the IRS. Id. ¶ 45.

By causing CWC to fail to pay money due to the IRS, Campos and others caused CWC to earn more income to which it was not entitled. Having earned these illicit profits, Campos and others used CWC to perform work on behalf of other members and associates of LCN. For instance, in March 2018, CWC performed work at a location on Elizabeth Avenue in Linden, New Jersey, which was owned by Francesco "Frank" Cali, who, as described above, was a high-ranking Gambino family member until his murder in March 2019. See id. ¶ 46.

As another example, CWC helped construct Campos's personal residence in Scarsdale, New York. CWC paid for labor, material and certain subcontractors who worked on the home. Through his own corporation Dorset Properties, Campos reimbursed CWC for a portion of these expenses, but as of the execution of search warrants in June 2019, CWC was still "owed" approximately $350,000 for this work. In other words, CWC was used to provide $350,000 in free work to Campos personally. See id. ¶ 77.

### 2. Additional Checks Scheme

To reap the benefit of their various crimes, and to fund other illegal activity, Campos made extensive use of check cashing businesses and shell companies to illicitly funnel millions of dollars in cash out of CWC. Specifically, between October 2014 and through at least June 2019, Campos and Fiore caused CWC to issue over $2 million in checks to

associates' businesses for work that was never performed (the "Additional Checks"). Id. ¶ 75. As these checks served no legitimate business purposes, these associates went to check cashing businesses, cashed the Additional Checks and returned the money (often to Fiore) for Fiore and Campos to use. Id.

To conceal the illicit nature of these payments, the defendants and their co-conspirators completed documentation falsely stating that these Additional Checks were for work performed in connection with CWC construction projects. Id. In actuality, this was a method by which the defendants, among other things, secured the benefit of their illicit activity by withdrawing illegal proceeds in cash. Id. As explained below, this money was also used to fund other illegal activity. For instance, money obtained from an Additional Check was used to pay a bribe to obtain the answers to a required New York City safety training course. Id.; see also id. ¶¶ 78-99.

Campos often directed that co-conspirators cash large volumes of Additional Checks around the Christmas season. For instance, on December 18, 2018, at approximately 7:08 a.m., an individual ("Individual-1") met with Fiore in Fiore's vehicle. Individual-1 said his check-casher (the "guy in Jersey") said that if they were "going to do what we did last week," i.e., cash large amounts of Additional Checks and return the money to Fiore, that "Wednesday and Thursday is better than Thursday and Friday . . . . I didn't want to tell you that on the phone." Fiore stated, "Alright, so, probably today." Later that day, on December 18, 2018, beginning at approximately 11:32 a.m., Individual-1 met with Campos and Fiore, among others, at the CWC office. During the meeting with Fiore, Fiore provided Individual-1 with additional checks totaling approximately $100,000 for Individual-1 to cash and return to Fiore. Individual-1 asked Fiore whether Fiore was going to give Individual-1 any more Additional Checks that week because Individual-1 had to let the check casher know. Individual-1 then asked Fiore whether he needed the cash that same day, which Fiore said he did. Accordingly, Individual-1 took the checks to a check casher and cashed them. Beginning at approximately 2:59 p.m., Individual-1 met with Fiore at the CWC office for Individual-1 to provide Fiore with $48,000 of the approximately $100,000 in Additional Checks Fiore directed Individual-1 to cash. Individual-1 informed Fiore that he had to pick up the rest the following day.

This is just one example of the illegal money laundering operation directed by Campos, Fiore and others. By causing large amounts of Additional Checks to be cashed, Campos and Fiore were able to illicitly withdraw millions of dollars of illegal profits, thereby (a) permitting them to use the cash in untraceable ways as they wish, including for additional criminal activity, and (b) at the same time further reducing CWC's tax burden by fraudulently reporting the Additional Checks as legitimate business expenses.[1]

---

[1] Campos thereby earned enormous, illegal profits, exhibiting his ability to pay a substantial fine. In addition to his financial disclosures described in the PSR, in a recorded conversation on June 29, 2019, Kocaj recounted to Individual-1 a conversation with Campos he had shortly after the execution of federal search warrants on June 26. Among other things, Kocaj stated that Campos wanted to "pay for the lawyers" and also "pay off the suppliers"

3.     Honest Services Schemes

As part of their control of CWC, Campos and others also engaged in a series of wire fraud schemes by, among other things, providing free services and materials for the benefit of multiple employees of numerous construction companies, including real estate developers, and fraudulently accounting for certain expenses.[2]  See PSR ¶ 47.

For instance, beginning at least as early as 2016 and through 2019, CWC, together with others, performed free work—including the provision of labor, materials, and rental and delivery of equipment—at co-defendant John Simonlacaj's residence in Scarsdale, New York, the value of which totaled over $100,000.  See id. ¶¶ 48-49.  As part of this scheme, Kocaj, a principal of CWC and co-defendant and relative of Simonlacaj, directed a subcontractor (the "Owner") to perform work at Simonlacaj's residence, which he did in 2018.  Kocaj told the Owner to bill CWC for this work by providing an invoice that falsely stated it was related to a construction project managed by Construction Company #1 on which CWC worked.  PSR ¶ 51.  The Owner was paid for this work by, among other things, two $20,000 checks issued by CWC dated October 31, 2018, and November 28, 2018.  See id.

These extensive, free benefits were not simply gifts to a friend.  Rather, they were bribes—extensive in-kind benefits to Simonlacaj, then Construction Company #1's Managing Director for Development, calculated to secure and maintain Simonlacaj's support for CWC, in violation of Simonlacaj's fiduciary duties to his employer.  See generally United States v. Skelos, 988 F.3d 645, 655 (2d Cir. 2021) (explaining that to prove an illegal quid pro quo, the government "does not have to prove an explicit promise to perform a particular act made at the time of payment so long as the general nature of the act to be taken was understood at the time of the payment" (internal citation marks omitted)).

Indeed, while the free work on Simonlacaj's house was being performed, CWC employees routinely commented about how they enjoyed special privileges with Simonlacaj and Construction Company #1.  In fact, CWC secured multiple projects with Construction Company #1, so many that Campos directed that they form a new corporation, Eastern Interiors LLC (nominally operated by co-defendant and Gambino crime family soldier James Ciaccia) to avoid the appearance of having so many projects with the same company.  PSR ¶ 39.  As Kocaj recounted in a lawfully recorded conversation on November 8, 2018, "What do you think I am around for?  If it was not for my cousin [i.e., Simonlacaj] you guys would not be where you are today. . . . . When this company started it started because of me."  PSR ¶ 55.  And there are multiple instances in which Campos and others sought Simonlacaj's assistance

_____

owed money by CWC and place money "into escrow accounts" so that his "family is taken care of."

[2] Campos spends the majority of his sentencing memorandum disputing whether the evidence in this case amounts to an honest services scheme.  The government has addressed Campos's objections to this evidence, outlined in the PSR, below.

in, among other things, securing payment and approving change orders, which Simonlacaj did—including during the performance of the free work at the home. See, e.g., PSR ¶ 56 (describing, among other things, a $330,000 change order for CWC's benefit dated May 3, 2019 with the notation "Per John Si," and other requests for payment to CWC in May 2019 in which Kocaj texted Simonlacaj, "I'm getting a lot of pressure from my office about the funding. I reached out but no one is getting back to me. Help!!!!").

Other co-conspirators also were explicit about the illicit relationship with Simonlacaj. For instance, on January 31, 2019, in a recorded conversation, Fiore, one of the principals of CWC, spoke with another individual about obtaining work and bragged about the illicit relationship they had with Simonlacaj. Fiore stated, "I'll bring Mark [i.e., Kocaj] with me, his name is Chippy, he's uh, the cousin, so you know but keep it to yourself, the cousin of [Construction Company #1], this director, John [i.e., Simonlacaj]. There's a beautiful in there. There's things we can do with Chippy there, he whispers what he needs to whisper and we get things done." PSR ¶ 54.

Fiore also described the free benefits being provided to Simonlacaj. In another conversation on March 2, 2019, Fiore complained about Campos's decision to agree to do more work at a Construction Company #1 project, stating, "I don't give a fuck what John [i.e., Simonlacaj] say, he don't give a fuck, he gets his, win, lose or draw. He gonna give it back if we lose? He gonna say sorry guys, you lose, throw it in?" And Simonlacaj himself made clear the importance of the work being performed on his home, writing in a text message to Kocaj, "Please tell Benny [i.e., co-defendant Benito Dizenzo who performed much of the work] stop crying all the time. Need to finish. This is my house not a fucking job site tell him. Or will just call someone else he he [sic] can go fuck himself." PSR ¶ 52.

As noted above, CWC's performance of work on Simonlacaj's residence was not legitimate work, and as such, CWC did not have a project on its books that referred to Simonlacaj's residence. Rather, CWC, including Campos, and others, fraudulently accounted for the expenditures by claiming that they related to legitimate Construction Company #1 projects. For instance, on March 15, 2019, Fiore told Campos that CWC owed money to a subcontractor for "John Si's house." PSR ¶ 57. Later that day, Fiore told a co-conspirator to fraudulently account for the payments on CWC's books, stating, "I just got off the phone with Andrew [Campos] a couple minutes ago. . . . [The street of Simonlacaj's residence. The subcontractor's] owed eight days over there. . . . Put that against [i.e., account for it as an expenditure related to] 76 11[th Avenue, a project managed by Construction Company #1]. Chippy knows about that as well. That's, um, John Si's house." Id. In addition to proving that CWC committed tax fraud by accounting for these costs as legitimate business expenses, this also shows the illegality of the scheme—the benefits to Simonlacaj had to be hidden so as not to appear in its financial statements.

If there were any doubts as to the true nature of the benefits provided to Simonlacaj, Kocaj eliminated them in a recorded conversation on February 25, 2019, with Individual-1:

| | |
|---|---|
| Individual-1: | Who did all the work up there [i.e., at the Simonlacaj residence]?  Did we do it? |
| Kocaj: | We did it. |
| Individual-1: | Who, Benny [i.e., co-defendant Benito Dizenzo]? |
| Kocaj: | Benny.  And your guys. |
| Individual-1: | My guys? |
| Kocaj: | [Unintelligible ("UI")] and all them. |
| Individual-1: | I thought they were at Larkin [Plaza, another CWC project]? |
| Kocaj: | No, they took them there.  A couple days here and there. They know, Andrew [i.e., Campos] knows. |
| Individual-1: | I'm sure he knows. |
| Kocaj: | Right . . . [UI] pay for it. |
| Individual-1: | Who paid for it, him?  He [Simonlacaj] paid for it out of his own pocket? |
| Kocaj: | No, he put it – he made him put a change order in. |
| Individual-1: | Oh. |
| Kocaj: | I'm just saying, he didn't have to do that.  It should have been pro bono. |
| Individual-1: | Right. |
| Kocaj: | Write it off. |
| Individual-1: | I guess. |
| Kocaj: | They do 50 million a year in business.  No? |
| Individual-1: | Right, worth 200 grand. |
| Kocaj: | Whatever, a hundred, hundred and fifty, whatever it was. You don't think it's worth it to do some of the paperwork? |
| Individual-1: | He had to do it with everybody. |
| Kocaj: | Yea. |
| Individual-1: | So he got it for free. I can't even get a fucking, I can't get [materials from the Owner's company]. |
| Kocaj: | Even [the Owner's materials], 50,000. |
| Individual-1: | [The Owner] paid for it? |
| Kocaj: | No. . . . put in a change order. |

PSR ¶ 50.  In other words, Kocaj confirmed that it was "worth it" for CWC to perform "a hundred, hundred and fifty" thousand dollars in free work at Simonlacaj's residence because Construction Company #1 does "50 million a year in business."  In fact, Kocaj admitted that the work performed by CWC should have been done "pro bono," i.e., paid for by CWC but instead that Simonlacaj stated that the work was to be fraudulently paid for by Construction Company #1 through a "change order," i.e., an adjustment to the contract for work performed by CWC on a legitimate Construction Company #1 project.

CWC also performed additional free work for other employees of Construction Company #1, including at a home in the Bronx and over $5,000 in free kitchen cabinets.  See id. ¶¶ 59, 61.  Fiore also was captured discussing an illicit cash bribe he gave another employee of Construction Company #1 ("CC#1 Employee").  Id. ¶ 60.  Specifically, on April 12, 2019,

Fiore stated, "Are you on speaker or am I off speaker?" CC#1 Employee said, "Hold on a sec, no one's here anyway." Fiore then stated, "Let me know what, what I gave you so far." CC#1 Employee replied, "38," i.e., $38,000. Fiore said, "How much? 38, right?", to which CC#1 Employee #2 confirmed, "38, yea." Fiore then said, "Okay. And I owe you, there's another 42 that's gotta come, correct? It was 80?" CC#1 Employee stated, "It was 80, it was 85 and then the 50 is after when you get the other one." Fiore said, "Right, but right now," and the CC#1 Employee stated, "Right now, it's 85 minus the 38. . . . for now. . . . And then I'll do the . . . give me Monday, Monday, I'll work out the verbiage for the other shit [i.e., another change order], pay you guys for the general conditions, I'll do something with that." Fiore said, "You got it my man."

4.      Other Crimes

a.      Other Overbilling Schemes

Campos also participated in other criminality relating to his operation of CWC, including by overbilling another construction company (described as "Construction Company #4") by causing it to pay for an office for Construction Company #1. See, e.g., PSR ¶ 71 (describing a recorded meeting in which Kocaj stated to Campos, "I'm going to bury [i.e., fraudulently bill for the office] it in this mock-up. And I'm going to try to bury the whole fucking office there. I'm not stupid, Andrew"). Campos and others also routinely overbilled for work that was never performed. See, e.g., id. ¶ 72 (describing recorded statement of Kocaj in which he said he would tell Campos, "You took the money. I know what I built and what it cost me. You took the money," and complaining that Campos would criticize Kocaj for overbilling even though "when you [Campos] put in a change order for $600,000 but it costs $300,000, that's okay"). As Kocaj put it in a conversation to Fiore, Campos "drinks all the water and the glass is empty and he wants to know what happened to it?" to which Fiore replied, "He knows what happened to it." Id.

b.      OSHA Fraud and Related Bribery

In addition, Campos helped orchestrate the scheme to fraudulently obtain training certification cards from the Occupational Health and Safety Administration ("OSHA") and other entities. For instance, Campos, among other things, provided the names of individuals who received the fraudulently procured cards, directing that the false statements be made to OSHA even though the classes were not actually held. PSR ¶¶ 78-99. In addition, Campos was present during the "exam" for a course required by New York City law in which he and other co-conspirators had the answers to the tests and filled them out together. During a meeting on May 7, 2019, which was lawfully recorded, while many of the co-conspirators fraudulently completed the required paperwork together, Campos said, among other things, "See, I woulda got this one [i.e., a question on a test] wrong . . . Maybe he is giving you one wrong one in these things . . . We can't get all the same ones wrong. . . . I think he gave us wrong answers. . . We are going to wind up failing this and he's [i.e., the corrupt examiner] going to fucking say fail or pass, he's keeping the money." See PSR ¶ 97.

As indicated in this conversation, to obtain the answers to this exam, Campos authorized the payment of an approximately $15,000 bribe to the corrupt examiner. Specifically, in May 2019, Campos authorized the issuance of an Additional Check, which Individual-1 cashed and returned to Fiore. As confirmed by statements made by Kocaj during consensually recorded conversations, the proceeds of this check were used to pay the required bribe. Indeed, on May 8, 2019, Individual-1 met with Kocaj near a CWC construction project and, during the conversation, Kocaj stated he had the money to deliver to the corrupt examiner, which he did. See PSR ¶ 98.

### c. Payment of Individual-1's Loans

Campos helped repay loans Individual-1 owed to other individuals and then collected the money from Individual-1, who performed work for CWC.[3] Although Campos and Fiore did not add interest to the amount owed, Fiore stated on at least one occasion they should have done so, comparing the arrangement to a traditional "loanshark" loan. Specifically, on November 2, 2018, Fiore stated in a recorded conversation to Individual-1 that "The favor that you're getting done. We're paying down your debt with [another individual], based on the way you structured it. . . . Zero points [of weekly interest that would not reduce the principal owed]. You should be paying three points minimum on this. Three points minimum. . . . Three points, you should be paying. A hundred thousand, what's three points?"

Fiore also repeatedly used threats of violence against Individual-1 concerning the money Individual-1 either owed or was due given his work for CWC, and often referenced Campos, Fiore's superior in the Gambino crime family. For example, as captured on a conversation occurring over Fiore's cell phone on March 13, 2019, Fiore yelled at Individual-1 that the payroll expenses for CWC employees who Individual-1 supervised, and which Campos had agreed to pay, were too high. During the conversation, Individual-1 laughed, causing Fiore to state:

> No, you laugh. When you get punched in the face and your teeth get knocked out, 'cause you're being a dick, you're not going to laugh no more, okay? . . . You think it's a fucking joke. Don't make light of it. Because at the end of the day, this is coming out of your fucking ass. . . You're lucky you're not in front of me because I'd knock your fucking teeth out. . . . Because I know what you are and I know who you fucking are. . . . Listen, I don't give a fuck. At the end of the day, when you're upside down [i.e., not able to cover payroll and loan payments], you deal with him

---

[3] This conduct is described in the PSR at paragraphs 107 to 109. Although, as described below, Vincent Fiore often used threats of violence when discussing the money owed to Individual-1, the government does not argue that this constitutes an extortionate collection of credit and therefore it should not affect the Guidelines calculus. The government does maintain, however, that such conduct should be considered by the Court in fashioning the appropriate sentence under 18 U.S.C. § 3553(a).

[i.e., Campos]. You deal with him. . . . How you fuckin' lasted fifty something years, I don't know.

A spreadsheet recovered from a hard drive used by Fiore during the execution of a search warrant at CWC's office on June 26, 2019 confirms his and Campos's collection of over $100,000 from Individual-1.[4] Furthermore, on September 18, 2019—after the execution of the warrant—during a lawfully recorded conversation, Individual-1 began to ask Fiore about the money Individual-1 owed to Campos and Fiore, stating, "When you see Andrew, last we spoke, I still had a balance." At this point, Fiore interrupted Individual-1 and, pretending not to know to what Individual-1 was referring, stated, "Balance of what? What do you owe? I don't know nothing about that. . . Andrew's out of this equation. There's no need for you to mention his name. . . . He's doing what he's doing, so you don't need to bring up his name."

Fiore made clear his desire to assault Individual-1 on other occasions. For instance, in a conversation between Fiore and Kocaj on February 6, 2019, Fiore recalled a conversation he had with Campos about Individual-1's debt, stating:

> Fiore: You're [Campos] the one who wants to front him, you're the one who wants to do whatever you want to do. I want to kick him in his balls. I don't want to give him nothing, I want to choke him. . . .
>
> Kocaj: With [Individual-1], I know he helped him out with some finance, right?
>
> Fiore: Yup.
>
> Kocaj: Where'd he get that money from, the company, no?
>
> Fiore: Of course.
>
> Kocaj: Is he eating that?
>
> Fiore: No, we take it out of whatever's coming. But at the end of the day, you still took it—you [Campos] gave it to him. I wouldn't have gave it to him. Don't make me find out you go to him for another dollar. . . . he ain't your [Individual-1's] fucking bank so you could be a whore. You're taking advantage of his [Campos's] kindness and you're a scurve.

> d. Obstructive Conduct

Campos also took part in other conduct that, although not amounting to obstruction of justice for purposes of the Guidelines, may be considered by the Court under 18

---

[4] As another example, on January 18, 2019, when Individual-1 inquired about how a spreadsheet that detailed the amount of money Individual-1 owed, Fiore stated, "You are a nosey motherfucker. You're worse than a whore. You want to know everybody's business instead of your own, but that's yours right there."

U.S.C. § 3553(a). For instance, in November 2019, Campos and Fiore directed that an individual who they believed had testified before the grand jury (the "Witness") be fired for providing truthful information to the government. Specifically, on November 22, 2019, during a lawfully recorded conversation, Fiore told Individual-1 that as "a personal favor to Andrew," Individual-1 had to remove the Witness from CWC projects because the government "[h]ad him down to the grand jury." Fiore stated that Campos told Fiore that the Witness "didn't have to talk" and "could've pled the Fifth." Fiore even complained that had he instructed the Witness to invoke his Fifth Amendment right to remain silent, as Campos wished, "That's obstruction of justice." PSR ¶ 120. Thereafter, Campos and Fiore discussed not reassigning the Witness, but the Witness was ultimately fired from CWC. Although the government cannot prove that this firing was directly related to his testimony, such conduct is also relevant to the Court's consideration. See id.

Finally, in November 2019, Fiore directed an individual to falsely take responsibility for conduct relating to the Additional Checks scheme described above. Specifically, during lawfully recorded conversations in November 2019, Fiore told an individual that Campos would pay for the individual's legal expenses and possible financial penalties for, among other things, cashing the Additional Checks and returning the money to Fiore. Id. ¶ 103. Fiore instructed the individual to falsely claim he had spent the money (rather then return it to Fiore for his and Campos's benefit) due to, among other things, a purported drug addiction, instructing the individual to say, "[I] paid the guys in cash and whatever profit I made, I spent. . . . I got high, tell him every fucking thing. I got high, I love the women. . . . I got bad habits, you know." Id.

B.      The Defendant's Prior Fraud Conviction

Campos and co-defendant Richard Martino were charged in 2004 with, among other crimes, racketeering for various crimes they committed as part of their membership in the Gambino family, including committing a massive scheme to defraud users of adult telephone services. See 03-CR-304 (CBA) (E.D.N.Y.). Specifically, the defendants advertised telephone numbers as offering free samples of services such as psychic hotlines, dating services and sexually oriented "talk-lines." See PSR ¶ 171. When a victim called these telephone lines, it triggered recurring monthly charges on the victims' telephone bills. Id. This scheme generated approximately $420 million in revenue between 1997 and 2001. Id. The defendants then laundered the proceeds through several corporate entities. Id. Campos, who was then a Gambino family associate, specifically opened several shell companies that had no employees or physical space but which were used to defraud victims and launder the proceeds. See id.

Ultimately, on the eve of trial on February 14, 2005, Campos pleaded guilty to one count of wire fraud conspiracy, in violation of 18 U.S.C. § 371, for which he was sentenced principally to 21 months' imprisonment and ordered to pay $300,000 in forfeiture, less than $13,000 in restitution and a $10,000 fine. See id. Richard Martino pleaded guilty that same day and was ultimately sentenced to a total of 108 months' imprisonment.

C.     Campos's Ascension Within the Gambino Crime Family and Facilitation of the Violation of Others' Supervised Release

Following his release from the custody of the Bureau of Prisons in July 2014, Richard Martino began a three-year term of supervised release. One of the standard conditions of his supervised release was that he could not associate with felons, including, of course, his former co-defendant Campos. Nonetheless, Campos and Martino repeatedly violated that condition by using sophisticated methods to evade the court-ordered supervision and meet on multiple occasions. Co-defendant Vincent Fiore was also captured on a recording stating that he too associated with Campos following Fiore's release to a half-way house, which was also a violation of the conditions of Campos's release.

As one example, law enforcement officers learned from judicially authorized wiretapping of co-defendant Frank Tarul's cell phone that Campos and Martino were scheduled to meet on February 2, 2017. That day, law enforcement officers conducting physical surveillance observed Martino and Campos meet at Country Kitchen Diner in Pelham, New York. At the end of their meeting, Campos and Martino hugged each other but, despite dining together, left minutes apart.

Martino and Campos also used more elaborate methods to avoid being seen meeting together, including using Tarul as an intermediary and to transport Martino to illicit meetings. For instance, as captured on judicially authorized wiretapping of Tarul's cell phone, on June 7, 2017, at approximately 12:09 p.m., Tarul asked what Martino was doing. Martino replied that he was heading to the Bronx and asked if he wanted to meet, which Tarul said he would. Martino also stated that "the other guy," i.e., Campos, would be with Tarul later. At approximately 12:24 p.m., Martino and Tarul spoke again and they agreed to meet by Fordham Preparatory School. At approximately 12:55 p.m., law enforcement officers observed Martino's empty car near Fordham Preparatory School in the Bronx. At approximately 1:05 p.m., officers observed Tarul's and Campos's empty cars near Antonio's Trattoria in the Bronx. At 1:10 p.m., officers observed Martino inside the restaurant. At 1:20 p.m., Tarul stepped outside, appearing to look for someone. At 1:40 p.m., officers observed Martino, Tarul, Campos and another individual sitting at a table inside the restaurant together. At 2:48 p.m., Campos left, and at 3:09 p.m., Martino and Tarul walked out of the restaurant together, got into Tarul's car and left.

As another example, as captured on judicially authorized wiretapping, on July 9, 2017, at approximately 8:53 a.m., Martino spoke with Tarul and asked him to call "CWC," i.e., Campos (the principal of CWC), and let "CWC" know that Martino had a message from "Tow Truck" about a meeting the next day. Martino told Tarul that Campos would know where to go. Tarul said he would "call him" right now. Minutes later, Tarul attempted to call Campos but the call went to voicemail. At approximately 10:00 a.m., Tarul again spoke with Martino and stated that he (Tarul) had confirmed with Campos that Campos would be at the meeting. The next morning, July 10, 2017, law enforcement officers conducting physical surveillance observed Campos meet in the Pelham Bay diner with Louis "Louie Jet" Gampero, an inducted member of the Lucchese crime family associated with Jets Towing company.

Outside of the diner, officers also observed, among others, Pasquale "Patty" Falcetti, a captain in the Genovese family, having a meeting. Shortly thereafter, Campos met with Falcetti in the diner.

Finally, Campos helped Fiore violate the conditions of his supervised release following Fiore's release from federal prison after serving 27 months in custody for attempted extortion. Specifically, on April 16, 2019, during a lawfully recorded conversation, Fiore recounted how he had borrowed $10,000 two weeks before he was arrested on his prior case. Fiore stated that, while incarcerated, he "sent a message" to his creditor that he would "straighten it out" and be sure that the creditor "got his money." After a dispute arose with the loan, Fiore stated that "I wasn't in the halfway house 15 fucking minutes, Andrew [i.e., Campos] comes and picks me up" and drove Fiore to a social club, where he had a discussion about the loan.

As demonstrated by the charges in the instant case, Campos's meetings with other felons – themselves members and associates of La Cosa Nostra – were not mere social gatherings. Indeed, these are precisely the types of in-person meetings where crime family business, including criminal activity, were discussed.

### D. The Defendant's Powerful Position Within the Enterprise

Through his years-long dedication to the crime family, Campos has risen its ranks, becoming a powerful captain entrusted with its most sensitive matters. For instance, Campos, with Fiore's assistance, helped the Gambino family investigate the circumstances surrounding the murder of Francesco "Frank" Cali, who, at the time of his death on March 13, 2019, was a high-ranking member of the Gambino family.[5]

The day after Cali's murder, on March 14, 2019, at approximately 5:49 p.m., law enforcement agents conducting physical surveillance observed Campos leaving his home and driving into Manhattan, where he parked near a pizzeria and got out of his car. At approximately 6:33 p.m., Campos was picked up in a vehicle registered to a an LCN associate and driven to another location in Manhattan, where Campos met outside with Louis Filippelli, another Gambino family captain. Thereafter, Campos and Filippelli got into the LCN associate's car and drove to near a church in Brooklyn, where they were observed meeting outside with, among others, Giuseppe Gambino, another inducted member of the Gambino family.

Several days later, Campos and Fiore traveled to Staten Island to meet with multiple other high-level Gambino family members to discuss the circumstances surrounding Cali's death. Arrangements for this clandestine meeting were captured over lawfully

---

[5] Anthony Comello was later charged with Cali's murder in Richmond County Supreme Court. The government does not contend that any of the defendants had any involvement in Cali's death.

intercepted conversations on March 17, 2019, between Fiore, Campos and Ernest Grillo, another captain in the Gambino family.

The next morning, March 18, 2019, Fiore spoke with his ex-wife. During the conversation, Fiore referred to the Cali murder and his attendance at the meeting the night before. Among other things, Fiore stated that he saw the "tape," i.e., the surveillance video from Cali's home that captured the murder. Fiore also discussed a possible motive for the murder relating to a woman who had been at Cali's home that day. During the call, Fiore referred to Cali affectionately as "Frankie" and somebody who "was loved." Fiore also said that the "two" of them (i.e., Fiore and Campos) had driven to Staten Island and met "a half dozen" people. Later that day, Fiore also spoke with co-defendant Mark "Chippy" Kocaj, who asked Fiore how Fiore "made out with him [i.e., Campos] last night." Fiore said that he (Fiore) was a "victim of his" last night and did not get home until approximately 12:30 or 12:45 a.m.

Campos and Fiore have also expressed their allegiance to one another by virtue of their membership in the Gambino family. For instance, in May 2019, Fiore purchased a home in Briarcliff Manor. Campos gave Fiore the necessary money for the down payment (and Kocaj served as a co-signor). In a lawfully intercepted conversation on May 9, 2019 at CWC's office, Fiore stated, "I asked you . . . could it be done?", to which Campos replied, "Yeah, what, am I gonna say no to you? I'm not gonna say no. I won't do that. I'm never gonna say no to you." Fiore confirmed, "You're my blood."

The results of a search warrant executed on Campos's home on June 26, 2019, further reveal just how importantly he views his membership in the Gambino family. Specifically, in a closet off of Campos's bedroom, agents discovered multiple pictures of Campos and Martino visiting in prison Frank LoCascio, who was the underboss of the Gambino family under boss John Gotti and recently passed away while serving a life sentence for, among other offenses, murder. See Ex. A.

II.     Applicable Law

In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure that sentencing courts must follow in light of United States v. Booker, 543 U.S. 220, 258-60 (2005):

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [a district court] may not presume that the Guidelines range is reasonable. [A district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

Section 3553(a) directs the sentencing court to consider the following factors, among others, when imposing a particular sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

III.    Guidelines Analysis

A.      The Government's Estimate of the Guidelines

As noted above, Campos pleaded guilty to Count One of the Indictment, charging him with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and admitted his participation in Racketeering Acts Five (wire fraud relating to the payroll tax scheme), Seven (money laundering relating to the Additional Checks) and Ten (money laundering relating to the construction of his home, termed the "Dorset Properties Scheme"). The government respectfully submits that the Guidelines estimate set forth in the plea agreement is correct. This calculation is as follows:

| | | |
|---|---|---|
| Base Offense Level (§§ 2B1.1(a)(1), 2S1.1(a)(1)) | | 7 |
| Plus:   | Loss Greater than $550,000 (§ 2B1.1(b)(1)(H)) | +14 |
| Plus:   | Aggravating Role (§ 3B1.1(a)) | +4 |
| Less:   | Global Resolution (§ 5K2.0) | -2 |
| Less:   | Timely Acceptance of Responsibility (§ 3E1.1) | -3 |
| Total:  | | <u>20</u> |

Because Campos is in Criminal History Category II, this results in a Guidelines range of 37 to 46 months' imprisonment. This also yields a suggested fine range of $15,000 to $150,000. See U.S.S.G. § 5E1.2(c)(3).

This analysis, to which Campos stipulated in his plea agreement, differs from the calculation in the PSR in the following respects:

· **Racketeering Acts Five, Seven and Ten** – The PSR calculates that the "underlying offense" of the racketeering and money laundering crimes is "wire fraud conspiracy, as charged in Count 1, Racketeering Act 5. The Guideline for wire fraud conspiracy is 2B1.1(a)(2), which provides a base offense level of 6." PSR ¶ 126. The government respectfully submits, and the defendant agreed as part of his plea agreement, that the base offense level for wire fraud is 7. See U.S.S.G. § 2B1.1(a)(1) (providing a base offense level of 7 "if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more"). Because the offense underlying Campos's racketeering conspiracy conviction is wire fraud, which carries a maximum sentence of 20 years, see 18 U.S.C. § 1343, the government respectfully submits—and the defendant has so stipulated—that a base offense level of 7 is appropriate.

· **Racketeering Act Nine** – The PSR initially noted that if the defendant were convicted of Racketeering Act Nine, charging extortionate collection of credit relating to Individual-1's loans, this would constitute another racketeering act that would result in a grouping analysis and increased total offense level. PSR ¶¶ 129, 156-169. Because, as noted above, the government does not argue that this conduct constitutes extortionate collection of credit, it should not affect the Guidelines, which is now accurately reflected in the addendum to the PSR (but should still be considered by the Court under 18 U.S.C. § 3553(a)).

B.   The Defendant's Objections to the Presentence Report

The defendant posits myriad objections to the PSR, which are also recast as sentencing arguments in his sentencing submission, many of which are addressed above. The government details below its responses to what it believes are the other objections raised by the defendant in his August 27, 2021 letter setting forth objections to the PSR ("Def. PSR Obj."), as well as the defendant's arguments regarding the same, detailed in his January 27, 2022 sentencing memorandum ("Def. Sentencing Mem.").

Paragraphs 47-68 of the PSR:  the defendant spends pages of his sentencing submission explaining his view of the "function and business practices" of the construction industry and CWC to the Court. See Def. PSR Obj. at 2-3. The government does not dispute the majority of Campos's description of the "structure of CWC's contracts" and the "process for payment under the construction contracts," though it believes this background is largely immaterial to the defendant's crimes and should not be incorporated into the PSR. Def. PSR Obj. at 2; see also Def. Sentencing Mem. at 32-37 (outlining general nature of contracts but acknowledging that CWC received additional payments in form of change orders). The government does, however, dispute that "[a]ll" of CWC's "tickets and change orders were heavily negotiated by the construction managers and owners/developers." Def. PSR Obj. at 3.

Indeed, the tens of thousands of dollars of differences in the amount sought by CWC in change orders and the amount that it received alone demonstrates the imprecision and room for abuse in these "negotiations."  See Def. Sentencing Mem. at 37-41 (describing purported change order negotiations).

The defendant's argument that layers of review by a construction manager's supervisors and representatives make the inflation of change orders "virtually impossible" fares little better.  Def. Sentencing Mem. 37; see also Def. PSR Obj. at 6.  Surely Campos is not alleging that there has never been a fraudulent change order in the history of New York City construction.  And Campos and others clearly agreed for that to occur here.  But even under the defendant's argument, higher-level supervisors are not present on a job site to assess the intricacies of a project and, thus, any inflated amounts would be difficult to detect.  For example, in a recorded call on March 3, 2019, at approximately 2:08 p.m., Fiore, speaking to co-defendant Carlos Cobos, asked Cobos, "How many men we have there [i.e., at the job site] today?"  Cobos responded, "13 guys."  Fiore asked, "Was anybody there from [the name of the general contractor]?  After Cobos said he did not see anybody, Fiore instructed him to, "Okay, put 17 guys down on the paper, that's how I'm going to write the ticket, an extra four guys."[6]  Moreover, the defendant's arguments are thoroughly contradicted by each of the recorded conversations outlined above, in which members of the conspiracy openly discussed the import of the Simonlacaj-Kocaj relationship, as well as, in a conversation between Kocaj and Campos, "bury[ing]" costs.

In any event, as detailed below, the structure of CWC's contracts, or the means through which it obtained additional funds through tickets and change orders, does not mean that the criminality described above did not occur.

Paragraphs 47-68 of the PSR (Specific Issues Related to Construction Company #1):  Campos claims that Construction Company #1 often did not pay construction managers and, therefore, subcontractors, including CWC.  See Def. PSR Obj. at 4; Def. Sentencing Mem. at 42-45.  Although this may be true, a defendant may be guilty of committing honest services fraud even if he is entitled to the property that is the subject of the bribe or kickback.[7]

Paragraph 47 of the PSR:  Campos requests that the statement that he and CWC "agree[d] for [certain] expenses to be fraudulently billed to the companies" be deleted because

---

[6] Later that day, Cobos informed Fiore that, for that particular day, Fiore needed to keep the numbers accurate, because "this morning was a guy, he was looking at some of the guys, so has to be 13 guys."  Nonetheless, this conversation is an explicit example of the ease with which CWC was able to inflate its tickets and change orders.

[7] Campos also appears to suggest that Construction Company #1's involvement in, among other things, "embezzlement and misappropriation of funds," Def. Sentencing Mem. at 42, somehow makes it less likely that Simonlacaj was involved in inflating change orders on behalf of CWC.  The argument defies logic.

"[t]here is no evidence he 'actually' fraudulently billed any expenses . . . on any projects in exchange for improper benefits to construction company employees." Def. PSR Obj. at 3-4. But the PSR only states that Campos and others agreed for this to occur, which they indisputably did. See, e.g., supra (Feb. 25, 2019 conversation in which Kocaj admitted that CWC performed over $100,000 of free work on Simonlacaj's home and "Andrew knows" and "he made him put a change order in").

Paragraph 48 of the PSR: Campos objects to this paragraph because it "contains no supporting facts or citations [and] is a bare and unsupported legal conclusion." Def. PSR Obj. at 5. This legal conclusion (that Campos and others were part of an honest services wire fraud scheme relating to Construction Company #1), however, is drawn from Racketeering Act 11 and Count 16 of the Indictment and, as set forth herein and in the PSR, is supported by ample facts.

Paragraphs 49-51, 60: Campos objects to these paragraphs, claiming that the government has not identified a specific requisition or change order "that was improperly billed by CWC in exchange for favors that CWC provided, including the renovations performed on Simonlacaj's home." Def. PSR Obj. at 5; Def. Sentencing Mem. at 46-50. This argument is flawed for numerous reasons.

First, the PSR clearly states, and the evidence clearly shows, that the parties intended for fraudulent change orders to be submitted. Whether that was ultimately done by the time the government executed its search warrants or the Indictment was returned is irrelevant. Free benefits were provided in exchange for promises of official actions. Nothing more is required under the law. See, e.g., United States v. Silver, 948 F.3d 538, 551 (2d Cir. 2020). Campos also argues that the government cannot prove honest services fraud because it has not shown a "specific, identified set of benefits [that] was promised or intended in exchange for favors performed by CWC." Def. Sentencing Mem. 48 (emphasis in original); see also PSR Obj. Ltr. at 5-6 & n.5. But the government has shown such benefits—assistance with the approval of change orders, assistance with securing payment for work performed, and assistance with securing current and future contracts. See, e.g., Silver, 948 F.3d at 557 (discussing specificity requirement). In any event, as set forth herein, such specificity is not required to permit the Court to fashion the appropriate sentence under 18 U.S.C. § 3553(a).

Campos's characterization of the recordings in this case, which he describes as "chatter," merits little discussion. Def. Sentencing Mem. at 48. As detailed extensively above, and to take but a few of several examples, it was not "chatter" for Kocaj and Fiore to ask an executive of Construction Company #1 for assistance securing payments and approving change orders while CWC was performing free work on his home. See PSR ¶ 56. It was not "chatter" when Fiore instructed a co-conspirator to fraudulently account for payments owed to a subcontractor for the work performed on Simonlacaj's residence. See id. ¶ 57. It was not "chatter" to remove employees from a CWC project, have them perform work at Simonlacaj's house instead, and "put a change order in" on it. PSR ¶ 50. Indeed, this Court has already found that this conduct amounted to an unlawful bribery scheme, acknowledging, at Kocaj's sentencing, that the Court had to "consider the nature of the offense, which is basically a bribe

to Mr. Simonlacaj so that this company, CWC, could get benefits from his business." Kocaj Sentencing Tr. 25.

        Second, whether or not the misconduct satisfies the legal requirements of honest services wire fraud is irrelevant. These schemes do not affect the Guidelines calculation and the government respectfully submits that the legal arguments made by counsel do not affect any other matter necessary for determining the appropriate sentence. Campos does not appear to contest that free benefits, including extensive renovations on Simonlacaj's home, were provided. And he does not offer any legitimate reason why they would be provided. The only logical conclusion is that they were done in exchange for a promise of official action as part of an illegal quid pro quo, as supported by the evidence outlined herein. In short, the fact that Campos and others at his direction routinely provided free benefits to construction executives, agreed to have at least some of these free benefits fraudulently accounted for, and enjoyed lucrative business relationships with these executives' employers is indisputable and should be considered by the Court under 18 U.S.C. § 3553(a).

        Whether or not they were successful, the illicit bribe at issue here was for the executive's promise of assistance in approving the change order along the chain (as well as other official actions, like ensuring payment to CWC). As noted above, Campos has not proffered any (and there is no) other reason for why CWC, a profit-maximizing entity, would spend hundreds of thousands of dollars in free benefits for construction executives if it were not in exchange for official action.

        Paragraph 52 of the PSR: In a call on March 2, 2019, Fiore expressed disagreement with Campos's decision to perform additional work at a project managed by Construction Company #1 and stated, "I don't give a fuck what John [Simonlacaj] say, he don't give a fuck, he gets his, win, lose or draw. He gonna give it back if we lose? He gonna say sorry guys, you lose, throw it in?" Campos asserts that this statement pertains to Simonlacaj receiving his salary from Construction Company #1, "whether or not CWC is paid for the work performed under its contract with HFZ." Def. Sentencing Mem. at 49; Def. PSR Obj. at 6. The government disagrees with Campos's interpretation of this recorded telephone call. Fiore would not describe Simonlacaj's salary as receiving "his, win, lose or draw." It is illogical to think that Fiore would single out Simonlacaj (versus any other employee of Construction Company #1) as receiving his salary whether or not CWC was paid for work. Rather, Fiore singled out Simonlacaj—who, as detailed above, undoubtedly received an illegal bribe from CWC—because Fiore believed he would still receive his illicit benefit no matter the effect on CWC.

        Paragraph 53 of the PSR: Campos claims without any basis that the PSR (and presumably the government) mistakenly believed that Kocaj's statement in a text message to Campos about Simonlacaj needing "8 more jacks" referred to workers. The government has always believed this to mean that Simonlacaj needed equipment (jacks) as part of the extensive renovations on his home, which is indicative of the free benefits CWC provided to Simonlacaj as part of the illegal bribery scheme.

Paragraphs 54-56 of the PSR: Paragraph 54 of the PSR notes that in January 2019, Fiore stated that "so you know, but keep it to yourself, [Kocaj is] the cousin of [Construction Company #1], this director, John [Simonlacaj]. There's a beautiful in there. There's things we can do with Chippy [Kocaj] there, he whispers what he needs to whisper and we get things done." Campos objects because supposedly by that date, "CWC was not interested in securing more work from [Construction Company #1] at that time." Def. PSR Obj. at 7. But in a conversation months later in March 2019 (described in paragraph 52 of the PSR), Fiore recounted how Campos wanted to do additional work with Construction Company #1, specifically, another tower of the project at 76 11th Avenue in Manhattan. And, in any event, Fiore made clear the improper benefits he and CWC obtained from Simonlacaj when he admitted that there's a "beautiful in" with Simonlacaj and that Kocaj just "whispers what he needs to whisper and we get things done."

Campos also argues in this objection that the referenced change orders and payments are not evidence of honest services fraud because the change orders might not have been paid and the payments were for work actually performed. But as set forth above, paying a bribe to an executive in exchange for an official act—even if the executive or his employer was obligated to perform such act, such as a payment or approving a change order—is unlawful and, regardless, relevant for the Court's consideration under 18 U.S.C. § 3553(a).

Paragraphs 58-59 of the PSR: Campos again complains that because CWC may have borne the cost of free benefits provided to construction executives, this somehow absolves Campos of any culpability. See, e.g., Def. PSR Obj. at 8. But these free benefits— paid for by CWC, even if not ultimately passed on to the construction manager or developer— were only provided to obtain preferential treatment for CWC.[8]

Paragraphs 62 – 65 of the PSR: Campos again claims that there is no evidence of honest services fraud with respect to Construction Company #2. See Def. Sentencing Mem. 51; Def. PSR Obj. at 9-10. He does not appear to contest that CWC performed work, largely for free,[9] at a jiujitsu gym with which a Construction Company #2 project manager was

---

[8] Campos avers that there are "no allegations" that work performed by CWC on Construction Company #1's personal residence were in exchange for improper favors from the employee, noting the government's disclosure that this employee denied this to be so. Def. Sentencing Mem. at 47 n.36; Def. PSR Obj. at 8 n.8. The government made this disclosure in an abundance of caution and believes the executive was not truthful in this statement. Again, Campos posits no theory other than bribery as to why he and his company would pay for such free benefits to many Construction Company #1 employees.

[9] Campos cites three checks, noting that this employee paid a "handyman company," but not CWC, $9,500. Def. Sentencing Mem. at 51. But as the PSR makes clear, CWC also bore the costs for much of these renovations without any repayment. Cf. PSR Obj. Ltr. at 10 (stating that the employee paid "some of" the costs for the gym himself, but noting work that CWC would not have likely performed).

affiliated. Again, there is no reason aside from an illicit benefit as to why CWC would pay anything for an unrelated project at a jiujitsu gym. To the contrary, as Fiore explained in a recorded conversation on February 27, 2019, "The only thing [the employee] could do is when it comes to our change orders, they come across his desk and he signs off on them." PSR ¶ 64. So even if this executive was not the final decisionmaker, the provision of free benefits in exchange for this official action is a classic, illegal quid pro quo. Indeed, Campos does not contest that, as stated in the PSR, in recovered text messages, co-defendant Benito Dizenzo admitted that as to the cost of a taper who performed work at the gym, Fiore would "put his bill with Larkin," i.e., fraudulently bill for this cost to the actual Construction Company #2 project at Larkin Plaza, and the taper "shouldn't be calling [the employee] tell him you worked it out with vinny." Id. ¶ 65.

Campos also claims it is "[c]rucial[]" to note that the government also disclosed that the Construction Company #2 employee denied [to the government] receiving any illicit bribes or kickbacks from CWC." Def. Sentencing Mem. at 51; PSR Obj. Ltr. at 10. As noted above, the government's disclosure does not mean that this executive's self-serving statement was truthful.[10] More to the point, Campos fails to note that in this same disclosure letter, the government informed Campos that the executive also stated "the defendant Vincent Fiore offered to have the cost of certain construction work performed at [the executive's request at the jiujitsu gym] fraudulently paid for by one of CWC's clients."

Paragraphs 66 – 67 of the PSR: Campos does not contest that free Disney World passes were provided to an employee of Construction Company #3, with which CWC had business. See Def. Sentencing Mem. at 52; Def. PSR Obj. 10. As set forth above, CWC provided extensive free benefits to construction executives in exchange for official action, and Campos has proffered no other reason for such benefits. Therefore, inclusion of this paragraph in the PSR, which is factually accurate and, in any event, does not affect the Guidelines but should be considered by the Court under § 3553(a), is appropriate.

Paragraph 68 of the PSR: Campos claims that this paragraph does not contain sufficient factual detail about how CWC provided employees of other construction companies with free benefits. Should the Court deem it necessary for consideration of the appropriate sentence, the government can provide such detail, which will in large part show additional free work on executives' personal residences. Nonetheless, the government acknowledges, in light of the voluminous benefits detailed at length in the PSR and herein, the Probation Department's belief that this paragraph does not contribute materially to the offense conduct. Jan. 27, 2022 PSR Addendum at 2.

Paragraph 77 of the PSR: Paragraph 77 states that as of June 2019, Dorset Properties had not reimbursed CWC for over $350,000 in expenses for the construction of Campos's home. Campos objects to this statement. Def. PSR Obj. at 11. However, this figure

---

[10] Indeed, individuals questioned by the government often do not admit their own culpability in criminal activity.

comes from, among other things, CWC's Quickbooks file, which, at the time of search warrants in June 2019, showed this amount owed to CWC by Campos's personal company, Dorset Properties. Campos, for his part, has not provided any evidence that this debt was ever repaid (and if it were repaid, this likely would only have occurred after the execution of the warrants, showing that Campos's true intent all along was not to repay the amount owed).

Paragraphs 111–119 of the PSR: Campos objects to the inclusion of misconduct committed by Kocaj in the PSR. As the Court has previously ruled with other defendants, having one PSR for all of the defendants' criminality provides the Court with appropriate context in imposing sentences, and should not be stricken from the PSR as the Court obviously will only sentence a defendant for his own misconduct.

Paragraph 120 of the PSR: Campos claims that the description of his desire to have a worker terminated for testifying in the grand jury should be "stricken" because it "cast[s] aspersions on Mr. Campos." PSR Obj. Ltr. at 14. But even if the witness's firing from CWC was not necessarily directly related to his testimony, Fiore's recorded statements make clear that Campos wanted the witness terminated because he did not invoke his Fifth Amendment rights and instead testified truthfully, which is undoubtedly relevant under 18 U.S.C. § 3553(a).

IV.   The Section 3553(a) Factors Weigh in Favor of a Sentence of 46 Months In Prison

Campos is a powerful captain in the Gambino crime family who has earned millions of dollars in ill-gotten wealth, some of which he has distributed to other members and associates of La Cosa Nostra. For the reasons set forth below, the government respectfully requests that the Court impose a sentence of 46 months' imprisonment, $1 million in restitution (as agreed) and a $150,000 fine. Such a sentence is appropriate given the nature and characteristics of the offenses, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offenses, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

A.   Nature and Circumstances of the Offense

The defendant sits at the top of the Indictment in this case. He was CWC's principal, and he is a captain in the Gambino crime family. Campos exercised control over each of the criminal schemes outlined above, and each of his co-defendants in this case looked to him for direction, including Fiore (a soldier in the Gambino crime family), George Campos (his father and a soldier), Ciaccia (a soldier), Martino (a soldier) and Kocaj (an associate), among others.

From this powerful position, the defendant orchestrated a massive payroll tax fraud scheme. He illicitly funneled millions of dollars in cash out of CWC, which was used to fund other illegal activity—like paying bribes for fake passage of a New York City safety training course. He also paid bribes in the form of in-kind benefits to numerous construction company executives in exchange for getting work and payments approved. He overbilled

construction companies and created an environment where those who worked for him knew they must participate in the same corrupt activities. And he did this all with and to the benefit of fellow members and associates of the Gambino crime family, a long-running and profitable criminal enterprise.

The nature and circumstances of each of these crimes alone are significant and, taken together, demonstrate how pervasive the defendant's criminal conduct has been, and warrant a serious term of imprisonment. Indeed, the defendant's tax crimes alone are extremely serious, especially given the large magnitude of the sums involved. As the Court observed as Simonlacaj's sentencing, with respect to tax crimes, it "causes people to lose faith in our system if they see that people get away with things that they don't get away with." Simonlacaj Sentencing Tr. 42. Of course, Campos's crimes were not limited to tax violations but, rather, encompassed widespread fraud offenses, through which Campos was able to enrich himself and other members of the Gambino crime family. They also placed the safety of the community in jeopardy. In connection with Campos's orchestration of several of his employees' improperly obtaining, among other things, OSHA OTP training cards without taking the required courses, Campos placed the public, other construction workers and the employees themselves at serious risk.

As the government has detailed to the Court in connection with Kocaj's and Simonlacaj's sentencings, Campos's orchestration of a massive scheme to offer out illicit benefits to obtain business corrupts the construction industry in ways that are difficult to detect, harming the construction companies that Campos cheated, their investors and lenders and others in the system who are playing by the rules. Indeed, the Court has already found, at Kocaj's sentencing, that CWC's provision of benefits to Simonlacaj were bribes. Kocaj Sentencing Tr. at 25-26. The Court should consider Campos's lack of remorse for his participation in this scheme—evidenced in the 25 pages he spends disputing the government's claims in his sentencing submission—in fashioning an appropriate sentence in this case.

Moreover, contrary to Campos's protestations, the government has not "acknowledged" it cannot prove the extortionate collection of credit claims against Campos. Def. Sentencing Mem. at 53. Rather, as noted above, the government has elected not to proceed to a Fatico hearing and is not arguing that Campos's actions amount to extortionate collection of credit under the Sentencing Guidelines. But the Court can and should consider Campos's conduct under § 3553(a). As detailed above, Fiore directly threatened Individual-1 with physical violence, as well as maintained a spreadsheet documenting the collection of money from Individual-1 each week. The evidence demonstrates that Campos and Fiore collected over $100,000 from Individual-1 through this scheme. And Fiore was not acting alone—after repeatedly threatening to knock [Individual-1's] fucking teeth out," Fiore warned Individual-1 that he would have to "deal with him," i.e., Campos. Indeed, this is yet another example of Campos's power and ability to use others to do his criminal bidding—precisely how a powerful captain in La Cosa Nostra operates.

Similarly, the Court should consider Campos's obstructive conduct, outlined above (though the government does not argue that it amounts to obstruction of justice for

purposes of the Guidelines). This conduct includes, in November 2019, Campos and Fiore's directive that an individual who they believed had testified before the grand jury be fired for providing truthful information to the government. Fiore's statements, captured on recorded conversations, seeking to retaliate against a witness on Campos's behalf are certainly relevant to the nature and circumstances of how the racketeering enterprise in this case operates. The same is true of Fiore's efforts to instruct another individual to lie about the circumstances of the Additional Checks scheme described above—that, rather than truthfully state he had returned the money to Fiore for his and Campos's benefit, he should lie about a purported drug addiction or other "bad habits." Fiore instructed the same individual that Campos would pay for his legal expenses and possible financial penalties. These acts provide important insight into the methods and means of this racketeering conspiracy and enterprise on which Campos sat at the top.

B.    Defendant's History and Characteristics

Campos's history and characteristics also weigh in favor of the requested sentence. Noticeably absent from the defendant's sentencing memorandum is an acknowledgement that this is the defendant's second time appearing in this courthouse for sentencing following convictions involving fraud committed with fellow Gambino crime family members. In 2005, Judge Amon sentenced the defendant to 21 months' imprisonment for his participation in a separate fraud scheme, detailed above and in the PSR, which did not deter him from committing additional crimes. And since that conviction, when the defendant was only an associate of the crime family, he has risen its ranks, becoming a powerful captain—a clear indication that specific deterrence is a significant consideration in this case.

Indeed, Campos has demonstrated that he is firmly committed to the Gambino crime family, tasked with attending meetings with other high-level Gambino family members in the wake of Cali's murder, and keeping in his bedroom closet photographs of himself and Martino visiting Frank LoCascio, the underboss of the Gambino family under boss John Gotti in prison, who was serving a life sentence for, among other offenses, murder, until his recent death. See id., Ex. A. The fact that Campos has remained so committed to this organization— even after serving 21 months in federal prison following his prior conviction in this District— shows that, like other members of La Cosa Nostra, Campos is likely to continue to carry out crimes on its behalf going forward.

Although the defendant asserts to the Court in his sentencing memorandum that his mantra is to "put others first," Def. Sentencing Mem. at 1, 4, certainly, the defendant did not put his community first, in violating the tax laws of the United States. He did not put his colleagues or counterparts in the construction industry first, in violating safety standards and defrauding his business partners. He did not put his family first, in choosing to commit crimes punishable by serious prison terms. Indeed, by his actions, the only group the defendant seems to have prioritized is his other family—the Gambino crime family.

The government also disagrees with the defendant's argument that the Court should not impose a fine in light of the $1 million restitution payment agreed to by the parties

in the plea agreement. Of course, fines and restitution serve different purposes—"[t]he purpose of restitution is to compensate victims for their losses," United States v. Gonzalez, 647 F.3d 41, 65 (2d Cir. 2011), whereas the imposition of a fine takes into account, among other things, the "complexity, scope, and . . . nature of criminal activity," United States v. Zukerman, 897 F.3d 423, 429 (2d Cir. 2018). Campos's argument that the restitution judgment in this case sends an ample "punitive message" thus apparently misunderstands the purpose of restitution. Def. Sentencing Mem. at 58. Of course, the Court should consider the defendant's financial circumstances in imposing a fine and here, they are substantial. Campos has real estate assets totaling $2.7 million and more than $900,000 in escrow accounts—not to mention four cars and luxury watches. PSR ¶ 199-200. His net worth is $3.55 million. Id. Even assuming his unsworn statements in his sentencing brief regarding the partial depletion of certain of his assets to pay restitution and attorney's fees is true, he is nonetheless left with significant financial assets, and is clearly able to pay a fine at the top of the $15,000 to $150,000 fine range. For the reasons detailed herein, including that, like Simonlacaj and Kocaj, the defendant's commission of the instant crimes was motivated by greed, not need, the government submits that a substantial fine at the top of that range is warranted in this case.

Finally, Campos asserts that his period of pretrial supervision and the COVID-19 pandemic weigh in favor of a non-Guidelines sentence. As the government argued in connection with Kocaj's sentencing, the defendant's pretrial release conditions were put in place to protect the safety of the community and to minimize the defendant's risk of flight—not to satisfy the mandates of 18 U.S.C. § 3553(a) at sentencing.



In short, Campos's history and characteristics compel the government's requested sentence.

C.    <u>Affording Deterrence and Protecting the Public</u>

A sentence of 46 months' imprisonment is also necessary to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) and (C).

---

11

1.      Specific Deterrence

The defendant asserts that specific deterrence is not necessary here because he has demonstrated that he has a "good character." Def. Sentencing Mem. at 18. The Court can and should consider all of the circumstances placed before it, including a defendant's good deeds. But the Court cannot turn a blind eye to the defendant's longstanding disrespect for the law and its consequences. Indeed, Campos fails to address the repeated, documented instances in which he has facilitated others' evasion of court-ordered supervised release conditions by, among other things, meeting together and passing messages to one another. As detailed above, Campos and Martino used intermediaries, including co-defendant Frank Tarul, to pass messages to one another and set up clandestine meetings—all in the context of participating in and running a long-standing criminal organization.

And, of course, that Campos committed the instant crimes after serving a prior federal sentence for fraud committed with members of the Gambino crime family demonstrates that incapacitation is necessary to serve as a specific deterrent and to protect the community from the defendant's life of crime. Indeed, as a member of the Gambino crime family, the defendant has sworn allegiance to it for life—a factor that significantly undercuts Campos's argument that he will not recidivate due to his age.[12] The defendant's prior periods of incarceration, his disrespect for supervised release conditions and his commitment to his crime family all strongly suggest that this defendant will not stop committing crimes on its behalf. Accordingly, specific deterrence compels a significant period of incarceration in this case.

2.      General Deterrence

As the government has detailed for the Court, general deterrence also warrants a 46-month sentence. Campos's crimes involved the offer and receipt of bribes from the Gambino crime family, a pernicious criminal organization whose substantial influence in the construction industry and the New York City community more generally persists. Campos oversaw a criminal conspiracy that helped award valuable, multi-million dollar contracts and payments to CWC, thereby enriching the Mafia all while robbing the American taxpayer. Indeed, as this Court noted in sentencing Kocaj, a significant sentence is important to acting as a general deterrent to others who, like Campos, would seek to enrich themselves and their organization through widespread corruption. See Kocaj Sentencing Tr. 28. Indeed, this case has received publicity—and particularly in publications that cover developments in the real estate and construction industries—and a substantial incarceratory sentence is warranted here to demonstrate to the construction industry that obtaining free benefits in exchange for doling out work cannot stand, as well as to send a message that enriching the Mafia and furthering its systematic influence in the construction industry will result in a significant sentence. Moreover, the Court acknowledged in connection with the Simonlacaj sentencing the

---

[12] For the same reason, numerous organized crime defendants—including, in this case, the defendant's father, George Campos—continue to commit crimes throughout their lives.

importance of general deterrence in tax cases in particular so as to promote respect for the law. Simonlacaj Sentencing Tr. at 41. The need is all the more powerful where, as here, the defendant is a high-ranking member of an LCN crime family.

> D.      Reflecting the Seriousness of the Offenses, Promoting Respect for the Law
> and Providing Just Punishment

Finally, a period of incarceration and fine at the top of the Guidelines range would promote respect for the law and provide just punishment, for all of the reasons detailed herein—but to particularly demonstrate that the laws should apply equally and that, regardless of Campos's wealth or connections, he should be held accountable for his crimes.

V.      Conclusion

Given all of the facts and circumstances discussed above, the government respectfully submits that leniency toward the defendant is unwarranted and would not satisfy the statutory purposes of sentencing.  Therefore, a sentence of 46 months' imprisonment and a fine at the top of the Guidelines range is sufficient, but not greater than necessary, in this case.

Respectfully submitted,

BREON PEACE
United States Attorney

By:  _____/s/_____
Kayla Bensing
Assistant U.S. Attorney
(718) 254-6279

cc:    Clerk of Court (AMD) (by ECF and e-mail)
Defense Counsel (by ECF and e-mail)
Roberta Houlton, Probation Officer (by e-mail)

# Exhibit A:

## Photographs of Items Seized from Campos's Home in June 2019

